# EXHIBIT A

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

GREGORY PARRY,

        Plaintiff,

v.

HOSPICE OF MICHIGAN, INC., *a Michigan non-profit corporation*, et al.

        Defendants.

Case No. 2:22-cv-11328-DPH-DRG

Hon. Denise Page Hood

---

| | |
|---|---|
| Sarah S. Prescott (P70510)<br>Annemarie Smith-Morris (P87221)<br>SALVATORE PRESCOTT<br>PORTER & PORTER, PLLC<br>*Attorneys for Plaintiff*<br>105 East Main Street<br>Northville, MI 48167<br>(248) 679-8711<br>prescott@sppplaw.com<br>smith-morris@sppplaw.com | David R. Deromedi (P42093)<br>Angelina Rose Delmastro (P81712)<br>DICKINSON WRIGHT PLLC<br>*Attorneys for Defendant*<br>500 Woodward Ave., Suite 4000<br>Detroit, MI 48226<br>(313) 223-3048<br>dderomedi@dickinsonwright.com<br>adelmastro@dickinsonwright.com |
| Kenneth M. Mogill (P17865)<br>MOGILL, POSNER & COHEN<br>*Attorneys for Plaintiff*<br>27 E. Flint St., 2nd Floor<br>Lake Orion, MI 48362<br>(248) 814-9470<br>kmogill@bignet.net | |

---

## PLAINTIFF GREGORY PARRY'S SUR-REPLY TO DEFENDANTS' MOTION TO PARTIALLY DISMISS PLAINTIFF'S COMPLAINT

## INTRODUCTION

In Defendants' Motion to Partially Dismiss Plaintiff's First Amended Complaint, which was filed almost two years ago, Defendants primarily alleged that Plaintiff failed to "demonstrate the 'when, where, in what or by whom'" with regard to his claims, impeding Defendants' ability to defend against those claims. (ECF No. 6, PageID.39). For the reasons expressed in his responsive brief, Plaintiff still disagrees with this accusation. Now, however, Defendants' concern has also been proven unfounded by the successful litigation of this case over the past two years. Plaintiff files this sur-reply to notify the Court that Defendants' concern is moot, such that the Court can preserve its scarce judicial resources in expeditiously denying Defendants' Motion to Partially Dismiss.

## FACTS

Plaintiff filed his complaint on June 15, 2022. (ECF No. 1, Complaint and Jury Demand). Before Defendants answered, Plaintiff filed a First Amended Complaint on July 20, 2022. (ECF No. 4, First Amended Complaint). On August 3, 2022, Defendants filed a Motion to Partially Dismiss Plaintiff's First Amended Complaint, predominantly on grounds they felt Plaintiff failed to allege sufficient facts to support liability. (ECF No. 6, PageID.38). Defendants requested dismissal of Plaintiff's FCA retaliation claim against all Defendants, the public policy claim against the individual Defendants, and the MFCA claim against the

individual Defendants.  (*Id.* at PageID.27).  Plaintiff filed a response on August 31, 2022, opposing Defendants' argument, but, in the alternative, requesting the opportunity to amend his Complaint to include additional factual allegations. (ECF No. 9, Plaintiff's Response to Defendants' Motion to Partially Dismiss Plaintiff's First Amended Complaint).

While awaiting the Court's ruling, the parties proceeded with discovery.  The Court has not yet ruled on Defendants' motion to dismiss, nor Plaintiff's conditional request to amend his Complaint.  Discovery in the case concluded in April 2024, and the dispositive motion deadline passed on May 6, 2024.  As no party filed any motion for summary judgment, the parties await a trial date.

## LAW AND ARGUMENT

A prime thrust of the pending 12(b)(6) motion is that it fails to plead a claim according to the standards of Federal Rule of Civil Procedure 8.  For all the reasons already stated, Plaintiff stands on his opposition of this argument.

However, if it is more efficient, or if this Court feels there are inadequacies in the First Amended Complaint, Plaintiff can easily resolve any remaining inadequacies without prejudicing Defendants by expanding the Complaint's factual allegations, without altering the counts alleged, legal arguments or other fundamentals of the case. An amendment of this nature would not require the

reopening of discovery, nor any change in strategy on the part of Plaintiff or Defendants; it would simply expand the facts alleged.

Plaintiff has included a proposed Second Amended Complaint as **Ex. I** to this motion, again should it aid the Court in cutting through this argument, which Plaintiff urges is inapt.

## **CONCLUSION**

For these reasons, Plaintiff respectfully requests this Court deny Defendants' Motion to Partially Dismiss Plaintiff's First Amended Complaint, or, in the alternative, permit Plaintiff to file a Second Amended Complaint (see **Ex. I**).

Respectfully submitted,

Dated: June 19, 2024
/s/ Sarah S. Prescott
Sarah S. Prescott (P70510)
Annemarie Smith-Morris (P87221)
SALVATORE PRESCOTT
PORTER & PORTER, PLLC
*Attorneys for Plaintiff*
105 East Main Street
Northville, MI 48167
(248) 679-8711
prescott@sppplaw.com
smith-morris@sppplaw.com

and

Kenneth M. Mogill (P17865)
MOGILL, POSNER & COHEN
*Attorneys for Plaintiff*
27 E. Flint St., 2nd Floor
Lake Orion, MI 48362
(248) 814-9470
kmogill@bignet.net

## CERTIFICATE OF SERVICE

I hereby certify that on June 19, 2024, I e-filed the foregoing document with the Clerk of the Court via the Court's electronic filing system, which will serve a notice of electronic filing and copy of the same to all counsel of record.

Dated: June 19, 2024                    /s/ Tara L. Lank
                                        Tara L. Lank, Paralegal

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

GREGORY PARRY,

       Plaintiff,

v.

HOSPICE OF MICHIGAN, INC., *a Michigan non-profit corporation*, et al.

       Defendants.

Case No. 2:22-cv-11328-DPH-DRG

Hon.  Denise Page Hood

---

| | |
|---|---|
| Sarah S. Prescott (P70510) <br> Annemarie Smith-Morris (P87221) <br> SALVATORE PRESCOTT <br> PORTER & PORTER, PLLC <br> *Attorneys for Plaintiff* <br> 105 East Main Street <br> Northville, MI 48167 <br> (248) 679-8711 <br> prescott@sppplaw.com <br> smith-morris@sppplaw.com | David R. Deromedi (P42093) <br> Angelina Rose Delmastro (P81712) <br> DICKINSON WRIGHT PLLC <br> *Attorneys for Defendant* <br> 500 Woodward Ave., Suite 4000 <br> Detroit, MI 48226 <br> (313) 223-3048 <br> dderomedi@dickinsonwright.com <br> adelmastro@dickinsonwright.com |
| Kenneth M. Mogill (P17865) <br> MOGILL, POSNER & COHEN <br> *Attorneys for Plaintiff* <br> 27 E. Flint St., 2nd Floor <br> Lake Orion, MI 48362 <br> (248) 814-9470 <br> kmogill@bignet.net | |

---

## <u>INDEX OF EXHIBITS TO PLAINTIFF GREGORY PARRY'S SUR-REPLY TO DEFENDANTS' MOTION TO PARTIALLY DISMISS PLAINTIFF'S COMPLAINT</u>

| Exhibit | Description |
| --- | --- |
| I. | Proposed Second Amended Complaint |

# EXHIBIT I

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

GREGORY PARRY,

                Plaintiff Parry,

v.

HOSPICE OF MICHIGAN, INC., *a Michigan non-profit corporation*, et al.

                Defendants.

Case No. 2:22-cv-11328-DPH-DRG

Hon. Denise Page Hood

---

Sarah S. Prescott (P70510)
Annemarie Smith-Morris (P87221)
SALVATORE PRESCOTT
PORTER & PORTER, PLLC
*Attorneys for Plaintiff Parry*
105 East Main Street
Northville, MI 48167
(248) 679-8711
prescott@sppplaw.com
smith-morris@sppplaw.com

Kenneth M. Mogill (P17865)
MOGILL, POSNER & COHEN
*Attorneys for Plaintiff Parry*
27 E. Flint St., 2nd Floor
Lake Orion, MI 48362
(248) 814-9470
kmogill@bignet.net

David R. Deromedi (P42093)
Angelina Rose Delmastro (P81712)
DICKINSON WRIGHT PLLC
*Attorneys for Defendant*
500 Woodward Ave., Suite 4000
Detroit, MI 48226
(313) 223-3048
dderomedi@dickinsonwright.com
adelmastro@dickinsonwright.com

---

## PROPOSED SECOND AMENDED COMPLAINT

Plaintiff Parry, by his undersigned attorneys, brings this Second Amended

Complaint pursuant to the False Claims Act, 31 U.S.C. § 3729 et seq., MCL

400.610c and the common law of the State of Michigan.

**PARTIES, JURISDICTION AND VENUE**

1.     Plaintiff Parry (referred to herein as "Plaintiff Parry" or "Mr. Parry") is an individual who resides in Michigan.

2.     Defendant Hospice of Michigan, Inc., frequently d/b/a NorthStar Care Community, is the largest non-profit hospice and palliative care provider throughout lower Michigan and is affiliated with subordinate Michigan-based non-profit hospice and palliative care entities, including Arbor Hospice, Inc.; NorthStar Palliative Care, Inc.; and Supportive Care Services of Michigan, Inc., formerly d/b/a @HOMe Support, now d/b/a NorthStar Solutions Group.  Recently, Defendant announced an affiliation with the University of Michigan to expand hospice care to Northern Michigan.  Defendant Hospice of Michigan's principal place of business is in this District.

3.     Defendant Robert Cahill was President and Chief Executive Officer ("CEO") of Defendant Hospice of Michigan from 2014 until well after this case was filed, near the end of 2023. On information and belief, Mr. Cahill joined Hospice of Michigan in or around 1998 and held a number of executive and office positions prior to being named CEO.

4.     Defendant Patrick Miller is Hospice of Michigan's current CEO. From 2014 until the end of 2023, he was Executive Vice President, Chief

Operating Officer ("COO"). On information and belief, Mr. Miller joined Hospice of Michigan in or around 2007 and held a number of executive and office positions prior to being named COO. Today, Mr. Miller has been promoted to CEO.

5. Defendant Lee Ann Meyers is Hospice of Michigan's current Executive Vice President, Chief Administrative Officer. From 2017 until the end of 2023, she was Executive Vice President, Chief Financial Officer ("CFO"). On information and belief, Ms. Myers joined Hospice of Michigan in or around 2000 and held a number of executive and office positions prior to being promoted during this suit.

6. This Court has subject matter jurisdiction over this action pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. § 1331, in that this action arises under the laws of the United States.

7. Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b) and 1391(c), and also pursuant to 31 U.S.C. § 3732(a), because Defendant transacts business within this District and acts proscribed by the False Claims Act occurred within this District.

8. This Court has supplemental jurisdiction over Plaintiff Parry's closely related State law claims pursuant to 28 U.S.C. § 1367.

## GENERAL ALLEGATIONS

9.      In October 2015, Defendant Hospice of Michigan ("HOM") hired Plaintiff Parry as Director of Contract Services.

10.     Throughout his tenure at HOM, Plaintiff Parry reported most directly to then-CFO, Defendant Lee Ann Myers.

11.     Based on his excellent performance, Plaintiff Parry was promoted multiple times over the next six years.

12.     Plaintiff Parry received numerous accolades and positive reviews, which glowed about his performance and people skills.

13.     On July 20, 2021, less than seven months after Plaintiff Parry's most recent promotion to Vice President and General Counsel, and days after his most recent positive evaluation, Defendants terminated Plaintiff Parry's employment without forewarning or any lawful basis.

14.     Plaintiff Parry had no prior disciplinary history or negative performance evaluation of any sort before that time.

## PARRY IS DRAWN INTO FRAUDULENT SCHEME, GATHERS EVIDENCE OF CRIMINAL CONDUCT

15.     The story of how Plaintiff Parry moved from a highly praised, regularly promoted, valued employee to termination began in January 2021, when Defendants Myers and Miller requested that Plaintiff Parry draft a contract for a

4

particular part-time caregiver many layers below the C-suite, a man named Rabbi Joey Krakoff.

16.    Defendants Myers and Miller instructed Plaintiff Parry to model Krakoff's contract after a 2010 contract between HOM and another local rabbi, E.B. Freedman, for spiritual care services.

17.    Plaintiff Parry was not familiar with either Krakoff or Freedman, and he had never before been asked to do something like this: in a company of hundreds of employees with often high turnover, it was unheard of for the Company's CFO and COO to personally oversee a single part-time caregiver's hire.

18.    As Plaintiff Parry worked on the assignment, he became concerned that the 2010 Freedman contract was the pretextual cover for illegal kickbacks to induce Freedman and the company he founded and ran, Jewish Hospice & Chaplaincy Network ("JHCN"), to refer patients to HOM.

19.    JHCN supposedly provided free end-of-life spiritual guidance to Jewish community members, and as such, it frequently referred Jewish community members to area hospices.  In short, JHCN was a regular provider of referrals to HOM.

20.     In fact, as Parry worked on this matter, Defendant Miller told Plaintiff Parry that JHCN (via Freedman) was responsible for more referrals to HOM than any other source over many years.

21.     Because HOM receives about 87% of its income from Medicare and Medicaid, any payments or in-kind "freebies" given by HOM to Freedman or JHCN to induce referrals would violate the Anti-Kickback Statute ("AKS") and/or the False Claims Act ("FCA").

22.     Plaintiff Parry identified a number of red flags with regard to HOM's arrangement with Freedman and JHCN as he investigated the Krakoff assignment.

23.     First, JHCN was **supposed** to provide a <u>charitable</u>, community benefit – that is, to be a free resource to dying Jewish individuals, to provide gratis spiritual aid and comfort.  In that respect, many rabbis affiliated with JHCN made themselves available to patients to provide spiritual care for <u>free</u>.

24.     Defendant Miller admitted to Plaintiff Parry that HOM did not pay **those** rabbis at all—again, JCHN was **supposed** to help arrange free services….and it certainly fundraised off of bereaved Jewish families by claiming that it was *giving away* its services.

25.     That was only partly true: under the agreement Plaintiff Parry was asked to reconstitute, HOM paid *Freedman* $40,000 for the spiritual care services he arranged for the other rabbis to give for free.

26.     In fact, since 2010, HOM had been paying Freedman *individually*—i.e., under his social security number—and at his home address, rather than through Freedman's charity, JCHN.

27.     Defendant Miller told Plaintiff Parry that HOM had agreed to do this because JHCN's board imposed "a salary max [ ] and anything paid to [Freedman] through [JHCN] would likely face that limit."

28.     In other words, HOM paid Freedman under the table to help him hide from the charity that he received over $40,000 a year from HOM, in addition to his $400,000 salary it granted him.

29.     Beyond the above, the notion of duplicating Freedman's 2010 contract as a template was not sensible given HOM's standard business practices.  Among other things, it had never been updated in over a decade.

30.     In any case, HOM's actual practice with Freedman over many years never honored the written contractual terms, and truly was a thin cover for funneling the man money.

31.     Specifically, the agreement to be duplicated stated that Freedman was supposed to bill for services and be paid by the hour, for time actually worked, yet HOM's accounts showed that it had paid Freedman a salary amount (about $3,446, or twice the maximum permitted under the contract) every month since May 2010.

32.     The tally of pay to Freedman, per HOM's records, is:

Payments by Year

| Row Labels | Sum of Payment Amount |
|---|---|
| 2010 | 27,564.80 |
| 2011 | 41,776.60 |
| 2012 | 41,354.20 |
| 2013 | 41,341.80 |
| 2014 | 41,356.80 |
| 2015 | 41,356.80 |
| 2016 | 41,356.80 |
| 2017 | 41,356.80 |
| 2018 | 41,356.80 |
| 2019 | 41,356.80 |
| 2020 | 41,356.80 |
| 2021 | 41,356.80 |
| 2022 | 42,892.80 |
| **Grand Total** | **525,784.60** |

33.     As another example, legitimate HOM staff providing actual spiritual care were expected to "chart," i.e., medically record patient visits, yet Freedman did not do so and had no access to the HOM electronic medical record system to do so.   Thus, when Parry was looped into this situation, he could see a history of payments and then confirmed there existed no history of medical records by Freedman to justify those payments.

34.     Worse, HOM at times paid Freedman whether or not he worked at all. That is, Freedman was a contractor set up to be paid by ACH whether he invoiced

work or not.  This was a unique arrangement in all of HOM; no other individual got such treatment.

35.     Finally, contracting for rabbinical (or any spiritual) services is not even permissible under Federal law for entities like HOM.

36.     Medicare Conditions of Participation are rules that hospices like HOM must follow in order to receive reimbursement for services provided to Medicare patients.  These rules categorize spiritual care as a "core" service, which hospices **must** provide through full-time, formal hospice employees.

37.     The fact that HOM had been paying Freedman for these services as a contractor for over a decade ran afoul of Medicare rules, no matter what he was paid or how many referrals he provided.

38.     The pay given to Freedman was also wildly out of step with others who did not direct a major flow of referrals, but who provided similar services, as Parry learned.

39.     For example, HOM had a contract with a different Jewish community group to train staff on Jewish traditions—one of the services Freedman supposedly performed for HOM—for just $1,600 **per year** total.

40.     Likewise HOM had previously contracted Muslim Spiritual Care and Hospice Network, but these contractors received half of Freedman's rate of pay, were only permitted to work half as many hours, were required to submit true

invoices each month, and were paid under company Tax ID numbers, rather than social security numbers.

41.    HOM had also terminated these contracts with the Muslim Spiritual Care and Hospice Network–but not Freedman's–around 2014 because of "sequestration cuts."

42.    In addition, Plaintiff Parry could locate no evidence that HOM screened Freedman's background, or supervised him in any way, or trained him on evolving standards such as on HIPAA or COVID-19 or other safety requirements, nor that JHCN had executed a HIPAA agreement, nor that it had malpractice insurance in place–all omissions which were unprecedented. No person or entity within HOM had any similar treatment.

43.    Meanwhile, the connection between HOM's payments to Freedman and referrals by him was explicit.

44.    For example, an internal HOM document Parry found analyzed the "return on investment" HOM was getting from paying Freedman; in other words, the document analyzed whether the cost of paying Freedman was worth the additional patient census value from his referrals.

45.    Later, when Krakoff was to be put on payroll, other internal documents and communications did the same thing: discussing how, for the pay to Krakoff, HOM expected he would grow census, that is, bring in new patients.

(This function of advertising or growing census is the role of inside marketing staff, and not part of the job description of any bona fide spiritual caregiver).

46.    In short, Plaintiff Parry was deeply concerned that the contract Defendants Myers and Miller instructed he draft for Krakoff was simply an expansion of an illegal kickback scheme that had been used to ensure Rabbi Freedman directed as many Jewish patients to HOM as possible.

47.    Krakoff was Freedman's heir apparent at the organization, but there was no basis for paying him anything.

48.    After all, HOM had its own in-house, full-time spiritual caregivers already, as the Conditions of Participation **required**.

49.    When Plaintiff Parry was approached to put Krakoff on the payroll, HOM had no opening and had not initiated conversations about developing a contract for Krakoff based on patient need or a backfill of an opening.

50.    Instead, as Parry learned, in 2020 ***Freedman*** had demanded that HOM add Krakoff to its payroll because he was thinking of retiring in a few years. While he meandered toward retirement, he wanted his own payoffs to continue, plus for Krakoff to now also be paid monthly by HOM as well.

51.    Defendant Miller gave Plaintiff Parry no list of substantive duties to include in Krakoff's contract, however; in fact, as noted above, internal memos showed one of the only "duties" that Miller requested Plaintiff Parry include was

that Krakoff "grow census for Arbor Hospice," a HOM affiliate, i.e., that he recruit patients in return for pay.

## HOM PROVIDES COMPUTERS, SOFTWARE, AND TECH SUPPORT TO JHCN AS A KICKBACK FOR REFERRALS

52.     Kickbacks made illegal by Federal law are not limited to cash payments.  If anything is provided in-kind (without charge) to a medical provider to induce referrals, that is also illegal.

53.     HOM spent the mid-2010s developing a service whereby it would aid organizations in the medical field by providing IT support and software to them.  It stood up a subsidiary to do just that in about 2016 and began charging fair market value for those goods and services to third parties, under carefully circumscribed written contracts.

54.     However, when JHCN needed computers, IT support, software licenses and the like in the same timeframe, HOM simply provided those to it *for free* without any contract and without invoicing for them–at all.

55.     Year in and year out from about 2016 until 2021, it also provided expensive licenses and immediate 24-hour responses and report writing and other technical support on demand to JHCN for free.

56.     No one at HOM can give any lawful explanation how or why this happened, especially when HOM was busy charging for these various services to many others.

57.     Parry discovered this scheme in 2021, shortly before he was fired.

## HOM CEO IGNORES BYLAWS, PROVIDES CASH GIFTS TO JHCN AS A KICKBACK FOR REFERRALS

58.     HOM has a Board of Directors and operates, ostensibly, pursuant to bylaws.

59.     Among the HOM bylaws is a provision that limits what assets of HOM the CEO can give away, without Board consent and approval.

60.     The named Defendants approved and processed cash "donations" to JHCN in excess of these bylaw-limited amounts, without disclosure to the Board and without its required approval.  The following "donations" were made to JHCN:

| Date | Name | Amount | Type |
| --- | --- | --- | --- |
| 3/22/2022 | Hospice of Michigan | $10,000.00 | Donation |
| 1/13/2020 | Hospice of Michigan | $20,000.00 | Donation |
| 1/7/2019 | Hospice of Michigan | $20,000.00 | Donation |
| 11/6/2017 | Hospice of Michigan | $15,000.00 | Donation |
| 12/5/2016 | Hospice of Michigan | $20,000.00 | Donation |
| 12/14/2015 | Hospice of Michigan | $20,000.00 | Donation |
| 1/2/2015 | Hospice of Michigan | $15,000.00 | Donation |
| 12/23/2013 | Hospice of Michigan | $15,000.00 | Donation |
| 12/17/2012 | Hospice of Michigan | $15,000.00 | Donation |
| 2/17/2012 | Hospice of Michigan | $15,000.00 | Donation |
| 2/28/2011 | Hospice of Michigan | $10,000.00 | Donation |
| 2/2/2010 | Hospice of Michigan | $5,000.00 | Donation |
| 2/19/2009 | Hospice of Michigan | $1,000.00 | Donation |
| TOTAL | | $181,000.00 | |

61.     The "cover" used for these gifts was "supporting" JHCN conferences. However, even when a conference did not happen—as in 2020 during COVID-19—the "donations" continued.

62.     These payments were made to elicit and sustain the referral stream from Rabbi Freedman.

## HOM SUPPLIES A FULL TIME, IN-KIND EMPLOYEE TO JHCN

63.     Parry also discovered that HOM's now-CEO Patrick Miller had long ago agreed to pay a full salary to a JHCN affiliate, Natalie Rosenfield, who did not work at HOM at all.

64.     In short, HOM provided a free, in-kind, full-time employee to JHCN to do with what it wanted, and it maintained her as a HOM employee on paper, so she could also get free benefits.

65.     Defendant Miller explained to Plaintiff Parry that Rabbi Freedman had asked HOM to give Rosenfield a job back in 2017 to help her get health care benefits that JHCN did not provide at the time.  Miller agreed to do so.  Neither can explain why JHCN, an entity with a multi-million dollar endowment, could not pay for Rosenfield to obtain medical care coverage.

66.     In 2021, when he was dragged into this situation, Plaintiff Parry recognized this as a form of insurance fraud, in which HOM was representing that

Rosenfield was a bona fide employee who qualified for its employee plans, when in fact she was an employee on paper only.

67.     Rosenfield's true job was for JHCN, and it was to help local Jewish people looking for hospices to find appropriate hospice care.

68.     Rosenfield did a good job referring patients to her benefactor—the vast majority of JHCN's Jewish patients seeking hospice care were referred to and enrolled with HOM.

69.     As Plaintiff Parry dug deeper into the ties between HOM and Freedman, all evidence pointed to an illegal kickback scheme.

## PARRY OPPOSES FRAUD AND KICKBACKS

70.      In May, June, and July 2021, Plaintiff Parry explicitly opposed HOM's relationships with Freedman, Krakoff, Rosenfield, and JHCN as illegal kickbacks or intended kickbacks (in the case of Krakoff) that were unlawful under the AKS and FCA.

71.     Plaintiff Parry told Myers and Miller on or around May 15, 2021 to stop all payments to and cut ties with Freedman, during a recorded meeting.

72.     Plaintiff Parry also refused to draft the new contract for Krakoff and explained that doing so would likely constitute a violation of the AKS/FCA.

73.     Plaintiff Parry further stated that HOM must terminate Rosenfield's supposed employment.

74.     In light of Plaintiff Parry's opposition, Defendant Miller spoke of cleaning up the situation, joking that even if Defendant Myers might look good in "an orange jumpsuit," he would not.

75.     But as Plaintiff Parry suggested concrete ways to unwind the unlawful scheme, Defendant Miller countered over and over again with ways to hide the facts, rather than correct the conduct.

76.     For example, he favored removing public-facing evidence that Natalie Rosenfield actually worked for JHCN, such as editing JHCN's website to remove her, rather than cutting ties.

77.     They could not remove Rosenfield, he said, because, as JHCN's staff member responsible for telling local Jewish families where to go for hospice care, she was "the belly button," he said, "it's an important position."

78.     Defendant Miller also opposed making *any* changes to the arrangement with Freedman, such as requiring the Rabbi to make a record of whom he supposedly cared for, in order to be paid.

79.     Defendant Miller justified the relationship with Freedman and JHCN by telling Plaintiff Parry there were some ways to justify the relationship, and, after all, it was not **only** a scheme to buy referrals: "It's not–this isn't *just* a, you know, pay for referrals [thing]."

80.     He also commented to Parry that pressure to correct the payoffs would be justified by a stream of self-serving "bullshit" from Freedman, such as the Rabbi saying "we're religious so we're protected," and that, in short, Freedman would not agree to end the scheme.

81.     In short, Defendant Miller made clear that he understood the "bullshit" from Freedman, about why the scheme could go on, was unsupportable. Yet, at the same time, Defendant Miller shot down various recommended steps to end it.

82.     Defendants Miller and Myers left the recorded meeting with Plaintiff Parry with no discrete action items and no plan to actually end the JHCN kickbacks.

83.     Defendant Miller made sure, however, to clarify that the situation should not be addressed too forcefully or with much detail in writing.

84.     The kickbacks continued in all forms.

85.     No notice to the HOM Board was given as to Plaintiff Parry's concerns.

86.     Naturally, HOM's policies required that a report of suspected kickbacks be immediately investigated, but Defendant Myers was the boss overseeing the Corporate Compliance Officer, and she intentionally withheld the details of the meeting.

87.     By June 2021, Plaintiff Parry sent Myers and Miller the text of the AKS by email, making very clear that their unwillingness to address or change the relationship with Freedman and JHCN were likely in violation of the law.

88.     Notably, the statutory scheme Plaintiff Parry was referencing involves potential criminal sanctions.   Indeed, it is a **<u>felony</u>** to participate in a kickback scheme.

89.     Moreover, the statutes at issue **<u>require</u>** that participants report kickbacks or suspected kickbacks to the government for _**it**_ to decide legality.

90.     Myers and Miller shared Plaintiff Parry's warnings and communications with Defendant Cahill, but still no notice of this situation was delivered to the HOM Board.

91.     By June 2021, Plaintiff Parry concluded that HOM would not correct its misdeeds, self-report, or even stop them going forward as evinced by the ongoing payments to Freedman.

92.     Therefore, he urged Defendant Myers to hire an external law firm to help him bring the situation to a proper resolution.

93.     Defendant Myers flatly rejected self-disclosure, saying the remedies under the False Claims Act were "nothing we can even entertain."   She worried, "just think about the damage that would do," and speculated that no one would snitch on HOM, including Freedman.

94.     She further worried about a whistle blow, asking with the law so bad for HOM,

"I don't know how a plaintiff loses; right?"

95.     That said, she reasoned, "[Freedman] would never disclose, I'm guessing[,] . . . because he has so much more to lose. . . . [H]e's wrapped up in this multiple times over."

96.     This echoed Miller's comments from the prior call in which he noted the "exposure" between JHCN and HOM went "both ways."

97.     At the end of the meeting with Plaintiff Parry, Defendant Myers sketched out a theory in which legal counsel would be hired to paper over the situation and suggested "I'm guessing we would never put anything in writing when it comes to anything around money."

## HOM HIRES FOLEY AND LARDNER IN ORDER TO PLACATE PLAINTIFF PARRY, THEN FIRES THE FIRM UPON RECEIPT OF PRESERVATION NOTICES

98.     Plaintiff Parry ultimately got permission from Defendant Myers (who had received permission from Defendant Cahill) to hire an outside firm, Foley and Lardner ("Foley"), to spearhead an investigation on June 16, 2021 by email, citing her prior experience with the firm.

99. The Foley partner hired to lead the investigation was a highly respected former federal prosecutor.

100. However, the fact was, Defendants Cahill and Miller never intended to actually investigate anything or make independent conclusions or give arm's length advice.

101. Rather, as Defendant Cahill later testified under oath, the primary reason for hiring the firm was to "help" Plaintiff Parry "understand that what we were doing was **not** in violation" of the law, because Parry "brought up some concerns."

102. Unaware of this intention, once HOM retained Foley, Plaintiff Parry reported to the Foley lawyers the facts set forth above, and he sent related documents supporting his findings and concerns.

103. As Foley began its investigation, it noted to Defendant Myers and Plaintiff Parry in a June call that it could not "sugar coat" what the evidence showed; it seemed entirely possible that HOM would have to self-report violating the AKS and FCA.

104. As noted above, this was *not* what Defendant Cahill had anticipated when he agreed to bring in a law firm; it was quickly becoming clear that Foley would perform a real investigation.

105.   Indeed, Foley's attorneys repeatedly asked to meet with Cahill, which he refused on grounds he was busy.

106.   Likewise, Plaintiff Parry insisted that Defendant Miller meet with Foley "today" in an email dated June 29, 2021, which Miller refused, declined, and otherwise avoided.

107.   When Foley instead sent litigation holds to Defendants Cahill, Miller, Myers, and Plaintiff Parry at Parry's insistence and with his help naming custodians, Defendant Cahill instructed Defendant Myers to shut down the work immediately.

108.   Defendant Myers instructed Foley to stop all work and decided, in consultation with Defendants Miller and Cahill, to fire Foley.

109.   Defendant Myers told Plaintiff Parry that HOM had decided to fire Foley on a July 8, 2021 phone call.

110.   Upon receiving this news, Plaintiff Parry responded that they all faced a serious risk of criminal exposure and begged her to reconsider firing Foley.

111.   As before, Myers asked Plaintiff Parry how the government would even find out about the kickbacks.  "Who would blow the whistle?" Myers asked Plaintiff Parry.

112.	Parry responded, "*I* am the whistleblower," noting that he had already escalated the issue, and he could not pretend he had not, and certainly could not be part of an intentional cover up.

113.	On information and belief, none of this was reported to the HOM Board.

114.	As noted above, internal HOM policies required that these latest allegations of violating the AKS had to be handled via a particular investigation process, and overseen by the entity's Compliance Officer.

115.	However, the Compliance Officer answered to Defendant Myers, and Myers violated all internal policies by simply siloing Compliance away from this entire matter.

## HOM COVERS UP, RETALIATES AGAINST PARRY

116.	After the July 8 call, however, the Defendants fully understood that Parry had identified himself as a whistleblower and had engaged in protected conduct.

117.	HOM hired its regular, local counsel that had worked with HOM throughout the decades-long kickback scheme, Health Law Partners ("HLP"), to cover up its mess.

118.   First, Miller contacted Rosenfield in early July, and, as Rosenfield testified under oath, Miller told her she could no longer be paid by HOM to work at JHCN because "there was a whistleblower," namely HOM's "lawyer."

119.   Next, on or around July 15, 2021, HOM presented a bill of over $57,000 to JHCN for the IT freebies and services they had given away to JHCN.

120.   JHCN refused to pay, on the basis that these had been freely-given gifts. The parties later settled the dispute, much later, for a lesser sum.

121.   Meanwhile, Defendant Myers decided to search what, exactly, Plaintiff Parry had sent from his HOM email to Foley and/or to his personal email address.

122.   On July 19, 2021, she received a report from IT and then had it sent to her in paper form that day.

123.   The report unmistakably disclosed Plaintiff Parry's protected conduct, including research into whistleblowing, the AKS/FCA, and Rabbi Freedman's contract.

124.   Emails he had collected, for example, were titled "Whistleblowers Expose Hospice Fraud…." and "Rabbi contract."

125.   Within minutes of receiving the report, Myers called HLP, and it began work on termination documentation for Plaintiff Parry.

126.   Myers also alerted Cahill and Miller to what she had found.

127.   The three individual Defendants quickly agreed that Plaintiff Parry had to go.

128.   The next day, on July 20, 2021, Defendant Myers fired Plaintiff Parry in a call also attended by Jeffrey Ratich, HOM's Director of Human Resources.

129.   During the meeting, Myers told Plaintiff Parry that he was being fired for being "insubordinat[e]" with her during the July 8 call where he had identified himself as a whistleblower.  Her notes show that Parry was too insistent ("bullying" and "trying to intimidate me") as he "shared a list of accusations" she felt were "without any facts or supporting evidence."

130.   If, as Myers claimed, Parry was allegedly rude or inappropriate on the July 8 call, HOM policies **<u>required</u>** there to be a lengthy investigatory process in order to ensure both sides had been heard and understood before termination.

131.   That did not happen.

132.   Defendant Myers also cited as a basis for termination Parry's other explicitly protected conduct, namely "receiv[ing] and accept[ing] confidential information through [his] personal Outlook account."

133.   In particular, she was referencing Parry sending himself materials with which to blow the whistle on the above matter.

134.   When Plaintiff Parry objected to these bases for termination, Myers said that he was an at-will employee and she could fire him for any reason.

135. Plaintiff Parry responded that while he was an at-will employee, he could not be fired for retaliatory purposes.

136. Both Myers and Ratich knew that they had a duty to report and investigate any assertion of retaliation, but they did not do so.

137. Policies also required Human Resources to vet the termination and approve.

138. That also did not happen.

139. After firing Plaintiff Parry, HOM continued to cover up its kickback scheme.

140. Defendant Cahill, who alone reported to HOM's Board of Trustees, never disclosed that Plaintiff Parry had raised concerns about AKS/FCA violations, nor that Plaintiff Parry had alleged his termination was retaliatory, nor that Foley was hired and quickly fired, nor that Defendant Cahill had skirted bylaws to approve large "gifts" to JHCN, nor that HOM had given away HOM freebies related to IT, nor anything about Natalie Rosenfield.

141. During a November 2022 meeting with HOM's management team, Cahill claimed that HOM fired Parry for ***absenteeism***, which is attested by a third party witness—but is wholly contrary to its stated (made up) reasons for the termination.

142. In specific, Defendant Cahill told the staff that Plaintiff Parry had "stopped coming in to work" and that HOM "couldn't reach him" so it fired him.

143. Defendant Myers also took on an entirely different mode of smearing Parry, claiming that he had been inappropriate to her "as a woman." Again, there was no record of this whatsoever.

144. Defendant Cahill testified that this fabrication of yet another excuse for the unlawful termination was developed "after [Parry] was terminated for other reasons" and "had nothing to do with" the termination decision.

## COUNT I
## RETALIATION IN VIOLATION OF
## 31 U.S.C. § 3730(h)

145. Plaintiff Parry incorporates here all previously stated allegations.

146. Defendants employed Plaintiff Parry within the meaning of the anti-retaliation provision of the Federal False Claims Act.

147. Plaintiff Parry engaged in activity protected under the Act when, among other things, he refused to participate in Defendants' scheme to defraud the government, gathered materials in preparation for blowing the whistle on Defendants, and specifically identified himself to Defendant Myers as a whistleblower.

148. Defendant Hospice of Michigan and the individual Defendants each knew of Plaintiff Parry's activities and that these activities were protected under the Act.

149. Defendants terminated Plaintiff Parry's employment, despite the fact that Plaintiff Parry performed his job satisfactorily or better, including as reflected in an unbroken string of surveys and evaluation.

150. Defendants terminated Plaintiff Parry's employment because Defendants were aware that Plaintiff Parry knew of Defendants' unlawful conduct and efforts to conceal that unlawful conduct, and because Defendants knew that Plaintiff Parry refused to participate or acquiesce in the unlawful conduct or its equally unlawful concealment, and refused to condone and join in Defendants' plans to eschew legally mandated self-disclosure, reimbursement, and related processes.

151. Plaintiff Parry made clear intentions of bringing or assisting in a FCA action

152. Defendants' termination of Plaintiff Parry's employment violated 31 U.S.C. § 3730(h).

153. Defendants' actions are the direct and proximate cause of damage to Plaintiff Parry, including, but not limited to: (a) loss of past and future earnings and earning capacity; (b) the value of fringe, profit-sharing, and retirement benefits; (c)

mental and emotional distress, embarrassment, humiliation and anxiety about the future; (d) damage to his good name and reputation; and (e) loss of the ordinary pleasures of everyday life, including the right to pursue gainful occupation of his choice.

## COUNT II
## RETALIATION IN VIOLATION OF MICHIGAN PUBLIC POLICY
### (in the alternative)

154. Plaintiff Parry incorporates here all previously stated allegations.

155. During the course of his employment with Defendants, Plaintiff Parry refused to violate the law, refused to acquiesce and participate in violations of the law, internally opposed Defendants' unlawful policies and practices, and identified himself to Defendants as a whistleblower.

156. Defendants terminated Plaintiff Parry's employment because Defendants were aware that Plaintiff Parry knew of Defendants' unlawful conduct and efforts to conceal that unlawful conduct, and because Defendants knew that Plaintiff Parry refused to participate or acquiesce in the unlawful conduct or its equally unlawful concealment, and refused to condone and join in Defendants' plans to eschew legally mandated self-disclosure, reimbursement, and related processes.

157. Defendants' decision to terminate Plaintiff Parry's employment was thus in retaliation for Plaintiff Parry's refusal to violate the law or acquiesce in violations of law.

158. Defendants' retaliation against Plaintiff Parry violated clearly established public policy of the State of Michigan that an employer may not retaliate against an employee where the reason for the retaliation was the employee's failure or refusal to violate a law or rules and regulations of the State of Michigan or the United States during the course of employment.

159. As a direct and proximate result of the violation, Plaintiff Parry has sustained injuries and damages, including, but not limited to: (a) loss of past and future earnings and earning capacity; (b) the value of fringe, profit-sharing, and retirement benefits; (c) mental and emotional distress, embarrassment, humiliation and anxiety about the future; (d) damage to his good name and reputation; and (e) loss of the ordinary pleasures of everyday life, including the right to pursue gainful occupation of his choice.

## COUNT III
## RETALIATION IN VIOLATION OF MCL 400.610c

160. Plaintiff Parry incorporates here all previously stated allegations.

161. Defendants are employers within the meaning of MCL 400.601 et seq., the Medicaid False Claim Act.

162. Plaintiff Parry had a right pursuant to MCL 400.610c to be free from retaliation because of his participation in an investigation into activity prohibited by the Medicaid False Claim Act.

163. Defendants were aware that Plaintiff Parry had investigated activity prohibited by the Medicaid False Claim Act and its Michigan and federal statutory counterparts.

164. Defendants terminated Plaintiff Parry's employment because of his participation in an investigation into activities prohibited by the Medicaid False Claim Act and its statutory counterparts.

165. Defendants' actions were intentional and in disregard of Plaintiff Parry's rights and sensibilities.

166. As a direct and proximate result of Defendants' violation of Plaintiff Parry's rights as alleged, Plaintiff Parry has sustained injuries and damages, including, but not limited to: (a) loss of past and future earnings and earning capacity; (b) the value of fringe, profit-sharing and retirement benefits; (c) mental and emotional distress, embarrassment, humiliation and anxiety about the future; (d) damage to his good name and reputation; and (e) loss of the ordinary pleasures of everyday life, including the right to pursue gainful occupation of his choice.

## COUNT IV
## DEFAMATION
### (against Defendant Robert Cahill)

167.    Plaintiff Parry incorporates here all previously stated allegations.

168.    Defendant Robert Cahill falsely stated that Hospice of Michigan terminated Plaintiff Parry's employment because of "absenteeism."

169.    Defendant Robert Cahill furthermore falsely stated that Plaintiff Parry had stopped coming into work at HOM and that HOM was unable to reach Plaintiff Parry for long periods of time.

170.    These statements were of and concerning Plaintiff Parry.

171.    Defendant Cahill published these statements to third parties by announcing the falsehood at a meeting of dozens of HOM managers.

172.    Defendant Cahill knew these statements were false, because he had approved the termination of Plaintiff Parry's employment for another reason–namely in retaliation for Plaintiff Parry's whistleblowing activities–and because Plaintiff Parry had no history of absenteeism at HOM.

173.    Plaintiff Parry has suffered harm, including to his reputation and his ability to find a new position after being retaliated against at HOM.

## RELIEF REQUESTED

For all the foregoing reasons, Plaintiff Parry demands judgment against Defendants as follows:

1. Compensatory damages in whatever amount he is found to be entitled;

2. Exemplary damages in whatever amount he is found to be entitled;

3. Punitive damages in whatever amount he is found to be entitled;

4. A judgment for lost wages and benefits;

5. An award of interest, costs and reasonable attorney fees; and

6. Such further relief as equity and justice require in the circumstances.


Respectfully submitted,

SALVATORE PRESCOTT
PORTER & PORTER, PLLC

*/s/ Sarah S. Prescott*
By: Sarah S. Prescott (P70510)
Annemarie Smith-Morris (P87221)
Attorneys for Plaintiff Parry
105 East Main Street
Northville, MI 48167
(248) 679-8711
*prescott@sppplaw.com*
*smith-morris@sppplaw.com*

and

MOGILL, POSNER & COHEN

*/s/ Kenneth M. Mogill*
By: Kenneth M. Mogill (P17865)
Attorneys for Plaintiff Parry
27 E Flint St, 2nd Floor
Lake Orion, MI 48362
(248) 814-9470
*kmogill@bignet.net*

Dated: June 19, 2024

## DEMAND FOR JURY TRIAL

Plaintiff Parry demands a jury trial in the above-captioned matter.

Respectfully submitted,

SALVATORE PRESCOTT
PORTER & PORTER, PLLC

*/s/ Sarah S. Prescott*
By: Sarah S. Prescott (P70510)
Annemarie Smith-Morris (P87221)
Attorneys for Plaintiff Parry
105 East Main Street
Northville, MI 48167
(248) 679-8711
*prescott@sppplaw.com*
*smith-morris@sppplaw.com*

and

MOGILL, POSNER & COHEN

*/s/ Kenneth M. Mogill*
By: Kenneth M. Mogill (P17865)
Attorneys for Plaintiff Parry
27 E Flint St, 2nd Floor
Lake Orion, MI 48362
(248) 814-9470

Dated: June 19, 2024          *kmogill@bignet.net*