Rabbi E.B. 'Bunny' Freedman
March 13, 2024

                    UNITED STATES DISTRICT COURT

                   EASTERN DISTRICT OF MICHIGAN

                        SOUTHERN DIVISION


GREGORY PARRY,

          Plaintiff,

-vs-                          Case No. 2:22-cv-11328-DPH-DRG

HOSPICE OF MICHIGAN, INC.,   Hon. Denise Page Hood

A Michigan non-profit

corporation, et al.,

          Defendants.

~~~~~~~~~~~~~~~~~~~~~~~~~/

DEPONENT:    RABBI ELCHONON BUNIM "BUNNY" FREEDMAN

DATE:        Wednesday, March 13, 2024

TIME:        9:36 a.m.

LOCATION:    Plunkett Cooney

             38505 Woodward Avenue, Suite 100

             Bloomfield Hills, Michigan


REPORTER:    John J. Slatin, RPR, CSR-5180

             Certified Shorthand Reporter


             (Appearances listed on page 2)

Rabbi E.B. 'Bunny' Freedman
March 13, 2024

**Page 2**

```
1   APPEARANCES:
2
3       SARAH S. PRESCOTT (P70510)
4       ANNEMARIE SMITH-MORRIS (P87221)
5       Salvatore Prescott Porter & Porter, PLLC
6       105 East Main Street
7       Northville, Michigan  48167
8       (248) 679-8711
9       prescott@sppplaw.com
10      smith-morris@sppplaw.com
11          Appearing on behalf of the Plaintiff.
12
13      DAVID R. DEROMEDI (P42093)
14      Dickinson Wright, PLLC
15      500 Woodward Avenue, Suite 4000
16      Detroit, Michigan  48226
17      (313) 223-3048
18      dderomedi@dickinsonwright.com
19          Appearing on behalf of the Defendant.
20
21
22          (Appearances continued on page 3)
23
24
25
```

**Page 3**

```
1   APPEARANCES (CONTINUED):
2
3       BRIAN T. McGORISK (P44363)
4       Plunkett Cooney
5       111 E. Court Street, Suite 1B
6       Flint, Michigan  48502
7       (810) 342-7005
8       bmcgorsik@plunkettcooney.com
9           Appearing on behalf of The Witness.
10
11      BRIAN H. HERSCHFUS (P41567)
12      Wood Kull Herschfus Obee & Kull, P.C.
13      37000 Grand River Avenue, Suite 290
14      Farmington Hills, Michigan  48335
15      (248) 476-2000
16      bhh@woodkull.com
17          Appearing on behalf of Jewish Hospice &
18          Chaplaincy Network and The Witness.
19
20      ALSO PRESENT:  Gregory Parry
21
22
23
24
25
```

**Page 4**

```
1                   TABLE OF CONTENTS
2
3   WITNESS                                     PAGE
4
5   RABBI ELCHONON BUNIM "BUNNY" FREEDMAN
6
7       Examination by Ms. Prescott               8
8
9   EXHIBITS (Attached):                  IDENTIFIED
10
11      Exhibit 1   Stipulated Protective Order    7
12      Exhibit 2   United States District         8
13                  Court, Eastern District of
14                  Michigan, Subpoena
15      Exhibit 3   Jewish Hospice and            58
16                  Chaplaincy Network and
17                  Hospice of Michigan,
18                  Proposal for Collaboration,
19                  7-1-2002
20      Exhibit 4   E-mail string from Miller    139
21                  dated 10-26-20
22      Exhibit 5   E-mail string from Feeedman  149
23                  dated 11-16-20
24
25          (Exhibits continued on page 5)
```

**Page 5**

```
1   EXHIBITS (Continued):                 IDENTIFIED
2
3       Exhibit 6   Letter of Agreement Between  216
4                   Rabbi Elchonon Freedman and
5                   Hospice of Michigan
6       Exhibit 7   Intro notes document         223
7       Exhibit 8   Spiritual Care Services      237
8                   Agreement
9       Exhibit 9   Letter of Agreement Between  238
10                  Rabbi Elchonon Freedman and
11                  Hospice of Michigan
12      Exhibit 10  Confidentitaly(sic) Agreement 243
13                  document
14      Exhibit 11  Hospice of Michigan          246
15                  Spiritual Care Agreement
16      Exhibit 12  E-mail string from Freedman  247
17                  dated 1-30-22
18      Exhibit 13  E-mail string from Lazar     253
19                  dated 2-1-22
20      Exhibit 14  E-mail string from Miller    264
21                  dated 6-15-10
22      Exhibit 15  Statement for Contract       266
23                  Services dated 8-4-10
24
25          (Exhibits continued on page 6)
```

Rabbi E.B. 'Bunny' Freedman
March 13, 2024

Page 6

1  EXHIBITS (Continued):                                 IDENTIFIED
2
3      Exhibit 16    Summary of Services Provided    269
4                    to Hospice of Michigan
5      Exhibit 17    Digital audio file played       298
6                    during deposition
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 7

1                        Wednesday, March 13, 2024
2                        Bloomfield Hills, Michigan
3                        9:36 a.m.
4                            *    *    *
5              (Deposition Exhibit 1 marked
6               for identification.)
7                            *    *    *
8      MR. McGORISK:  Before we get started, I just want
9  to put on the record, Exhibit Number 1 is the stipulated
10 protective order which also protects -- besides
11 documents, it protects testimony, and we're requesting
12 that Rabbi Bunny Freedman's testimony be designated as
13 confidential and subject to this protective order.
14     MS. PRESCOTT:  Did you get the appearances, John?
15     THE REPORTER:  Yes, I have them.  Thank you.
16     MS. PRESCOTT:  One moment, and I'll introduce
17 myself.
18         But also, for the record, you know, I don't think
19 that -- you know, there was absolutely no contemplation
20 of just blanket designations under the protective order,
21 but we -- we understand your attempts to designate, and
22 so I'm going to take that up later.
23                            *    *    *
24     RABBI ELCHONON BUNIM "BUNNY" FREEDMAN,
25 having been first duly sworn, was examined and testified

Page 8

1  as follows:
2                        EXAMINATION
3  BY MS. PRESCOTT:
4  Q.  So, Rabbi, we did get to meet yesterday.  I'm Sarah
5      Prescott, Greg Parry's lawyer.
6          I'm going to hand you what I've marked as Exhibit
7      2.
8              (Deposition Exhibit 2 marked
9               for identification.)
10         MS. PRESCOTT:  Did I give you --
11         MS. SMITH-MORRIS:  Oh, I think --
12         MR. McGORISK:  I think you gave me the one that you
13     already --
14         MS. PRESCOTT:  Apologies.  I apologize.
15 BY MS. PRESCOTT:
16 Q.  All right.  Rabbi, I have handed you Exhibit 2, which is
17     a subpoena for your appearance today to testify.
18         Did you receive this?
19 A.  (Nods head.)
20         THE REPORTER:  I'm sorry.  Is that --
21 A.  Pardon?
22 BY MS. PRESCOTT:
23 Q.  Did you receive this document?
24 A.  Just now, yes.
25 Q.  Had you received it before today?

Page 9

1  A.  I'm not aware of this -- having this --
2  Q.  Okay.
3          MR. McGORISK:  I accepted service for him on this
4      document.
5          MS. PRESCOTT:  All right.
6          MR. McGORISK:  He saw the first one, though.
7  BY MS. PRESCOTT:
8  Q.  All right.  So, we are -- we are here today pursuant to
9      subpoena, and your testimony today will be taken
10     pursuant to a set of Court Rules, the Federal Rules of
11     Civil Procedure, and they will be used for any purposes
12     allowed thereunder.
13         I am happy to repeat myself or clarify any time.
14         Will you let me know if you need me to do that?
15 A.  Sometimes there will be a deficiency in my hearing, and
16     if you talk a little louder than you are right now, I
17     don't think we'll have a problem.
18 Q.  Will do.
19         And I -- I never want to interrupt you.  So, please
20     definitely let me know if you have not finished an
21     answer.  I want to hear your answers.  I need to hear
22     your answers.
23         But, like I said, you -- since -- since you have
24     shared that you have some concern with hearing, I'm
25     always happy to repeat myself and/or clarify.  I'm also

Rabbi E.B. 'Bunny' Freedman
March 13, 2024

Page 10

1    happy to take breaks as needed.
2         I would just ask that we answer any question that
3    is pending at that time.)
4  A.  (Nods head.)
5  Q.  If you nod or shake your head in a "no" way, I may say,
6    "Is that a yes or no?" just because a court reporter
7    would -- will then be able to take it down.
8         I know we need to take a break for counsel later
9    this morning.  That's fine.  Like I said, if there's
10   other times, you know, restroom, whatever you may need.
11        So, I wanted to begin this morning, Rabbi, by
12   asking, when did you meet -- when did you first meet Bob
13   Cahill?
14 A.  I don't know when the first time was.  He had been
15   working up the ranks, and until he became the -- the --
16   no, I met him -- I've met him numerous times, and when
17   he became the CEO, then there was more interaction.
18 Q.  Understanding that you won't be able to pinpoint the
19   first time you met -- that's reasonable -- what is the
20   first time you do remember knowing Bob?
21 A.  JHCN puts on a conference each year, and we've met.  And
22   that's been running for about 17 years.  And I think Bob
23   was usually in attendance at those conferences, and we
24   were cordial and friendly.  And that was most of the
25   interaction until he became the CEO.  But there were

Page 11

1    other -- would be other occasions that I -- I did meet
2    him.
3  Q.  When you worked at HOM, did you ever have a reporting
4    relationship with Mr. Cahill?
5  A.  When I worked for HOM?
6         In which period are you talking about?  Throughout
7    until '21?
8  Q.  At any time, did you ever have a relationship where you
9    reported to Bob Cahill?
10 A.  I don't think so.
11 Q.  Okay.  Tell me -- you've mentioned that when Bob became
12   the CEO, the relationship -- it changed in some way.
13        What were you thinking of?
14 A.  Well, he was the boss of the organization.  Prior to
15   that, I started where the CEO was Carolyn Cassin.  Then
16   there was Dottie Deremo and then it was Bob.
17        So, it was just a -- a normal transition kind of
18   from leadership, and there was a lot of encounters that
19   I had along the way.  I couldn't date them or, you know,
20   give you a list of how many times.  But they were, as
21   you would expect -- I mean, I was -- I always carried
22   like a -- at least in the first part of my -- when I
23   probably met Bob -- I'm going to take that back.
24        Can you ask me again?
25 Q.  Well, just how things changed when he became CEO.

Page 12

1  A.  Well, he became the CEO and sometimes there were
2    sit-downs where we -- we -- we met, and he had come to
3    the Jewish Hospice offices.  I had been in offices --
4    the various different offices from downtown to -- onto
5    Ann Arbor, where there -- we interacted and talked about
6    subjects.
7         But my main answer -- person that I answered to was
8    Patrick Miller.
9         THE REPORTER:  I'm sorry.  "-- was --"?
10 A.  Patrick Miller.
11        THE REPORTER:  Thank you.
12 BY MS. PRESCOTT:
13 Q.  All right.  Have you ever been out to a meal, for
14   example, with Bob Cahill and --
15 A.  Not that I recall, no.
16 Q.  All right.  Have you -- do you recall a time where he
17   was the -- either the speaker or the MC, the announcer
18   who was the one who gave you a -- public award or --
19   or recognition of some kind?
20 A.  I received their annual award in one year, and I don't
21   remember if it was Bob.  My memory of that is -- my --
22   most likely, it was Dottie that -- I don't know if --
23   remember if they gave be a plaque or anything, but I
24   was their honoree, and she probably had mentioned
25   accolades.  But I don't -- I don't think it was Bob.  It

Page 13

1    could have been.
2  Q.  When we add in not just sit-down meetings that happened
3    at both JHCN and HOM, and we expand that out to now
4    talking about phone calls or Zooms or larger group
5    meetings where it wasn't just the two of you, did you
6    all interact relatively routinely throughout the years
7    or infrequently?
8  A.  I would not -- infrequently that we would be calling
9    each other.  It was -- it was through Patrick that most
10   of our -- my communication with JHCN post the Dottie
11   era.
12 Q.  All right.  In the last -- in the last couple of years,
13   how many sort of meetings have you had where Bob Cahill
14   was present, depending on -- no matter who else may have
15   been there?
16 A.  You said a couple years?
17 Q.  Yes.  The last couple, two, three years.
18 A.  I'm going to guess about two --
19 Q.  Okay.
20 A.  -- that I can think of.  I mean, I can think of one,
21   but --
22 Q.  Do you think of yourself as having a friendly
23   relationship?
24 A.  More courteous, friendly.
25        It wasn't unfriendly.  So, we could call it

Page 14

1    friendly, but it wasn't, you know, something we catch --
2    caught up with each other and called each other, say
3    "hi" and things like that, no.
4  Q.  Okay.  Have you read his deposition?
5  A.  No.
6  Q.  So, he testified that he couldn't remember ever meeting
7    with you.
8      What's your reaction to that?
9  A.  I recall differently.
10 Q.  Have you read Patrick Miller's deposition?
11 A.  Yes.
12 Q.  Have you read all of it?
13 A.  Yes.
14 Q.  Did anything surprise you in the deposition?
15 A.  Much.
16 Q.  What?
17 A.  His version of -- of a lot of events, multiple events.
18    It was very different than my understanding of the
19    situation.
20 Q.  Okay.  What else?  Anything else?
21    MR. McGORISK:  Well, I'm going to object.  It's
22    kind of overly broad.  I mean --
23 A.  Yeah, it is.  It is --
24    MR. McGORISK:  The deposition is like several
25    hundred pages long.

Page 15

1      So -- but to the extent you can remember --
2  A.  Yeah.  So, you know, he remembered things very
3    differently than I did.  And in many of the things, I
4    found that he was -- didn't have a clear understanding
5    of the JHCN relationship, and it was surprising to me,
6    the relationship between Hospice of Michigan and JHCN.
7  BY MS. PRESCOTT:
8  Q.  Okay.  Anything else in general, understanding that
9    you're just giving me an overview of what -- what stands
10   out or what you recall as being surprising?
11 A.  There would be observations.  I probably don't think you
12   want to hear my observations and judgments, but the
13   facts that -- that were stated, some were, like I said
14   to you earlier, some were -- I didn't really understand
15   where those facts came from or didn't jibe with my
16   awareness of the situation.
17 Q.  Okay.  What are the areas that you remember sort of
18   standing out to you as things where your -- your
19   memories diverged?
20 A.  If I remember correctly, there were about a dozen things
21   in that -- in his testimony that didn't jibe with my
22   understanding of how they went -- actually happened.
23 Q.  Okay.  Like what?
24 A.  Or --
25     I mean, the entire relationship.  The -- the hiring

Page 16

1    and the reporting and interactions with Natalie.  The --
2    just the whole -- you know, there's -- there's about a
3    dozen things.  I don't know that I could efficiently
4    tick them off, you know, but there was a lot of conflict
5    of my memory.
6  Q.  Did you make any notes to yourself about it?
7  A.  I did.
8  Q.  Where -- where are they?
9  A.  I don't have them with me.
10 Q.  Okay.  When was the last time you looked at them?
11 A.  Last night.
12 Q.  Okay.  Then having looked at this last night -- and I
13   know you -- you know, you knew you were having to come
14   here today and probably presumed this would be the kind
15   of thing we would be talking about.
16     What do you remember taking notes on?
17 A.  For instance, when -- when he was -- asked about
18   business relationship, he had no idea -- I don't know if
19   he just said "I don't remember," but like he couldn't
20   respond right away.
21     Of course it was a business relationship, and, of
22   course, there was.
23     And in that book, Natalie's book, you know, it
24   shows documentation of that.
25 Q.  Okay.  What else?

Page 17

1  A.  I can't be specific, so I won't attempt.
2  Q.  Did you get to the part of the deposition where he --
3    we -- I'm confronting him about having been recorded
4    talking about trying to appeal to you as feeling
5    persecuted and Jewish people in general feeling
6    persecuted?  Did you read that part?
7  A.  I did read that part.
8  Q.  Did that ever come out in your discussion and dialog
9    with him?
10 A.  No.
11 Q.  Like did he ever approach you on anything and say like,
12   "Look, I'm here for you.  I'm trying to protect you,
13   Rabbi," and, you know, that kind of a manipulative, you
14   know, thing --
15 A.  The persecution piece -- I mean, you know, we took all
16   the Hospice of Michigan employees in -- on a somewhat
17   regular basis to visit the Holocaust Memorial, you know.
18   And that is a framework that -- that is relevant to most
19   of us.  And we were -- in trying to educate the
20   community, we would talk about the Holocaust as a
21   separate entity, not as our identity or not -- you know,
22   and it -- it was part of our history and more recent
23   history we were -- felt it was important.  We had a
24   number of patients on a very regular basis.  It was
25   almost -- at any given time, there are Holocaust

Rabbi E.B. 'Bunny' Freedman
March 13, 2024

Page 18

1  survivors.
2         Now, that is a segment of -- Jewish people that
3  might certainly feel that way.  So, there was education.
4  And it could be that Patrick went on one of those visits
5  or something or knew about them.  But this was -- this
6  is not part of my everyday conversations.  And if we had
7  a conversation, I would probably remember it.
8         So, no, I don't think we had a conversation, but --
9  Q.  Did you -- have you listened to the tapes?
10 A.  No.
11        What tapes?  The -- are they --
12 Q.  There's tapes of them talking about you, and I'm just
13 wondering if you've heard them.
14 A.  Tapes?
15        Where would those tapes be?
16        No, I'm not -- not aware.
17 Q.  I don't know what you look-- let's -- what have you
18 received from this litigation; if you know?
19        Like, hey, here are some files -- things we pulled
20 up out of the computers in the basement of HOM that you
21 should see and look at?
22 A.  I think there would be in Natalie's book if -- if we
23 received it.
24 Q.  All right.
25 A.  And so we -- we saw the -- the depositions, and there

Page 19

1  were some e-mails that were presented to us.  Most of
2  what I heard about, I heard from Brian, stuff that he
3  culled from the information passed on to him from
4  previous lawyers, and he presented them to me a while
5  ago.
6  Q.  When -- when did you first seek legal help related
7  anything to do with HOM?
8  A.  I have two -- a son and son-in-law that are lawyers.
9  This is not their field at all, but -- so, I have had
10 conversations with them regarding HOM and regarding my
11 transition and things like that, casual relationships.
12 No -- no payment involved.
13 Q.  Sure.
14 A.  So, I wouldn't say they were signed lawyers.
15        I've talked on multiple occasions with Brian --
16 with Brian Herschfus and, of course, with --
17 Q.  So, it's not --
18 A.  -- both Brians.
19 Q.  -- some people might say it's nice.  Some people might
20 say it's not nice to have lawyers in the family.  It
21 depends on your outlook.
22        But putting aside chatting with your own kids --
23 A.  The two of them are -- are very nice to have in my
24 family.
25 Q.  Good.

Page 20

1  A.  Okay.
2  Q.  Those lawyers are good.
3         All right.  So, putting aside, you know, talking to
4  your own family about concerns, when did you go to a
5  lawyer that, you know, you would have to establish some
6  sort of relationship --
7  A.  Approximately --
8  Q.  -- business-wise?
9  A.  Approximately four, five, six months ago.  Four, five
10 months, you know.
11 Q.  Okay.
12 A.  More recent.
13 Q.  Okay.  Okay.  So, let me get -- so, for example, there
14 came a time when Hospice of Michigan started issuing
15 some different legal documents, Confidentiality
16 Agreements, Business Associate Agreements, agreements
17 with -- between JHCN and HOM.  That happened in, you
18 know, 2021 and 2022.
19        Did you have -- did you retain counsel at that
20 point to go over those?
21 A.  No, I didn't retain counsel.  But we had a lawyer, Linda
22 Wasserman, affiliated with Honigman Miller.  And she was
23 a very dear friend and -- but she was our attorney.  I
24 don't know if she would be the attorney of record.  But
25 whenever there was an issue, we went to her and she has

Page 21

1  been very helpful.
2         I don't -- I can't tell you -- there must have been
3  things to do with the relationship with HOM, but not
4  every document that I signed, for sure, you know, was
5  reviewed by her.  So, I'm not sure what you're asking
6  about in terms of legal advice.
7  Q.  Okay.
8  A.  It -- it was a light involvement -- I could tell you
9  that -- on all fronts.  There were a couple of issues
10 that came up, but I don't recall issues with Hospice of
11 Michigan strategically or otherwise.
12 Q.  Okay.  Let me ask it this way.
13        Do you recall that you made -- have made notes that
14 the relationship with Hospice of Michigan became
15 adversarial in 2021 or 2022, somewhere in there?
16 A.  I recall, yes.
17 Q.  Okay.  When the relationship became adversarial,
18 whatever time frame exactly that was, did you have a
19 lawyer helping you with the adversarial nature of how
20 things were developing?
21 A.  I didn't really have a lawyer of -- of official -- you
22 know, a relationship that was paid or -- until Brian
23 came onboard, Brian Herschfus.
24 Q.  Couple -- three, four months ago?
25 A.  Yeah.  The same time frame.

Rabbi E.B. 'Bunny' Freedman
March 13, 2024

Page 22

1  Q.  Okay.  Fair enough.
2      Okay.  So, did there ever a come a time when
3      Hospice of Michigan's lawyers wanted to meet with you
4      and interview you?
5  A.  I don't think so.
6  Q.  Okay.  So, there is a woman named Abby Pendleton at a
7      place called Health Law Partners.
8      Do you ever remember meeting with her or talking to
9      her?
10 A.  I don't remember.
11 Q.  Okay.  Did you read Lee Ann Myers' deposition?
12 A.  I did.
13 Q.  Were there aspects of that deposition you also took
14     notes on because you saw issues that you didn't agree
15     with?
16 A.  I reviewed it all.  I might have wrote some notes to
17     myself, but it was nothing that I found particularly
18     alarming.
19     (Discussion held off the record.)
20 BY MS. PRESCOTT:
21 Q.  Have you read Greg Parry's deposition?
22 A.  I don't think so.
23     MR. McGORISK:  He's -- he's the Plaintiff.
24     THE WITNESS:  Yeah, I understand.  But I don't
25     think I saw his deposition.

Page 23

1      Brian, do you remember if you gave that to me?
2      MR. McGORISK:  I didn't send it.
3  A.  I don't think I did.  I saw the Complaint, but I -- I
4      don't think I saw his deposition.
5      No.  I -- I didn't.
6  BY MS. PRESCOTT:
7  Q.  Okay.
8  A.  Sorry.
9      MR. PARRY:  I'm not offended.
10 A.  I'm sure it would make great reading.
11 BY MS. PRESCOTT:
12 Q.  And then Mr. Deromedi, at the end of the table here,
13     when did you first meet him?
14     It could be a phone call or -- but I don't mean
15     only in person, but when did you first meet him?
16 A.  So, there was a conversation, maybe a month ago, that
17     I -- I met with him with -- yeah.
18 Q.  Okay.  And then relative to that conversation, like you
19     did with the depositions, did you have any notes that
20     you kept from -- from that -- that conversation?
21 A.  I don't think I took notes.
22 Q.  Okay.  And what did you -- what -- what kinds of things
23     did Mr. Deromedi either ask you about or did you share
24     with him?
25 A.  He gave me an understanding of what he thought the case

Page 24

1      was about, and -- and, yeah, that was -- it was broadly
2      about the case.  Walked me through it a little from the
3      perspective of Hospice of Michigan.
4  Q.  Okay.  So, sitting here today, what do you understand,
5      broadly speaking, the case is about?
6  A.  My understanding is that Mr. Parry felt that he was
7      wrongfully released from Hospice of Michigan.  And I
8      gather that there's two very different versions of that,
9      and Mr. Parry is bringing a case that he was wrongfully
10     fired.
11 Q.  Okay.  So, we can presume Parry's position is, you know,
12     "I was a good employee and didn't deserve it."
13     What is the other version to the extent that you
14     understand it?
15 A.  What -- from reading -- mostly from reading the
16     document -- documentation, you know, from the
17     deposition, I got the sense that they felt he was --
18     acted incorrectly and wasn't -- his behavior was not
19     appropriate, and -- and -- and he was fired for that
20     reason.
21 Q.  Okay.  Did you ever meet with Greg Parry?
22 A.  I don't believe so.
23 Q.  Okay.
24 A.  We're both nodding no.
25 Q.  Okay.  There was a -- a meeting in about June of 2021

Page 25

1      that was scheduled to meet with Patrick and meet Greg
2      Parry.
3      Do you remember any talk about that or the
4      possibility of meeting with HOM's in-house lawyer?
5  A.  No, I don't think so.
6  Q.  Okay.  All right.
7      So, let's look back a little bit.
8      I know I mentioned that you -- you used to work at
9      Hospice of Michigan.
10     Did you begin working at Hospice of Michigan for
11     the first time in 1992?
12 A.  Seems right.  I -- I wouldn't nail it exactly but sounds
13     right.
14 Q.  Early nineties?
15 A.  Yeah.  Early nineties, certainly.
16 Q.  Okay.  And what -- where -- did you have a job before
17     that?
18     Where did you come from?
19 A.  The job before that was -- I worked for a local Hebrew
20     school, Yeshiva Beth Yehudah.  I was the executive
21     director.  And -- you know, and I was the assistant
22     executive director, then executive director.  And --
23     yeah.
24 Q.  Did you have any -- any hospice background before
25     Hospice of Michigan employment?

Rabbi E.B. 'Bunny' Freedman
March 13, 2024

Page 26

1  A.  Not hospice specifically, but I had a fair amount of
2      knowledge of end-of-life issues, and it was a -- a
3      significant part of my role in my administration of
4      meeting with families.  I was doing fundraising and
5      outreach for -- for the school.  So, I was -- certainly
6      had a lot of funerals, and I was at a lot of Shiva
7      practices, and I was -- had an inclination to -- and I
8      think I served people well in -- in their bereavement,
9      either prior to death or -- or their grief before death
10     and after death.
11         So, as -- in my rabbinic duties prior to working
12     with Jewish Hospice, I had a close attachment with David
13     Techner, who was the -- the owner of Ira Kaufman Chapel,
14     which is a Jewish chapel in Southfield.  And we
15     actually -- when I left Yeshiva Beth Yehudah, my first
16     endeavor that I was involved in was a partnership with
17     David Techner to open a chain of funeral homes, which
18     took me deeply into that, the -- that -- the end-of-life
19     sector of the world.  And we traveled to a number of
20     cities and worked to develop that -- that chain.
21         It never got off the ground, but I spent six, eight
22     months really delving into end of life.
23         Yeah.  That's -- so, that's -- that -- that sort of
24     led -- David actually made the connection between
25     Hospice of Michigan and me.

Page 27

1  Q.  Okay.  And do you remember your title when you come into
2      Hospice of Michigan?
3  A.  I was the Director of Jewish Hospice Services.  It was
4      my primary role.  I was in an administrative position,
5      and my -- the key element of my job was -- Hospice of
6      Michigan felt that they could do a much, much better job
7      in servicing the Jewish community.  And they engaged me
8      to do that.  And I ended up in a substantial fundraising
9      position and event coordinators, you know, related to
10     the Jewish community.  And that's -- you know, that's --
11 Q.  In the course of fundraising, are you marketing the
12     positive aspects of HOM to the Jewish community in that
13     role?
14 A.  As -- at what -- as I was employed fully at -- at --
15 Q.  Yeah.  As the Director of Jewish Hospice Services.
16 A.  Yeah.
17 Q.  Yeah.
18 A.  Yeah.
19 Q.  And then do you keep that title as long as you remained
20     a formal employee of Hospice of Michigan?
21 A.  A full-time employee, yeah.
22 Q.  Okay.  And was it full-time when you started?
23 A.  Yes.
24 Q.  And then you ended and it wasn't full-time; right?
25     There was a step down to part-time?

Page 28

1  A.  Uh-huh.
2      THE REPORTER:  I'm sorry.  Is that "yes"?
3  BY MS. PRESCOTT:
4  Q.  Yeses and nos, if you can.
5  A.  Yes.
6  Q.  Okay.  So, you -- when you stepped to part-time, did you
7      change your title, or did you just keep the title?
8  A.  I relinquished -- to the best of my knowledge, I
9      relinquished the title.  I -- I'm not tracking my -- I
10     couldn't tell you what my title is necessarily today.
11     I -- I don't track my titles.
12         So, I know what my job was, but I couldn't tell you
13     what the title was.  I -- I'm not sure it was ever on a
14     document.
15 Q.  Okay.  So, when -- what year do you go to -- from
16     full-time to less than full-time with Hospice of
17     Michigan?
18 A.  Around 2001, something like that.  2000, 2001.
19 Q.  All right.  Did the people at Hospice of Michigan
20     understand that you were also developing and working on
21     Jewish Hospice Chaplaincy Network?
22 A.  Very much so, yes.
23 Q.  Okay.  And you founded the Chaplaincy Network; right?
24 A.  Uh-huh.
25     THE REPORTER:  I'm sorry.  Is that "yes"?

Page 29

1      MR. McGORISK:  "Yes"?
2  BY MS. PRESCOTT:
3  Q.  "Yes"?
4  A.  Yes.
5      I'm sorry.
6  Q.  Everyone is going to jump on you, but we'll try not
7      to --
8  A.  I got it.  I got it.  We're good.
9  Q.  Okay.  So, you founded it.
10         When did -- what year?
11 A.  I believe it was in 2000.
12         Yeah, I think so.  2000.
13 Q.  Okay.  So, when you -- when do you stop receiving a W-2
14     and being a formal employee of Hospice of Michigan?
15 A.  I believe that it was about 2010 that I stopped becoming
16     an employee.
17 Q.  Okay.
18 A.  I -- but I -- go ahead.  Ask.
19 Q.  I didn't mean to interrupt.  I'm sorry.
20 A.  No.  No.  That's -- I'm good.
21 Q.  Okay.  Was there some aspect of employment that was
22     different from 2000 to 2010 other than just that you
23     were part-time?
24 A.  Well, I didn't receive any benefits after that.
25 Q.  After 2000, when you went part-time?

Rabbi E.B. 'Bunny' Freedman
March 13, 2024

Page 30

1   A.   Right.
2        And so -- so, any of my benefits and -- but I was
3   still receiving a W-2, I believe.
4   Q.   That makes sense.
5        Were you working about half time or was it less?
6   A.   That's very hard to determine how much, what part of my
7   life, but when I started, most of the people I was --
8   the people that I was working with, the patients that I
9   was working with, many of them are Hospice of Michigan
10  patients.  And I was devoting a lot of time to that.
11  And it was a big bulk of my patients at that time.
12       So, I was continuing to service the patients that
13  were there.
14  Q.   Okay.  Did you serve as a spiritual care advisor at
15  Hospice of Michigan at any time?
16  A.   That was -- that was always part of my responsibilities.
17  Q.   Who else at Hospice of Michigan is a spiritual care
18  advisor that you know that is of the Jewish faith?
19  A.   I don't know.  I don't -- I don't recall any.
20  Q.   Okay.  So, for example, when you become the Director of
21  Jewish Hospice Services and you want to -- you said
22  Hospice of Michigan felt that they need to do more with
23  the Jewish community, there's no spiritual care advising
24  from people who --
25  A.   Other than me.

Page 31

1   Q.   -- are of the faith; right?  Other than you?
2   A.   No.  There were other spiritual caregivers, of course.
3   Q.   Sure.
4   A.   But in -- from the Jewish faith was your question.
5   Q.   Right.
6   A.   And I think -- I'm pretty sure I was the only one.
7   Q.   And all the way up until today, as far as you know,
8   which, you know, I can only test what you know.  As far
9   as you know, there's no other spiritual care advisors
10  that have worked at Hospice of Michigan?
11  A.   I will clarify your question.
12  Q.   Okay.
13  A.   Or I -- I would clarify.
14       That's employed.
15       There are many rabbis that serve patients at
16  Hospice of Michigan.  So, they're Jewish and serving
17  them.  They're -- they're Jewish, but there -- there's
18  no one on the payroll.
19  Q.   Okay.  So, you're making the distinction between people
20  who are formal employees and they've been onboarded and
21  they have a personnel file and they're supervised by
22  Hospice of Michigan?
23  A.   Uh-huh.
24  Q.   There's no Jewish people other than you that you --
25  A.   I didn't say --

Page 32

1   Q.   -- have known -- known about --
2   A.   In spiritual care.
3   Q.   In spiritual care?
4   A.   Uh-huh.
5   Q.   Yeses and nos, if you can.
6   A.   Yes.
7   Q.   But you made the point that there have been, over the
8   years, many rabbis who weren't employees, who did
9   provide service to Hospice of Michigan patients?
10  A.   Correct.
11  Q.   Okay.  When you leave Hospice of Michigan as an employee
12  in 2010, who was your main point of contact or your main
13  person that you worked out your next relationship with?
14  A.   In 2010?
15       Not in the early stages of the transition.
16  Q.   When you finally do separate, yeah.
17  A.   Okay.  When -- but I stay as an employee in 2010 or I --
18  say -- stay working for them.
19  Q.   Fair.  I mean, you just made the point that there are
20  people who are employed; right?  They -- they go there
21  everyday.  They serve patients whether they're connected
22  to JHCN or not.  They have supervisors.  They have
23  whatever training and onboarding through HOM.  That's
24  what I'm calling an employee.
25  A.   Uh-huh.

Page 33

1   Q.   Is that fair?
2   A.   Yes.
3   Q.   Okay.
4   A.   But could you re-state your question?
5   Q.   Okay.  So, but we understand when I'm talking about an
6   employee, I mean somebody who has all those qualities;
7   right?  That they -- they go to work at Hospice of
8   Michigan.  They're paid as a W-2.  They're supervised.
9   They're trained.
10       Are we on the same page that that's what I mean by
11  an -- an employee?
12  A.   I don't believe there was anyone that was employed other
13  than my role.
14  Q.   Okay.  But are -- okay.
15       As of 2010, you stop being someone who gets a W-2
16  and benefits and --
17  A.   I didn't get benefits before that.
18  Q.   Just -- just let me finish.
19       Fair enough.
20       As of 2002, you stop being paid a salary on a W-2
21  and having a supervisor at Hospice of Michigan and
22  having, you know, the -- the place to work and all of
23  that; right?
24  A.   No.
25  Q.   No.  Okay.

Rabbi E.B. 'Bunny' Freedman
March 13, 2024

Page 34

1    Who, at Hospice of Michigan, was your supervisor
2    after 2010?
3  A.  I believe it was Dottie Deremo.
4  Q.  Okay.
5  A.  Might I offer --
6  Q.  Sure.
7  A.  -- a little --
8  Q.  If you want to clarify.
9  A.  -- explanation for my hesitancy?
10 Q.  Sure.
11 A.  When I transferred from employee and getting a -- W-2
12     to a 1099, there was no change in my relationships to --
13     in Hospice of Michigan.  Nothing changed.  I was in the
14     same position.  For some reason, that I'm not fully
15     clear about, they wanted to change my position from a --
16     from a W-2 to a 1099.
17     There was nothing about who I responded to or what
18     I did or how I did it and how I achieved the goals of
19     taking care of our Jewish patients and getting them the
20     best care possible at that point.
21 Q.  Okay.
22 A.  I couldn't identify anything.
23 Q.  Okay.  So, who -- who was your immediate boss in 2009?
24 A.  It was Dottie, I believe.
25 Q.  Okay.

Page 35

1  A.  It was Dottie.
2  Q.  Okay.  You reported to Dottie?
3  A.  Correct.
4  Q.  Okay.  Did you get annual evaluations from Dottie?
5  A.  Not that I recall.
6      She might have made evaluations, but it wasn't a
7      formal process.
8  Q.  Okay.  Did you have modules that you had to complete
9      annually?  Training modules?
10 A.  Yeah.  Like if you're talking about HIPAA or -- other
11     regul- -- regulatory things, I was mandated to go to
12     these -- the sessions that were required, fire
13     protection and all kinds --
14     THE REPORTER:  I'm sorry.  "-- required --"
15 BY MS. PRESCOTT:
16 Q.  "Fire protection"?  Is that what you said?
17 A.  Fire protection.
18     THE REPORTER:  Thank you.
19 A.  And -- and, you know, emergency interventions and a
20     whole bunch of stuff.
21 BY MS. PRESCOTT:
22 Q.  Okay.
23 A.  But --
24 Q.  When was the last time that you completed a set of
25     computer modules on training that was promulgated to you

Page 36

1      by Hospice of Michigan?
2  A.  I don't know.
3  Q.  Okay.
4  A.  But it -- it went on for some time.
5  Q.  Okay.  You think it went on past 2010?
6  A.  I couldn't accurately tell you that.
7  Q.  Okay.  So, just trying to map out the changes -- and
8      you've pointed out the benefits go away --
9  A.  When?
10 Q.  In 2001 or 2000ish?
11 A.  Yeah.  Right.
12 Q.  Okay.  So, the benefits go away.  You go part-time, and
13     then the next -- another change that happened was going
14     from W-2 to a 1099; right?  That happened in 2010?
15 A.  Could you repeat?
16 Q.  Another thing that changed for you relative to Hospice
17     of Michigan is that you went from a W-2 to a 1099-style
18     reporting in 2010?
19 A.  Correct.
20 Q.  Okay.  Sometime in -- sometime, you don't know, you stop
21     attending the mandated trainings or getting the training
22     modules that the other HOM employees are getting; right?
23 A.  I will say that I didn't stop.  I don't recall when I
24     stopped.
25     I mean, I was required to get a flu shot and other

Page 37

1      medical things that were required.  So -- and I -- I
2      don't know when I stopped doing these modules.
3  Q.  Okay.  But you couldn't testify that you've -- you've
4      done a module in the last decade from Hospice of
5      Michigan; correct?
6  A.  I could not state that as -- as a certainty, for sure.
7  Q.  Okay.  And Dottie eventually leaves.
8      Did you consider yourself to be someone who
9      reported as a supervisee to anyone at -- at Hospice of
10     Michigan after she left?
11 A.  Sort of in an informal way.
12 Q.  Okay.
13 A.  We had -- I had regular meetings with Patrick Miller,
14     and we would be ironing out problems, you know, or many,
15     many conversations with myself and our team that focused
16     on getting the best possible care for our -- our
17     patients.
18 Q.  You don't think of yourself -- you didn't think of
19     yourself as a Hospice of Michigan employee after 2010,
20     did you?
21 A.  I thought that -- that I was a part-time employee, and I
22     had obligations to meet, and I met those obligations
23     continuously.  And I didn't see -- look at it as any
24     significant change.  I thought it was a technical thing
25     that they wanted to do for their bookkeeping purposes or

Rabbi E.B. 'Bunny' Freedman
March 13, 2024

Page 38

1    regulatory purposes.  I had no idea.  And I don't recall
2    any serious conversations about anything changing.
3  Q.  Ever?  Like up until today?
4  A.  Ever, yeah.
5  Q.  Same today?  You think there are --
6  A.  Through 2022.
7  Q.  Okay.
8  A.  Through '22, yeah.
9  Q.  Through '22?
10  A.  2022, yeah.
11  Q.  Okay.  So, how often did you -- did you have any login
12      credentials to use any Hospice of Michigan systems after
13      2010?
14  A.  I had a badge to enter the premises.
15  Q.  Okay.
16  A.  I attended the IDGs and --
17      THE REPORTER:  "-- attended the --"?
18  A.  The IDGs, which means team meetings.
19      THE REPORTER:  Thank you.
20  A.  I attended weekly team meetings and reviewed all the
21      Jewish patients, and -- and I was available for calls
22      any time, 24/7 --
23  BY MS. PRESCOTT:
24  Q.  Okay.  My question was different.
25  A.  -- 24/6.

Page 39

1  Q.  Just to clarify, my question was whether you had any
2      login credentials to log in to any Hospice of Michigan
3      system after 2010?
4  A.  May I answer it in the following way?
5      I had -- whatever I had in 2002 continued until
6      '22, for twenty years, and none of my practices changed.
7      So, I was an -- an efficient chronicler of my
8      visits at -- you know, in terms of a written component,
9      but I did faithfully attend all the IDGs and went
10      through every single patient, I mean, aside from if I
11      was sick or holiday or whatever it might be.
12      But I attended regularly.  I saw that as my
13      responsibility.  And I saw it as my responsibility to
14      stay knowledgeable about all the patients and make sure
15      that we assigned the appropriate personnel to those
16      people.  And that never changed.  I never -- and I
17      never -- I won't say "never," but I didn't do written
18      reports on these patients.
19  Q.  Did you have an e-mail address with Hospice of Michigan?
20  A.  No, never did.
21  Q.  Okay.
22  A.  I -- I mean --
23  Q.  So, you were the director?
24  A.  After I was -- after I was a full-time employee in 2001,
25      I never used a -- a Hospice of Michigan e-mail.

Page 40

1  Q.  I'm asking a different question.
2  A.  Please.
3  Q.  Which is whether you had -- how much you used or didn't
4      use is different from whether you had access.
5      Do you know whether you had a Hospice of Michigan
6      e-mail address in 2000 or 2001 or '02?
7  A.  I'm presuming that I did.
8      Well, I had when I was a full employee -- a
9      full-time employee.
10  Q.  Right.
11  A.  And I don't recall having used -- and this is my answer.
12      I don't recall having used.  I can't tell you if I had
13      one or I didn't have one.
14  Q.  Okay.
15  A.  Okay?
16      But I don't recall having used.  And a memory of
17      over some 22 years or so is -- is -- is not going to be
18      really accurate.  I'll make that disclaimer.
19  Q.  Sure.
20      Do you -- did you represent yourself to the
21      community after 2010 as a representative of Hospice of
22      Michigan, an agent, an employee of?
23  A.  No.
24  Q.  Okay.  But you were one?
25  A.  I was.

Page 41

1  Q.  So, did you represent its interests after 2010?
2  A.  Just as I would all the other hospices that I worked
3      with.
4  Q.  Okay.  Where else -- what other hospices did you work
5      for?
6  A.  About 16.
7      Do you want the -- the name of them all?
8  Q.  Sure.
9  A.  They might be in that book.
10  Q.  Okay.  Which ones paid you?
11  A.  Just Hospice of Michigan.  Now, they're -- that's --
12      that needs a qualification.
13      I was paid as a consultant for national firms --
14      firm, a firm who also had local offices.  And I was a
15      national consultant for helping them develop
16      relationships in the communities where they were
17      represented -- where they had offices.
18      So, that's -- and I was paid as a consultant.
19      And -- and that lasted for a long time beyond.  And I
20      couldn't tell you exactly when it started or exactly
21      when it ended, but probably worked for them, I estimate,
22      for about 15 years.
23  Q.  Okay.  Did they have a hospice facility in Michigan
24      or -- one or more?
25  A.  They -- well, they had a hospice -- I -- I don't think

Rabbi E.B. 'Bunny' Freedman
March 13, 2024

Page 42

1    they had an actual -- they had a full hospice operation
2    with -- with a number of offices in the Detroit area.
3  Q.  What -- what company or affiliation?
4  A.  Seasons Hospice, which changed the name down the line.
5      And --
6          MR. McGORISK:  Seasons?
7          THE WITNESS:  Seasons is the name of the hospice.
8          MR. McGORISK:  Like fall, winter, summer?
9          THE WITNESS:  Yeah.  Yeah.  Seasons, yes.
10         MR. McGORISK:  Okay.
11 A.  They had numerous offices here and around the country,
12     and the stip- --  you know --
13 BY MS. PRESCOTT:
14 Q.  Okay.  So, in places where you considered yourself to be
15     an employee -- like if we picked the year 2019, you
16     consider yourself to be an employee of Hospice of
17     Michigan?
18 A.  Yes.  I mean, I was listed as a consultant, and I
19     consider myself -- when they changed it to consultant --
20     consultant somewhere along the line, I -- I didn't look
21     at myself as an employee, but a consultant --
22 Q.  I --
23 A.  -- with specific responsibilities.
24 Q.  Yeah.  And I'm asking you not about the words on the
25     paper but what you -- how you considered yourself;

Page 43

1      right?
2  A.  Thank you.
3  Q.  Because that's what we're here for today.
4          So, you considered yourself an employee of Hospice
5      of Michigan until 2022?
6  A.  Yes.
7  Q.  Okay.  And then did you -- you considered yourself a
8      consultant or an employee of the Seasons Hospice entity?
9  A.  I clearly saw myself as a consultant for -- specifically
10     for their offices around the -- the country but not for
11     their local.
12 Q.  Okay.  And then -- and then are there other hospices
13     that you considered yourself working for or employed by?
14 A.  No.
15 Q.  Okay.  So, were there other people that -- so, let me
16     ask it this way:  When you were, in your mind, working
17     for -- employed by Hospice of Michigan, did they
18     understand, based on your exchanges with them, that you
19     were also employed by Jewish Hospice Chaplaincy Network?
20 A.  Who is "they"?
21 Q.  The people at Hospice of Michigan, the -- the C suite.
22 A.  The C suite?
23 Q.  Yeah.
24 A.  Did they understand -- could you specify the question
25     again?

Page 44

1  Q.  Yeah.
2          So, I want to understand, did people at Hospice of
3      Michigan who were in management, that were in charge of
4      running the place, did they understand that you had dual
5      employment?
6          MR. McGORISK:  Let me just object.  That -- there's
7      no foundation that he can testify about somebody else's
8      understanding.
9          MS. PRESCOTT:  Okay.
10 BY MS. PRESCOTT:
11 Q.  I'll take an answer.
12         MR. McGORISK:  You can ask him whether there were
13     statements made by other people that would give rise to
14     his -- to knowing that they understood, but he can't
15     tell what was on somebody else's mind.
16         MS. PRESCOTT:  I was -- I was simplifying the
17     question because he asked me to.  I asked it that way at
18     first.
19 BY MS. PRESCOTT:
20 Q.  All right.  So, the people who were in charge at Hospice
21     of Michigan, the CEO, the COO, the CFO -- the C suite,
22     okay -- did they know that you worked at Hospice of
23     Michigan at the same time as you worked for and were
24     paid by JHCN, as far as you know?
25 A.  Okay.  So, you're asking me to presume who knew?

Page 45

1  Q.  No.  I'm asking you what you know.
2          Did they talk to you and act toward --
3  A.  Well --
4  Q.  -- you like they knew you worked at JHCN?
5  A.  Well, there were certain people that definitely knew
6      about it, the team.  Generally speaking -- first of all,
7      it was -- the COO knew and the COO knew, and the --
8      the -- I'm not sure who else --
9  Q.  Fair.
10 A.  -- knew.
11         But I know that the team leaders knew that I was
12     a -- engaged.  And I don't think anyone distinguished,
13     that I know of, other than the -- the -- Patrick and --
14     and Bob, you know, recent time.  Certainly Dottie
15     Deremo, as the head, knew it, you know, but the team
16     leaders knew that I was -- I'm assuming knew that I was
17     a -- a dual employee.
18 Q.  Let me ask it this way.
19         Did you ever hide from people or trick people into
20     believing that you were only an employee of Hospice of
21     Michigan?
22 A.  Not to my knowledge.
23 Q.  Okay.
24 A.  I was only -- no.  I don't.  Not --
25 Q.  Right.  That -- that --

Rabbi E.B. 'Bunny' Freedman
March 13, 2024

Page 46

1   A.   Yeah.  No, I don't -- I don't think people assumed --
2   Q.   -- "I don't work for JHCN" --
3        THE REPORTER:  I'm sorry, guys.  One at a time.
4        Sorry.
5   BY MS. PRESCOTT:
6   Q.   "I don't work for JHCN.  I only work for you, Hospice of
7        Michigan"?
8   A.   Oh, No.
9   Q.   Did you ever act like that?
10  A.   No.
11  Q.   To the contrary, it was clear from your behavior and
12       your conduct and your title and things that you were
13       engaged with --
14  A.   Uh-huh.
15  Q.   -- in conjunction with Hospice of Michigan, that you
16       were the leader of JHCN; right?
17  A.   Correct.
18  Q.   Of course.  But you saw in Patrick Miller's deposition
19       where he said he was very confused and had no idea that
20       Natalie Miller(sic) worked for JHCN?  Did you see that
21       part?
22       MR. DEROMEDI:  I don't think --
23       MR. McGORISK:  Natalie Miller?
24       MR. PARRY:  Rosenfield.
25  A.   Natalie --

Page 47

1        MR. McGORISK:  Rosenfield.
2        MS. PRESCOTT:  That was a case from about 15 years
3        ago.
4   BY MS. PRESCOTT:
5   Q.   Natalie Rosenfield.  I'm so sorry.
6   A.   Okay.
7        MS. PRESCOTT:  Because we have a Patrick Miller.
8   A.   Okay.
9   BY MS. PRESCOTT:
10  Q.   Did you see where Patrick Miller -- he -- his
11       deposition, he claimed he did not know that Natalie
12       worked for JHCN?
13  A.   The answer is yes, I saw.
14  Q.   And what's your reaction to that?
15  A.   There's a number of options.
16       But my reaction is that it -- that can't be the
17       truth.
18  Q.   And you're chuckling.
19       Why?  I mean, you're -- it's because you can't
20       believe it, right, that he would say that under oath?
21  A.   And I think earlier I said to you there were a lot of
22       things that I was -- you asked me a question.
23       Was I surprised?  That was a big surprise.
24  Q.   Because Patrick Miller interacted with you and Natalie
25       on JHCN business regularly, did he not?

Page 48

1   A.   Repeatedly, yes.  Regularly, yes.
2   Q.   And if he tries to claim that Natalie or you misled him
3        or hid something from him about the nature of her
4        involvement with JHCN, would you disagree with that and
5        dispute that as untrue?
6   A.   Could you ask the question again?
7   Q.   Sure.
8        If he -- we don't know what he's going to say
9        someday in trial.
10  A.   Uh-huh.  Uh-huh.
11  Q.   But if he testifies that you or Ms. Miller did something
12       to hide --
13       MR. DEROMEDI:  Rosenfield?
14       MR. PARRY:  Rosenfield?
15  BY MS. PRESCOTT:
16  Q.   -- the truth --
17  A.   The name --
18  Q.   Ms. -- Ms. Rosenfield.  We're going to have to ask it a
19       third time.
20       If -- if Miller later says that you or Natalie
21       Rosenfield hid or distorted the truth of her true
22       relationship with JHCN, am I correct that you would say,
23       "We did not.  That's untrue.  We didn't do that"?
24  A.   Well, I could -- I can't testify what his -- was in his
25       mind.

Page 49

1   Q.   Fair.
2   A.   But I could testify what was in my mind, and I'm pretty
3        sure I can speak for Natalie on this subject because
4        we've had multiple discussions based on the deposition
5        we saw, that we know we never presented anything like
6        that in any way that we were aware of.
7   Q.   That she didn't work for JHCN and that she was solely an
8        HOM employee, you never led -- led Patrick to believe
9        that; correct?
10  A.   Correct.
11       MR. HERSCHFUS:  This may be a good -- it's 10:30.
12       So --
13       MS. PRESCOTT:  Okay.
14       (Short recess at 10:30 a.m.)
15       *  *  *
16       (Record resumed at 10:49 a.m.)
17       (Mr. Herschfus is not present
18       after the break.)
19  BY MS. PRESCOTT:
20  Q.   All right.  When we left off, we were talking about your
21       relationship with HOM in the years 2000 to 2010.
22       Are you drawing pay of any kind from JHCN before
23       2010?
24  A.   Yes.
25  Q.   Okay.  And did you get your benefits from JHCN in that

Rabbi E.B. 'Bunny' Freedman
March 13, 2024

Page 50

1   time frame, too?
2   A.   Yes.
3   Q.   Okay.  One of the things Patrick Miller tells my client
4        at some point is that there's a falling out between you
5        and Dottie Deremo in the early two thousands and that
6        she went on an apology tour.
7             Does that ring a bell to you?
8   A.   That fits into my memory.
9   Q.   What -- what was the falling out?
10  A.   As she explained it in her "apology tour," as you call
11       it, she felt there was someone -- some particular person
12       in the agency that was steering her wrong, and this
13       lady, as she described it -- as Dottie described it --
14       was like a borderline personality, and she needed to get
15       a protective order from her eventually.
16            I mean, this is as she reported to me.
17            And she apologized that, because of this lady,
18       before she understood how, you know, mendacious she was,
19       she was led to believe by that lady that -- that --
20       that -- that I was dishonest or whatever, bad-mouthing
21       me and many other people.
22            When we call this an "apology tour," it was
23       mainly -- as far as I know, it was about that particular
24       person steering her wrong and she had suspicious
25       approach and attitude towards me for a certain amount of

Page 51

1        time.
2             Whether that was true or not, I don't remember that
3        being the significant thing to me that she was -- you
4        know, that Dottie was reacting tough -- I mean -- and
5        I -- you know, it -- it wasn't like there was a
6        breakdown in our relationship.  But, as I described, you
7        know, she thought she wasn't being kindly towards me,
8        and she came to apologize.  And that was before she left
9        Hospice of Michigan, and we -- we have been fine since
10       then.
11  Q.   Were you an employee, at the time, working full-time, or
12       were you part-time by then?
13  A.   I was -- when she did the apology tour?
14  Q.   Yeah.
15  A.   Or -- or when this -- these incidents happened?
16  Q.   Well, how far apart was the apology from the incident?
17  A.   Well, quite some -- it was --
18  Q.   It was a year?
19  A.   It was -- I think, you know, as Dottie explained to me,
20       she was sort of doing a life review on the stuff that
21       had happened, and she wanted to clear the table with any
22       of the people that she might have been misguided by --
23       by this other woman.
24            So, she came to my office and she made a big deal
25       out of it.  She wants to make an appointment and then

Page 52

1        made a big apology to me.  It was essentially not -- not
2        a very essential or -- kind of thing.
3   Q.   What were you accused of doing that was bad-mouthing
4        you?  What was the bad-mouthing?
5   A.   I don't know.
6   Q.   Well, what had Dottie said to you that --
7   A.   She didn't --
8   Q.   -- under the influence of this other person?
9   A.   Yeah.  So, she -- she came to me and said, you know, "I
10       wasn't kind to you and I was suspicious of you," and
11       this and that.  And I wasn't interested in knowing what
12       this lady said.
13            The lady was -- that was --
14  Q.   How had --
15  A.   She -- she had bad-mouthed a lot of people, and there
16       was some kind of incident with her and Dottie that
17       triggered a whole lot of mess in the organization for a
18       period -- to my -- the best of my knowledge.
19            I wasn't privy to a whole lot of things but I --
20       there was -- there was -- Dottie was on some level at
21       that point being untoward, you know.  But --
22  Q.   Dottie was not kind to you, how?
23  A.   I would assess it this way, and this is just, you know,
24       emotional and feeling kind of things that I -- that I
25       felt.

Page 53

1        So, I don't have a lot of specifics in my memory
2        about this, but here is what I think was going on.
3             The leader before Dottie was a woman named Carolyn
4        Cassin.  And we had a very lovely relationship, and she
5        considered -- she used to call me her cowboy.  She --
6        she would say to me, "Just go out and do your thing and
7        create a lot of goodwill in the community for us, and
8        I'm satisfied."
9             And that was a -- set a pattern where I didn't take
10       reporting on patients seriously, and -- and I was doing
11       a lot of things for HOM that was very beneficial to
12       them, growing census, all kinds of things, fundraising,
13       and I -- I helped get a building built and -- and she
14       just said, "Bunny, you do your thing.  I'll run
15       protection for you."
16            I could say that Dottie's relationship for a while
17       was almost the opposite.
18            "Where are you?  When are you going?"  You know, at
19       that time -- I'll give you a -- I -- now just came to my
20       mind a good example.
21            When Carolyn Cassin saw that I was helping -- what
22       happened -- I mean, this is just anecdotal.  What
23       happened was, I became the renowned pastoral caregiver
24       for the Jewish community for end of life.  The -- the
25       community didn't know -- and even the rabbis didn't

Rabbi E.B. 'Bunny' Freedman
March 13, 2024

Page 54

1  understand there were different hospice organizations.
2  They just knew hospice, and they really only knew
3  because they only heard about Hospice of Michigan.
4      So, a rabbi would call me up and say, you know,
5  "I've got this patient, a hospice patient. Could you go
6  see her?"
7      Didn't know if it was Henry Ford, and I worked for
8  Hospice of Michigan.
9      So, it used to get me in trouble. I would respond
10  and take care of those people because that was my
11  mission in life, to help Jewish people go through this
12  last part of their lives. And the -- the -- so, there
13  was some employees at Hospice of Michigan, maybe this
14  woman included, who said what's the guy running around,
15  duplicitous, taking care of Henry Ford patients or
16  Beaumont patients that were -- DMC, and he's a trader,
17  or whatever he -- that she was calling me.
18      So, Carolyn Cassin would tell me, "You just be my
19  colleague. You get goodwill for our organization
20  wherever you can, get us a good name, give us -- you
21  know, make sure that whenever you go out, everybody
22  knows you actually work for Hospice of Michigan" --
23  that's what she said -- "and just go do it. You don't
24  have to ask anyone permission. You're my cowboy."
25      THE REPORTER: "-- you're my --"?

Page 55

1  A.  And she didn't tell that to the employees.
2          Cowboy.
3          THE REPORTER: Thank you.
4  A.  Okay.
5          And, "And you don't have to ask permission and
6  don't worry about anything. I've got you covered."
7          Dottie didn't take that kind of approach for a good
8  period of time, and she was getting fed by this woman
9  stuff about me.
10          You know, that -- that I was here and I was there
11  and I was -- well, how come I'm going out to this Jewish
12  event. It has nothing to do with hospice.
13          And so Dottie took that stuff seriously and was
14  worried about the protocols and how come I'm not -- I'm
15  helping other hospices or -- anyhow, but that got
16  straightened out. And I never thought that was a big
17  deal.
18          So, much later, she came to apologize, and I
19  thought it was a nothing burger.
20          Nothing burger.
21  BY MS. PRESCOTT:
22  Q.  Who was the lady in the story, the internal person at
23  the agency?
24  A.  I could say either I don't remember her name or I don't
25  care, but I -- I don't remember her name. I -- you

Page 56

1  know, I know -- I could see her right now as I'm
2  talking, but I don't remember her name.
3  Q.  She was an employee?
4  A.  Yeah. And she was higher up in the organization,
5  probably like a VP level.
6  Q.  Was it Herro? Lynn Herro?
7          MR. DEROMEDI: Terre.
8  BY MS. PRESCOTT:
9  Q.  Terre Herro?
10  A.  No. No.
11  Q.  Gloria Bunting?
12  A.  Do you know how far we're going back? We're back
13  into -- this -- my narrative begins in 1992, and this
14  happened somewhere along the line.
15  Q.  Well, Dot -- Dottie --
16  A.  Right when Dottie started.
17          When did Dottie start? Does anyone in this room
18  know?
19          MR. McGORISK: Well, you can't ask questions.
20  BY MS. PRESCOTT:
21  Q.  I don't know -- I don't know when Dottie starts.
22  A.  Yeah.
23  Q.  But when Dottie comes in, it's a different --
24  A.  Yeah. Different.
25  Q.  Suffice it to say, it's a different regime, and she is

Page 57

1  sort of like, "I want you to account for where you are
2  and which hospices you're helping, and I don't --" you
3  know, like, "I don't like you going out into the
4  community without it being specifically tied to HOM,"
5  et cetera?
6  A.  So, this woman -- thought it was mendacious behavior. I
7  was working behind everybody's back, and -- and it
8  turned into an issue, and I never paid it much mind,
9  because, frankly, I always saw my role from the
10  beginning of my employment with Jewish -- with Hospice
11  of Michigan and then my creation of Jewish Hospice and
12  Chaplaincy Network, my goal was to serve as many Jewish
13  people that found themselves in this place of end of
14  life. And there was no spiritual care coming from the
15  Jewish community until I got onboard with Hospice of
16  Michigan. And -- and -- and I was seen as a god. And
17  my mission in life was to get the best care possible for
18  any Jewish person, regardless if they were on hospice or
19  pre-hospice or before palliative care was even a thing,
20  but -- and beyond into bereavement. So, I do that
21  today. I did it then.
22  Q.  What -- what -- what did -- what was the job description
23  of the Director of Jewish Hospice Services at HOM?
24  A.  There's a document in there that I prepared.
25  Q.  Okay.

Rabbi E.B. 'Bunny' Freedman
March 13, 2024

Page 58

1 A.   It was edited by Hospice of -- of Michigan staff, and --
2      and it describes exactly what we do and how we do it,
3      and this has -- on the top of it, it's a note from
4      Dottie saying, "Bunny, this is an excellent presentation
5      work."
6          Now -- something about covering that -- what -- we
7      met in the meeting. So, this -- yeah.
8 Q.   So -- so, the witness is holding yesterday's --
9      Ms. Rosenfield's Dep Exhibit 1.
10         But you're pointing to --
11 A.   That document, yes.
12 Q.   -- this document.
13         So, let me mark it.
14         Do you mind -- well, you can --
15 A.   Okay. Here. Here.
16         MR. McGORISK: Well, she's going to mark it. She's
17     got a copy.
18 A.   Oh, okay. All right. Yes.
19             (Deposition Exhibit 3 marked
20             for identification.)
21 BY MS. PRESCOTT:
22 Q.   All right. I've handed you what I've marked as
23     Exhibit 3. And if you want to hand this down, certainly
24     David could look at it, too. It's marked in there, too.
25         All right. So, is Exhibit 3 what you were just

Page 59

1      testifying lays out -- what does it lay out?
2 A.   Lay outs the proposal written by me that -- that
3      describes what JHCN will do for -- which -- somewhere
4      back in -- it's dated July 1, 2002, and it's describing
5      all the services that we would do together and what a --
6      a partnership would look like, and all the different --
7      you know, different protocols we would use and -- yeah.
8      And it was followed by a memo for -- from a fellow named
9      Greg Grabowski that -- that what we have documentation
10     of -- we don't have a record of -- of a meeting -- a
11     subsequent meeting. But as I recall, there were
12     numerous meetings to use this as the preliminary
13     document.
14         And then we made agreements on different parts
15     beyond this, because this was my interpretation of what
16     it looked like. And there were some emendations that
17     I -- that I -- the only thing I have to -- a record of
18     that is Mr. Grabowski's list of issues that we wanted to
19     talk about at our next meetings.
20         And I think I found a number of documents that went
21     from 2002 to 2003 until a final agreement was reached.
22     And that's as well in this section of documents. And we
23     have a number of following -- okay. This is a --
24     there's a -- the actual agreement that I believe
25     followed my presentation and then a series of meetings

Page 60

1      was dated by me 7-15-03 and effective date was June 01,
2      2003. And it's -- this is what was written up as our
3      agreement.
4 Q.   Okay. So, let's break that down a little bit.
5 A.   Uh-huh.
6          MR. McGORISK: "Yes"?
7          "Yes"?
8 A.   Yes.
9 BY MS. PRESCOTT:
10 Q.   All right. Okay. Who is -- who is Greg Grabowski?
11 A.   Greg Grabowski was someone that I worked very closely
12     with for a number of years in that period.
13 Q.   It would -- was he with HOM?
14 A.   He was -- yeah. He was with HOM.
15         And it might -- I think I have a note from him
16     which -- yeah.
17         There's a record of a meeting on March 6th, 2003,
18     and this is -- the discussion ensued regarding the
19     working relationship between Jewish Hospice Chaplaincy
20     Network and Hospice of Michigan, history of the
21     relationship, legal compliance issues, current status
22     and future direction review, and then they have -- he
23     has a list of all the things that we want to go through
24     after that.
25         So, this was based in March 2003. In June or July,

Page 61

1      the agreement was signed.
2 Q.   Okay. So, this is part of -- you're pointing to the
3      document in the Rosenfield Exhibit 1 --
4 A.   Uh-huh.
5 Q.   -- for the March memo?
6 A.   Might I add? And I --
7 Q.   And just real quick; is that right?
8 A.   Correct.
9 Q.   Okay. What were you going to add?
10 A.   Well, I was just going to point -- point out a
11     statement.
12         It says in here that it was required by hospice
13     conditions of participation that JHCN rabbis and
14     volunteers must be Hospice of Michigan employees.
15 Q.   And do you know what that means?
16         What are the conditions of participation?
17 A.   I was again -- condition -- oh, I don't know what
18     conditions of -- hospice conditions of participations,
19     if that means HOM requirements, regulations. I'm not
20     sure.
21 Q.   Okay. All right. So --
22 A.   But, to me, it indicates that they wanted me on a salary
23     because it was in their interests to keep me there,
24     servicing their people.
25 Q.   And also keep you as an employee who got a W-2 and --

Rabbi E.B. 'Bunny' Freedman
March 13, 2024

Page 62

1  A.  Right.
2  Q.  -- got their training modules --
3  A.  Yeah.
4  Q.  -- and was under their supervision; right?
5  A.  Yes.
6  Q.  All of that.  Right.
7      Okay.  So, where we -- and you mentioned who Greg
8      is.
9      In these numerous meetings that you have, is
10     Patrick Miller or Bob Cahill a participant in any of
11     those?
12     In the meetings that you had mentioned that -- that
13     transpire after you propose Exhibit 3?
14  A.  May I go back to the last question?
15  Q.  Okay.
16  A.  Or do you want me to answer that?
17  Q.  No, that's okay.  Go ahead if you need to clarify
18     something.
19  A.  Because I found -- no, no.  This is not him.
20     This -- I have a letter from Greg Grabowski.  I was
21     hoping it would have his title in there, and it does
22     not.
23  Q.  Okay.
24  A.  This is --
25  Q.  So, you were pointing out that you -- you're not sure

Page 63

1      what his title is?
2  A.  No, I do.  Here I go.
3      Mr. Greg Grabowski, Vice President of Community
4      Relations.
5  Q.  Great.  Okay.
6  A.  Would -- would -- so, as -- as I said to you, someone I
7      worked with very frequently then in those days.
8  Q.  Did the lady who -- are you testifying that they're --
9      that Dottie Deremo took out a Personal Protection Order
10     against a Hospice of Michigan employee or former
11     employee?
12  A.  That was -- that was what she said to me.
13  Q.  Okay.  So, you don't know about that firsthand other
14     than what she told you?
15  A.  Not firsthand, no.
16  Q.  Okay.  And what was the -- was there some sort of threat
17     of violence or -- or stalking or do you know why -- what
18     the deal was personally?  Like you wouldn't know
19     anything other than what you heard; right?
20  A.  I could conjecture by the -- the aura that I sort of
21     felt from Dottie, but no.
22  Q.  Did Mr. Grabowski and you maintain a relationship after
23     he left Hospice of Michigan?
24  A.  For some short time.  And I think he went to another
25     hospice, but I -- I couldn't recall.

Page 64

1  Q.  Do you recall that he became the CEO of the Seasons
2      group that you mentioned before?
3  A.  Thank you.
4      Correct.
5  Q.  Okay.  And --
6  A.  But -- yeah.  Go ahead.
7  Q.  The -- the consulting relationship that you have, does
8      that begin sort of on the same track as what you're
9      suggesting for Exhibit 3?
10  A.  No.
11  Q.  No?
12  A.  It was a different kind of arrangement.
13  Q.  Okay.  Were you paid through Hospice Chaplaincy
14     Network -- Jewish Hospice Chaplaincy Network -- or were
15     you paid personally and individually?
16  A.  I was paid personally and individually.
17  Q.  Okay.  And did you tell Patrick Miller about that
18     arrangement at some point?
19  A.  I don't remember.
20     But may I make a clarifying point?
21  Q.  Okay.
22  A.  Which I think I stated earlier.
23     I didn't work with Seasons in particular on -- on
24     local issues in -- in Detroit.  And that -- I wasn't
25     paid for that, and I was explicitly not paid for that.

Page 65

1      I was paid to -- to do the work that JHCN does
2      in -- in giving them the resources necessary.
3      They would go to a city like Atlanta or they would
4      go to Los Angeles, and they would bring me in to work
5      with the Jewish community to set up, you know, something
6      very similar to Jewish Hospice services at Hospice of
7      Michigan.
8  Q.  And what was the reasoning for not doing that in Detroit
9      where you have such deep ties?
10  A.  I think -- conjecture -- that the CEO of Seasons --
11     THE REPORTER:  I'm sorry.  "The C- --"
12  A.  CEO --
13     THE REPORTER:  Thank you.
14  A.  Chief Executive Officer of Seasons, a large corporation
15     with offices all over America, wanted my services
16     rendered that he was paying for should be directly in
17     other cities, not in Detroit.
18  BY MS. PRESCOTT:
19  Q.  So, in other words, that was -- whatever the thought
20     process was, that wasn't from you.  That was something
21     that they proposed?
22  A.  Right.
23  Q.  Okay.  All right.  So, one of the questions I asked that
24     we hadn't finished was, you mentioned that after you
25     present Exhibit 3, you work through some meetings with

Rabbi E.B. 'Bunny' Freedman
March 13, 2024

Page 66

1    Greg and Dottie specifically --
2  A.  And other people in attendance --
3  Q.  Fair.
4  A.  -- listed on that document.
5  Q.  Were any of them Patrick or Bob Cahill -- Patrick Miller
6      or Bob Cahill?
7  A.  No.
8  Q.  Were any --
9  A.  I mean that -- not listed as getting -- that -- that
10     were present in these meetings, no.
11 Q.  Okay.
12 A.  Dottie Deremo was in the meeting.
13 Q.  Was the woman whose name you can't remember in the
14     meetings?
15 A.  That's a good question.
16         No.
17 Q.  Do you remember the role of the woman who was
18     bad-mouthing you?
19 A.  In -- somewhere in development, I believe.
20 Q.  Okay.  Okay.  Prior to your founding of JHCN, as you're
21     working as the Director of --
22 A.  Jewish Hospice Services.
23 Q.  -- Jewish Hospice Services, what was your -- what were
24     your job duties?
25         I know you were "the cowboy," but -- but that's --

Page 67

1  A.  I was a wrangler.
2  Q.  You're the wrangler.
3         So, what -- what is the -- the more formal -- what
4      was your -- your job duties?
5  A.  I -- my job duties were to be a liaison -- this is in my
6      words -- a liaison to the Jewish community, to make them
7      familiar with Hospice of Michigan and their services and
8      to be the conduit that -- that brought those services to
9      families, which meant when a call came in for any --
10     that -- a Jewish patient, that it was recommended to
11     them that they first speak with me, and I would explain
12     it and answer questions from the Jewish perspective
13     about the -- the -- the value of hospice services and
14     how it's not contradictory to anything Jewish.
15         Just as a sidebar, a little digression, that prior
16     to my working at Jewish Hospice, there was a general
17     feeling that hospice -- and this was spoken about in
18     many meetings and many people agreed to this -- that it
19     was a Christian operation, and, you know, it was -- you
20     know, it had -- the spiritual care people were all
21     Christian, and it was not -- no place to identify
22     yourself as Jewish and ask for any kind of Jewish
23     services or nor were they provided specific for Jewish
24     people.
25 Q.  Okay.

Page 68

1  A.  My -- my job was to break down the barriers in the broad
2      community and individually get the best care possible
3      for Jewish people so that becomes a -- a recognized
4      brand in the community that Hospice of Michigan, as
5      opposed to other hospices, would provide special Jewish
6      services, and they have Rabbi Bunny Freedman who gained
7      a reputation as the hospice rabbi and a darn good one, I
8      might say.  And -- and those services were -- I was to
9      see that, when they came onboard that they got all the
10     things they needed.  And -- and if I -- if they were
11     particular populations -- let's say they were Russian
12     immigrants -- so, they got the special care that they
13     needed, and I would pull in a volunteer rabbi that
14     spoke, you know, Russian to them.
15         And the same was true for Israelis that came here,
16     migrated here or Yiddish-speaking people that maybe were
17     Holocaust survivors.
18         You know, I knew the entire community, and I had --
19     part of what I had to do was like the pixel dust that,
20     you know -- that I had to provide was understanding all
21     the divisions in the Jewish community -- Conservative,
22     Orthodox, Humanistic -- you know, with all the
23     adjectives, understand that community, nurture
24     relationships with the rabbis and the -- the people that
25     moved the -- you know, move the community, the

Page 69

1      influencers, we would call them today, and make sure
2      they were all on board, provide educational
3      opportunities and all that stuff, and, of course,
4      provide for the spiritual care needs of our patients.
5         And sometimes providing meant hooking them up with
6      their own rabbi and working in tandem with their own
7      rabbi.
8         So, that's a --
9  Q.  Okay.
10 A.  -- as brief as I could do outline --
11 Q.  Okay.  That's helpful.
12 A.  -- that -- that I think satisfies your answer(sic).
13 Q.  Okay.
14 A.  Your question.
15 Q.  When you create JHCN, who are the next people you
16     hire -- or I guess you didn't hire yourself, but who do
17     you -- who was the first in the door?
18 A.  The first one that was hired and didn't get paid was my
19     daughter as my assistant secretary.
20 Q.  Okay.  Who is next?
21 A.  Nathan Shiovitz, again, wasn't hired.  He was a
22     volunteer that, when I started JHCN, he glommed onto me
23     and said, "I want to be your -- your primary volunteer."
24         We ended up having an office in our location and
25     was doing -- it appears -- you know, in memory, it

Rabbi E.B. "Bunny" Freedman
March 13, 2024

Page 70

1    appears to me that he was doing more work than an
2    employee would, you know, nights and all that stuff,
3    extremely dedicated.
4    Q.   Okay.  How about -- how about once we get to the point
5         of pay?
6    A.   Okay.  The first person that was hired was Sue Lazar,
7         who is, to this very day, my assistant, and she's our
8         office manager currently.
9    Q.   Okay.  Does she have a role in development or education
10        or anything else?
11   A.   She has a role in everything.
12             I mean, no, she -- she just does the backup for
13        everything.
14   Q.   Okay.  And then who is next in the door?
15   A.   Next in the door?
16   Q.   Paid -- paid employee?
17   A.   Okay.  I -- I enlisted a cadre of rabbis, very diverse,
18        and it was -- I must say it was a breakthrough to get
19        Reform, Orthodox, Conservative, Chabad or Hasidic
20        rabbis, Humanistic rabbis at the same table, and I
21        provided a program for CP, clinical pastor education
22        for rabbis of different denominations, representing
23        different communities.  And it was clinical pastoral
24        education, which is a required form for most hospitals
25        for -- for pastoral care.  So, that's a degree, you

Page 71

1    know.  And we ended up doing four credits, which got us
2    equal to a master's degree, all of us, in pastoral
3    care.
4             And a number of those rabbis became at least
5         part-time employees.  And I -- along the years, I have
6         facilitated for other rabbis to get CPE, and they became
7         the beginnings of chaplaincy group that was very
8         representative of the broad community, who became
9         contingent of part-time employees of -- of ours.
10   Q.   Okay.  So --
11   A.   That's a whole group.
12   Q.   There's a whole group of like rabbis that -- that would
13        be next in line somewhere, depending on who was first,
14        but somewhere in there --
15   A.   No.  Depending on their -- their capabilities and
16        their -- their -- you know, in their willingness to --
17        to get involved and more -- further engaged.
18             So, some rabbis were pulpit rabbis and there was no
19        way they could take that on, and some were maybe Hebrew
20        teachers that -- that were rabbis and could find spare
21        time in their day to do visits and things like that.
22        And we ended up with a full crew.
23   Q.   What is the -- that -- the patients don't pay for any --
24        or the callers, even if they aren't patients yet, don't
25        pay for JHCN services; right?

Page 72

1    A.   Correct.
2    Q.   And -- and JHCN services aren't for sale to be bought by
3         hospices or hospitals; right?
4    A.   That's qualified.
5    Q.   Okay.
6    A.   Like myself, there are other rabbis that are -- their
7         services are "bought," as you're calling it, for other
8         agencies throughout the community.
9    Q.   Okay.  Other hospices?
10   A.   Other hospices, sometimes nursing homes or other things.
11   Q.   Okay.  What other hospices are paying rabbis who are
12        also paid by JHCN?
13   A.   Currently, Heart to Heart, Michigan Palliative --
14        Michigan Palliative and Hospice Care is, I think, their
15        official name.
16             There have been numerous other ones along the way.
17             There's a missing -- I think one -- HCR.  Those are
18        the ones that are -- but there's -- I'm missing -- yeah,
19        there were others -- many others along the way that --
20        that had this kind of relationship.
21   Q.   How many as of 2021 besides the ones you named?
22   A.   I can't remember if there -- if there's others currently
23        or since 20- --
24   Q.   Okay.
25             THE REPORTER:  I'm sorry.  "-- since --"?

Page 73

1    A.   Since 2021.
2             THE REPORTER:  Thank you.
3    BY MS. PRESCOTT:
4    Q.   Okay.  So, how -- what rabbis work for Heart to Heart?
5             THE WITNESS:  Am I on --
6             MR. McGORISK:  What you know.
7             THE WITNESS:  What?
8             MR. McGORISK:  I mean --
9    A.   Yeah, I could share, but I'm saying there might be
10        competitive stuff that -- well, it's protected?  I just
11        want to know.
12   BY MS. PRESCOTT:
13   Q.   Yeah.  It's -- there's a protective order.
14             MR. McGORISK:  Yeah.  We already cited the
15        protective order.  So, it's not going to go outside of
16        the people involved in the case.
17             THE WITNESS:  Okay.  But it's -- there's a concern
18        in my mind that it might be competitive issues related
19        to different hospices.
20             Okay.  I can answer, because it's no --
21             MR. McGORISK:  You --
22   A.   Heart to Heart -- what?
23             MR. McGORISK:  You don't feel comfortable for some
24        reason disclosing --
25             THE WITNESS:  I'm -- I'm worried about competition

Rabbi E.B. "Bunny" Freedman
March 13, 2024

Page 74

1    with Hospice of Michigan and other hospices.
2    BY MS. PRESCOTT:
3    Q.   But I don't -- we don't represent any hospices, and we
4         don't -- I mean, the hospices themselves know this
5         information.  So, I don't know why it would be secret.
6         But your lawyer thinks it's secret and --
7    A.   Okay.
8              MR. McGORISK:  Yeah, I'm --
9              THE WITNESS:  You're not concerned?
10             MR. McGORISK:  I don't see the relevance of it,
11        but, I mean, this is a discovery deposition.  So,
12        there's nobody to rule on that.
13             But -- I -- I don't know --
14   A.   So, my concern is --
15             MR. McGORISK:  -- from a competitive nature --
16   A.   Is this on record?
17   BY MS. PRESCOTT:
18   Q.   Yeah.
19             MR. McGORISK:  Yeah.
20   A.   Yeah.
21             So, I'm a little concerned about competitive people
22        being concerned about who is getting paid and who is not
23        getting paid.
24             There -- see -- there's many that don't get paid,
25        and there's criteria we use when we -- to allow one of

Page 75

1    our -- our employees to get paid.
2              And -- and that's sort of privileged information.
3    BY MS. PRESCOTT:
4    Q.   Yeah, it's not privileged.  So --
5    A.   Huh?
6    Q.   But go ahead.
7              So, who got paid by Heart to Heart?  Or who gets
8         paid?
9    A.   Rabbi Rabin.
10             THE REPORTER:  I'm sorry.  "-- Rabbi --"?
11   A.   Rabbi Rabin.
12             THE REPORTER:  Thank you.
13   BY MS. PRESCOTT:
14   Q.   Okay.  And have you been paid by Heart to Heart?
15   A.   No.
16   Q.   And is there anyone else that you know that's been paid
17        by Heart to Heart that's also a JHCN employee?
18   A.   One second.
19             See, I'm -- Rabbi -- excuse me -- Rabbi Rabin is
20        paid by HCR.
21   Q.   Not Heart to Heart?
22   A.   Not Heart to Heart.
23   Q.   Okay.  Who was the Heart to Heart person?
24   A.   Rabbi Joey Krakoff.
25   Q.   Okay.  And before Krakoff, was there anyone else?

Page 76

1    A.   I don't recall.  I don't know.
2    Q.   All right.  And then what about anyone else that HCR
3         pays at JHCN?
4    A.   No.
5    Q.   What about Michigan Palliative?
6    A.   Is Rabbi Joey Krakoff.
7    Q.   And before Krakoff, was there anyone else Michigan
8         Palliative paid?
9    A.   Again, I don't -- I don't recall.
10   Q.   Okay.  Rabbi Kaluzny is an employee?
11   A.   Uh-huh.
12   Q.   Right?
13             Yeses and nos.
14             THE REPORTER:  I'm sorry?
15   A.   Yeah.
16   BY MS. PRESCOTT:
17   Q.   A JHCN employee?
18   A.   Yes.
19   Q.   Does she receive pay from any hospice?
20   A.   I don't think so.
21   Q.   And when these people are receiving pay, are they
22        receiving salaries or hourly or what are they getting?
23   A.   Usually it's a set fee, and it -- it's modeled very much
24        like my relationship with HOM.  And it's taking care to
25        see that the patients get the best possible care, which

Page 77

1    includes a -- lot of things beyond spiritual care,
2    enrichments and all the other things that we offer,
3    which are social workers and things like that.  But the
4    rabbi is paid for his role, and it's very similar.
5         They attended the team meetings, and they -- they
6    take responsibility for all the patients that are --
7    that are on that particular hospice, the Jewish
8    patients, and they report weekly.  They attend the
9    meetings personally.
10        I'm not sure there's any distinction really.
11   Q.   Okay.  So, let's talk about -- okay.
12        So, when JHCN adds these part-time employees, these
13   rabbis, they come in for the education, and you go
14   through that and they start to come on board.
15        The income of JHCN is from fundraising and
16   donations; right?
17   A.   I want to emphasize that most of our employees right
18        now, rabbis, are full-time.
19        In 20- --
20   Q.   Okay.
21   A.   A while back, when it started, when we started CPEs,
22        they were all part-time.  When you -- because we started
23        talking about employees.
24        So, the -- they were part-time.  Back then it was
25        very contingent, and -- and we didn't have the kind of

Rabbi E.B. 'Bunny' Freedman
March 13, 2024

Page 78

1    funding necessary to hire full-time people and give a
2    lot of benefits.  So -- yeah.
3  Q.  When you are paying people and paying yourself or paying
4    for benefits, whatever the --
5  A.  Yeah.  Right.
6  Q.  -- you know, whatever the outflow is --
7  A.  The deal is, yeah.  Right.
8  Q.  -- whatever the -- the --
9  A.  Payments.
10 Q.  -- expense side of this --
11 A.  Right.  Sure.
12 Q.  -- of the profit and loss statement, the income is from
13   donations; correct?
14 A.  Uh-huh.
15     MR. McGORISK:  "Yes"?
16     THE REPORTER:  I'm sorry.  Is that --
17 A.  Yes.
18 BY MS. PRESCOTT:
19 Q.  Okay.  And the donations are -- to your point, you had
20   been a fundraiser all the way back to the Hebrew school
21   and probably before that, and you talked about attending
22   funerals and that you were a fundraiser -- well --
23 A.  Nurtured relationships.
24 Q.  Okay.  You went all the way -- that goes all the way
25   before HOM; right?

Page 79

1  A.  Correct.
2  Q.  Okay.  And among the people that -- the way that -- to
3    this day JHCN is funded is -- the vast majority is
4    through individual donations; right?
5  A.  Correct.
6  Q.  Okay.  And when a family is involved with JHCN, somebody
7    who maybe gets the enrichments, maybe it's music, maybe
8    it's the social work, maybe it's, you know, any number
9    of these things, they don't have to pay for that
10   service; right?
11 A.  Correct.
12 Q.  They are -- the most that happens with them is that
13   they're -- you know, they're processed into JHCN.  They
14   may be followed.  They may be assisted into a hospice or
15   not.  They may be requested to fundraise through
16   invitations to events or donations; correct?  To make
17   donations?
18 A.  They're invited to do so, yeah.
19 Q.  And their families, if they pass away, are invited to do
20   so; right?
21 A.  Uh-huh.  Correct.
22 Q.  Okay.
23 A.  Well, the patients are almost never -- are -- yeah, we
24   wouldn't solicit the patients.  But we would solicit the
25   family and only after we've produced all the goodwill.

Page 80

1  Q.  Fair.
2      And the goodwill are the -- these things that
3    you're talking about relative to the enrichments, the
4    guidance?
5  A.  Social work --
6  Q.  Social work --
7  A.  -- spiritual care, and a massive amount of navigation
8    and, you know, walking -- holding their hand throughout
9    the process and cultivating a relationship with the
10   family that trust us and, you know -- and know that
11   they could always call on us 24/7.
12 Q.  When you presented Exhibit 3 -- so, this document -- you
13   mentioned that the handwriting on the front is
14   Dottie Deremo?
15 A.  Uh-huh.
16     THE REPORTER:  I'm sorry.  Is that "yes"?
17     MR. McGORISK:  "Yes"?
18 BY MS. PRESCOTT:
19 Q.  Yeses and nos.
20 A.  Yes.
21 Q.  She thought this was an excellent piece of work and she
22   said, "Script out the meeting"?
23 A.  Uh-huh.
24 Q.  Right?
25     THE REPORTER:  I'm sorry.  Is that --

Page 81

1  A.  Yes.
2  BY MS. PRESCOTT:
3  Q.  Were there any parts of Exhibit 3 that you recall being
4    rejected or whittled away, not pursued in subsequent
5    years?
6  A.  I don't think any of it was, you know, rejected.
7  Q.  Okay.  There are -- you are suggesting benefits to HOM
8    in the -- in the final two pages; correct?
9      There's a whole bunch of bullet points of benefits?
10 A.  Yeah.
11     I'm going to turn to that and -- if I can find it.
12     Okay.  Yes.
13     Benefit to H- -- I've got it.
14 Q.  Okay.  Did this document become the backbone of your own
15   understanding of the relationship with HOM?
16 A.  The template, yeah.
17 Q.  Okay.  How was it received?  What was the reaction you
18   got from the Hospice of Michigan staff that -- that was
19   part of this?
20 A.  I think it was received very well.  I think they
21   followed with a series of meetings, which only one that
22   I have notes, you know, that -- that list, you know, the
23   things they wanted to work out with us -- here it is --
24   and, you know, which I -- I referred to that document
25   that it was, I believe, written by Greg Grabowski.

Page 82

1    I believe so.
2  Q.  Did anyone at Hospice of Michigan ever tell you that
3      they did not want you to represent the interests of
4      Hospice of Michigan or position Hospice of Michigan in a
5      positive way in the community?
6  A.  When I say -- when you say "did anybody ever," in 25
7      years?
8        The answer is that -- not that I can recall.
9        And I'm pretty sure -- I mean, there -- there could
10     be -- this is -- I was sort of referring to earlier.
11       There's competition between all these hospices, and
12     it -- it takes sort of a -- a juggling to make sure
13     you're not stepping on people's toes and things like
14     that.
15       Were people ever upset with us from the hospice
16     world that why do we favor this organization, that
17     organization or why don't we get referrals from you?
18     Yeah, there could be some, you know, babble about that.
19     But did they come explicitly to tell me?  No.  I -- I
20     don't recall.
21  Q.  Okay.  So, relative to the last piece about, you know,
22     people being irritated with are -- are we getting the
23     best of you, like -- right?  Like are we getting your --
24  A.  Yeah.
25  Q.  -- you know, the lion's share of your --

Page 83

1  A.  Services.
2  Q.  -- your -- your community's business --
3  A.  Yeah.  Involvement.  Engagement.
4  Q.  -- you know?
5  A.  Uh-huh.
6  Q.  Did -- did people at Hospice of Michigan confront you
7      with sort of what's the return on our investment in you?
8  A.  The answer is no.
9        And the answer that I told competing people was
10     universally always, "Hospice of Michigan gives us great
11     care.  If you give us as great care as them, or exceed
12     them, accordingly, you'll probably end up getting more
13     business.  We don't make referrals, but we know who we
14     have great relationships with and who serve our people
15     well.  So, the determinant is always the best care
16     possible."
17  Q.  And who is employing you?
18  A.  Pardon?
19  Q.  And who continued to employ you from 2010 to 2022;
20     right?
21     MR. McGORISK:  Object to form.
22  BY MS. PRESCOTT:
23  Q.  Because nobody else did that besides Hospice of
24     Michigan?
25  A.  But that wasn't my part -- part of my conversation with

Page 84

1      anyone else.
2  Q.  I'm sure it wasn't, but that's the fact; right?
3  A.  Me?  No one paid me other than Hospice of Michigan --
4  Q.  Right.
5  A.  -- as I said.
6  Q.  Right.
7  A.  So, I got paid from Hospice of Michigan.
8  Q.  Right.
9        So, other than the fact that you were on their
10     payroll and they gave great care, was there any other
11     factor that ended up --
12  A.  It was only --
13  Q.  Let me finish, sir.
14     THE REPORTER:  I'm sorry --
15  A.  Sure.
16  BY MS. PRESCOTT:
17  Q.  Let me finish.
18     -- that ended up, it just so happens, with most of
19     the people that came through JHCN ending up at Hospice
20     of Michigan?
21  A.  We looked for the best care possible in every situation,
22     and that varied for every situation.  We would always
23     put out numerous options that we felt might fit their
24     needs, and we made it very clear that it was their
25     choice, not ours.  And we laid out what we knew about

Page 85

1      how to get the best care possible and somebody meet
2      their needs.  And the needs would invariably change with
3      almost every patient.  And sometimes some hospices fit
4      it better than others.
5  Q.  So, do you agree with the testimony from yesterday that
6      there are other hospices that give just as good care to
7      the Jewish community as Hospice of Michigan, equally
8      good care?
9  A.  Who testified that?
10  Q.  Natalie Miller(sic).
11  A.  Oh, Natalie.
12  Q.  Natalie Rosenfield.
13  A.  So, what did she -- tell me again what she said.
14  Q.  She named off -- I don't know -- three, four hospices
15     that she --
16  A.  Oh, we -- we --
17     THE REPORTER:  I'm sorry.  I'm sorry.
18  BY MS. PRESCOTT:
19  Q.  You have to let me finish.
20  A.  Yes.
21  Q.  She named off three or four hospices that she said were
22     equally as good as Hospice of Michigan.
23       Do you agree that there are three or four other
24     hospices --
25     MR. McGORISK:  Hold on a second --

Page 86

1  BY MS. PRESCOTT:
2  Q.  -- in the area that are just as good as Hospice of
3      Michigan?
4          MR. McGORISK:  Let me object to the form of the
5      question, because this misstates her testimony, I
6      believe, and that's not what she said about the other
7      hospices.
8          MS. PRESCOTT:  Okay.  Well, I asked her who is
9      better than Hospice of Michigan, and she said, "Better?
10     I don't know of anyone better but same quality," and she
11     named three or four places.
12 BY MS. PRESCOTT:
13 Q.  But let's -- let's go past that.
14     Who gives better care than Hospice of Michigan to
15     Jewish patients in the area?
16 A.  I don't know.
17 Q.  Who gives --
18 A.  But that doesn't agree that they give the best care.  I
19     don't know who to name that does better care.  And I --
20 Q.  Who gives the best care to Jewish patients?
21 A.  That's -- that's a variable.
22 Q.  It depends; right?
23 A.  Sure, it depends.
24 Q.  Okay.
25 A.  I mean, in -- in certain --

Page 87

1  Q.  And she certainly said, "It really depends.  There's
2      different factors."
3          She certainly --
4  A.  Dozens of factors that -- you know, and we strive to be
5      really, really -- this may not answer your question, but
6      I'll tell you what's -- really is important to us.
7          Good communication with us is very, very important.
8      If someone dies, and we didn't -- and we're jointly
9      taking care of with the hospice and -- and us, and they
10     don't call us to say the person died, and our rabbis end
11     up -- or whoever, enrichment specialists, call them up
12     and say, you know, "I -- could I come see Valerie
13     today?" that's not good.
14         We don't like those people that consistently make
15     that mistake and not inform us.
16         So, there's -- and I'll give you one example, and
17     there's dozens of examples like that.
18         So, when you say "Who is the best," there's a lot
19     of different qualities that I couldn't tell you the
20     best.  But if I have a patient that needs certain kind
21     of treatment that one hospice doesn't give and another
22     does, guess what they're going to hear in between the
23     lines that -- that what is a really, really good fit for
24     them?
25         If one -- one organization knows how to treat

Page 88

1      special -- like I referred to earlier -- they have a
2      translator that could translate, and they have a service
3      that sometimes they'll -- some hospices will actually
4      give service for -- for dialysis a couple times, very
5      expensive service, and they'll do it a couple times
6      until they condition the patient that -- you know,
7      convince them that it's really not helping them anymore.
8      And some people will just say, "We'll never give
9      dialysis."
10         It's just -- we don't want to spend all day me
11     giving you examples, but every patient I ever walk in to
12     or my rabbis walk in to have different needs.
13 Q.  Is it just --
14 A.  We -- we --
15 Q.  Go ahead.
16 A.  We specialize, and we believe that it's a part of our --
17     our very DNA, so to speak, that we understand strengths
18     and weaknesses of different hospices.  So, if you ask me
19     who the best -- if you refined it, I probably could
20     answer the question to that nature.  Like best in what?
21         Some people get to spend more time taking -- I'll
22     answer my question.
23         Some people take more -- give you more time with
24     private duty aides.  One hospice might give one hour a
25     week.  Another hospice might give actually two hours a

Page 89

1      day.  And if that's what they need, especially if
2      they're -- if the patients are alone or they have family
3      that can't cover, that becomes an integral part of it.
4          So, we never tell them, "You ought to take --" to
5      my -- best of my knowledge, I speak for myself and what
6      we -- we iterate to our staff all the time, we don't
7      tell people, "You should use this company."
8          We tell them, "Here is four really fine companies,
9      and, you know, this one does this, and this one does
10     this, and this one this.  So, you know, if you're
11     looking for that, you might be thinking about that."
12         And that's -- I hope all my rabbis are doing that
13     every time they visit a patient.
14 Q.  Do you refer to these read-between-the-line suggestions
15     and recommendations to people as referrals?
16         MR. McGORISK:  Object to form.
17         No, go ahead.  You can still answer.
18 A.  Okay.
19     I never refer to "referrals."  That's not in my
20     lexicon because I don't like that word.  That would --
21     might imply things, like kickbacks and things like that.
22     So --
23 BY MS. PRESCOTT:
24 Q.  Right.  The use of the word, though, isn't what -- just
25     like we talked about earlier, I'm not interested in

Page 90

```
1    labels as much as I am interested in the reality.
2            But I did ask you, to be fair, if you use the word
3    "referrals," and referrals might imply kickback.
4            Natalie Miller -- or Natalie Rosenfield talked
5    about referrals with HOM pretty frequently.
6            Are you aware of that?
7            MR. McGORISK:  Object to form.  Misstates her
8    testimony.
9    A.  I don't know that.  I wasn't -- I didn't hear -- I
10   didn't see any documents.  I didn't have a conversation
11   with her, but I don't know --
12           THE REPORTER:  I'm sorry.  "Did" or "did not have"?
13   I'm sorry.
14   A.  I didn't have a conversation with Natalie, but --
15   BY MS. PRESCOTT:
16   Q.  What -- what was her job at JHCN before 2021?
17   A.  What was her job?
18   Q.  Yeah.
19           What were her job duties?
20   A.  Before JHCN, she worked for Hospice of Michigan.
21   Q.  Before 2021 --
22   A.  Before --
23   Q.  -- at JHCN, what was Natalie's job duties?
24   A.  She's our care coordinator.
25   Q.  What does that mean she does day-to-day?
```

Page 91

```
1    A.  She -- from intake to final passage and -- and beyond,
2    she is informed about every patient.  There's two social
3    workers now, and they -- their job is to track every
4    patient activity and know that it's -- the assignment
5    was completed and to know where there are bumps along
6    the road and problems and to stay informed about all
7    those patients and offer assistance wherever possible.
8    They're both social workers.
9    Q.  So, let's talk about JHCN.
10           You founded it.  In part, its mission has always
11   been -- and it's just one of the things, but its mission
12   has certainly always been education, educating the
13   caregiving community, hospitals, hospices, whomever you
14   can, right, about specific cultural and religious needs
15   of the Jewish population; right?
16   A.  Uh-huh.
17           THE REPORTER:  I'm sorry.  Is that "yes"?
18           MR. McGORISK:  "Yes"?
19   A.  Yes.
20           Thank you.
21   BY MS. PRESCOTT:
22   Q.  Okay.  And that can include less formal sort of just
23   encounters that, you know, sort of guide the caregiver,
24   doctor, nurse in the moment, but it can also be up to,
25   "Let's sit down in the seminar room and -- and I'll talk
```

Page 92

```
1    for an hour"; right?  Or someone will talk for an hour?
2    A.  Or two hours.
3    Q.  Okay.
4            But the point is like it can be less formal, sort
5    of day-to-day education all the way up to a formal
6    seminar?
7    A.  All the way up to a conference each year with attendance
8    of -- aimed at professionals in the end-of-life care
9    world.  And it's a full-day seminar with -- that each
10   year with different speakers each year from around the
11   country.  It's a major conference recognized around the
12   country.  We have always attracted the top speakers
13   available in this world and in the end-of-life world and
14   drawing expertise from other places.  I mean, we'll have
15   people that lecture on heart disease and brain disease,
16   cancer and things like that at this conference.
17           And it's very, very popular.  And it's part of -- a
18   big part of our education.  We have an education
19   director that takes care of that conference and builds
20   it out every year, and it's quite a production.  And
21   education could be taking hospice employees to the
22   Holocaust Memorial Museum.  It could be a cultural,
23   talking to them about different things on the Jewish
24   calendar, different holidays or whatever it might be,
25   the high holidays and different -- obviously, at least
```

Page 93

```
1    initially, when we have an association with a hospice,
2    we'll -- we'll try and drill down the Jewish customs
3    that they should recognize that are relevant for going
4    into the home, and, you know, what -- what "kosher"
5    means and stuff like that.
6    Q.  Okay.  The -- the conference you mentioned is called the
7    Caring Coalition; correct?
8    A.  (Nods head.)
9            THE REPORTER:  I'm sorry.  Is that --
10   A.  Yes.
11   BY MS. PRESCOTT:
12   Q.  Yes.  Okay.
13           Throughout the time -- what is your title today at
14   JHCN?
15   A.  I'm the Executive Vice President.  I'll -- the -- I
16   think it's Exec- -- I --
17   Q.  It's like your age; right?  You don't even -- yeah.  You
18   have to think about it.
19   A.  No.  No, not my age.  I just don't -- titles don't
20   interest me that much.
21   Q.  Okay.  All right.
22   A.  And my own titles.
23           I'm the Executive Vice President, I think.
24   Q.  That changed in the last couple of years?
25   A.  Yeah.
```

Rabbi E.B. "Bunny" Freedman
March 13, 2024

Page 94

1  Q.  And what was it before?
2  A.  CEO.
3  Q.  There's a board of JHCN?
4  A.  Correct.
5  Q.  Bob Cahill and Patrick Miller and the Medical Director
6     of Hospice of Michigan all sat on the advisory board of
7     JHCN as well?
8  A.  Uh-huh.
9  Q.  Correct?
10 A.  Uh-huh.
11        THE REPORTER:  I'm sorry.  Is that --
12 BY MS. PRESCOTT:
13 Q.  Yeses and nos, if you can.
14 A.  Yes.
15 Q.  Okay.  If the --
16 A.  I'm sorry for being so loud.
17 Q.  Is the advisory board the same as the executive board?
18 A.  No.
19 Q.  Okay.  So, did Bob and Patrick know that they were part
20    of the advisory board?
21 A.  I can't answer if they knew or not, but they -- it's
22    very likely that they didn't know or they didn't
23    remember that we asked them somewhere along the line,
24    and it was perfunctory and honorary, and it was a -- we
25    used to have meetings.  We don't have any meetings of

Page 95

1     the advisory board any longer, but it's -- in some ways,
2     it's called -- we call it window dressing.  It's the
3     people that we interact with on a regular basis in doing
4     our work and that our -- you know, that we learn from
5     them, they learn from us, and play a role as advisors.
6  Q.  Okay.
7  A.  You know, meaning, not advisors as a committee sitting
8     in and deciding -- making decisions, but all of the
9     people on that list are people that help us do our work
10    and help train us as necessary, engage us, we engage
11    them.
12 Q.  If -- I mean, did you put people on the advisory board
13    without ever having a discussion with them about it?
14 A.  It might have -- have happened, you know, or it might
15    have been a judgment.  You call them six times, and you
16    leave a message or send an e-mail and you take that
17    as -- as an approval.
18        So --
19 Q.  Okay.
20 A.  We -- we certainly tried to -- to make sure that
21    everyone was aware.
22        We didn't remind them a hundred times, you know.
23    We would get them signed on and -- almost year-by-year,
24    unless we heard from them, they don't want to be listed.
25    It's more a listing than anything else.

Page 96

1  Q.  Okay.
2        (Discussion held off the record.)
3  BY MS. PRESCOTT:
4  Q.  There's a different board which is your -- sort of like
5     your board of directors, though; right?
6  A.  Executive board, yes.
7  Q.  Executive board.  Thank you.
8        And do you have a role on that board right now?
9  A.  I attend all the meetings.  But as -- and as an officer,
10    that's my role.
11 Q.  What -- what officer are you right now?
12 A.  Executive vice president, as I recall.
13 Q.  I see.  Okay.
14        And then so, before you became executive vice
15    president, were you the chairman of the executive board
16    when you were the CEO?
17 A.  No.
18 Q.  Who was chairman of the board?
19 A.  David Techner.
20        THE REPORTER:  Can you repeat the last name?
21        David Techner, T-e-c-h-n-e-r.
22 BY MS. PRESCOTT:
23 Q.  And David is the person you mentioned earlier in the
24    deposition who you thought about going into business
25    with before you ever went to HOM?

Page 97

1  A.  Good point, yes.
2  Q.  Right?  The same guy?  Okay.
3        Is there -- how many people are on that board?
4  A.  I think about 15.
5  Q.  Okay.  And is there an executive committee of that board
6     that is more routinely involved in operations?
7  A.  On paper there certainly is -- and yes.
8  Q.  And have you been on that executive committee as long as
9     JHCN has existed?
10 A.  Yes.
11 Q.  Okay.  Is there anyone on your -- on your executive
12    board who you didn't invite to be part of JHCN?
13 A.  There might be.  Rabbi Joey Krakoff plays a role in that
14    now and -- and he engages people, but no one gets on the
15    board without he and I having a conversation about it.
16    So --
17 Q.  Can you name anyone that you didn't invite that is on
18    the board right now?
19 A.  Yeah.  I'm not good at -- I am not good at remembering
20    names, so it will come to me.
21        There's two people that I'm keeping in mind, but
22    I -- the names will probably pop up.
23 Q.  Okay.  But they're --
24 A.  When they do, I'll --
25 Q.  To your point, there's a couple?

Rabbi E.B. 'Bunny' Freedman
March 13, 2024

Page 98

1  A.  Yeah.  There's a couple.  Yeah.
2  Q.  Okay.  Okay.  And those people would be people that
3       Rabbi Krakoff invited?
4  A.  Yeah.
5  Q.  How did you meet Rabbi Krakoff for the very first time?
6            Is he a friend of the family or professionally or
7       how?
8  A.  Rabbi Krakoff was the rabbi of a very large
9       congregation, Schaarai Zedek, and he was a rabbi for 16
10      years.  And prior to working for JHCN, I was quite
11      familiar with him, and we interacted, like I did with so
12      many other rabbis in the community.
13           And it was David Techner when Rabbi Krakoff was
14      leaving Schaarai Zedek that recommended that he could --
15      could make a possible good understudy and be part of a
16      succession plan.
17 Q.  And when in time is that?
18 A.  About 2015.
19 Q.  Okay.  Before 2015 was Rabbi Krakoff one of the people
20      who, from time to time, worked as a spiritual care
21      advisor at Hospice of Michigan?
22 A.  He was not official -- one of the -- he was not one of
23      those eight rabbis that -- and -- and was a part-time
24      employee.  He was never a part-time employee, but he
25      was -- as we do with almost all the rabbis in town at

Page 99

1       sometime or another, we're talking to -- would be
2       talking to him, and -- and it was frequent.  He was very
3       active in pastoral care.  And --
4  Q.  So, is that a yes, that he was a spiritual care advisor
5       before 2015?
6  A.  He was -- his title was pulpit rabbi for Schaarai Zedek.
7       He was doing spiritual care for Schaarai Zedek people.
8       And often in that, he would call us or we would call him
9       to get involved in one of the patients we were working
10      with.  So --
11 Q.  I guess what I -- I want to -- let me put it this way.
12           You attended these IDT meetings at HOM?
13 A.  Uh-huh.
14      THE REPORTER:  I'm sorry.  Is that --
15 BY MS. PRESCOTT:
16 Q.  Yeses and nos.
17 A.  Yes.
18 Q.  And along the line, one of the things you would do with
19      Natalie there is that, one or both of you would go
20      through this -- who -- which patients were the Jewish
21      patients and you would say this rabbi is on their care
22      plan, that rabbi is on their care plan?
23 A.  Uh-huh.
24 Q.  The third rabbi -- and -- and Rabbi Krakoff was one of
25      those people before --

Page 100

1  A.  Who showed up on --
2  Q.  -- before 2015 who would be giving spiritual care;
3       correct?
4  A.  Yes.
5  Q.  And not only did he do that, but Jewish Hospice
6       Chaplaincy Network presented it as a relationship that
7       he had with JHCN; right?  That he was one of the rabbis
8       affiliated with JHCN; right?
9  A.  Please make more clear.
10           He was affiliated?  That's like a very loose word,
11      he was "affiliated."  If he stopped by to say "hello,"
12      he might be affiliated.
13           What does "affiliation" mean?
14 Q.  Well, there came a time when you counted up all of the
15      pastoral care that JHCN was coordinating and helping HOM
16      receive from the Jewish community; right?  And you would
17      tally it up and you would say look at all the value -- I
18      mean, I -- you didn't say it exactly, these words, but
19      you would tally it up and meet with JHCN and -- or HOM
20      and say, "Look, we're bringing you all these different
21      rabbis to work for you."
22           Do you recall doing that?
23 A.  No.
24 Q.  Okay.
25 A.  Here, for this, after I saw the -- the -- the

Page 101

1       depositions from Patrick and -- and -- I forget her --
2       the other person's --
3  Q.  Myers.
4  A.  Myers, yeah, I tabulated an estimation.  And I
5       include -- it's in that book somewhere that -- you know,
6       that we provide based on -- I took a sample -- whatever.
7       I did some kind of calculation and it came up that we're
8       giving about $670,000 worth of care that it costs us,
9       not necessarily the reimbursement they get.
10           I don't ever recall factoring the income that they
11      make on -- on our patients.
12 Q.  But did you not hold out a whole set of congregational
13      rabbis as people who were affiliates of JHCN, and JHCN
14      would assist?
15           You would be the one responsible for attending the
16      IDT to say that their name was -- and that they were
17      seeing Ms. So-and-So or Mr. So-and-So, and they were
18      affiliates of JHCN.
19           You did that; right?
20 A.  I don't know.
21 Q.  Okay.
22 A.  I don't recall.  Yeah.
23 Q.  Well, then let's look at Exhibit 3.
24 A.  Uh-huh.
25 Q.  This is the one that -- you should have a marked one

Rabbi E.B. 'Bunny' Freedman
March 13, 2024

Page 102

1    there.
2  A.  Okay.
3  Q.  And you also have it in your notebook, but --
4  A.  Yeah.
5  Q.  Exhibit --
6  A.  Oh, right.  You gave it to me earlier.  Correct.
7  Q.  Okay.
8  A.  Thank you.
9  Q.  All right.  At the bottom of page 1, you talk about the
10     JHCN rabbinical team of ten rabbis, in the
11     third-from-the-bottom bullet point.
12 A.  Uh-huh.
13 Q.  And then in the second-from-the-bottom bullet point, you
14     reference congregational rabbis, and you say -- this is
15     under Benefits to Hospice of Michigan.  You say:
16          "Access to approximately 30 congregational
17          rabbis who are affiliated with --"
18     it says --
19          "-- JHCN and have received specific training
20          in working with hospice patients."
21 A.  Yes.
22 Q.  Does that make sense?
23 A.  It says there on it.  Yes.
24 Q.  Right.
25 A.  I wrote that.

Page 103

1  Q.  And so that's what I meant.
2          That you had these rabbinical -- excuse me -- these
3      congregational rabbis who were affiliates of JHCN, and
4      you told Hospice of Michigan, "They're our affiliates,
5      and they can provide care -- spiritual care to your
6      patients"; right?
7  A.  "Affiliates" is just a word saying they're associated
8      with us, would be synonymous with that.  They were
9      associated with us.  I said in that line that I would
10     help get access to those rabbis.
11 Q.  Right.
12 A.  I have a telephone list of all these people.  I know
13     these people, and -- and we could make sure that they're
14     interacting as best as I can.
15         I had no power over them and no way -- they -- I
16     didn't -- wasn't claiming, using the word "affiliate" to
17     say that these people are on our payroll or they -- they
18     swore on a document that they would join us.  I say
19     they're affiliated because these are people that I had
20     called or will call or do call, and I know them.  I
21     attended -- I was a member of the Michigan Board of
22     Rabbis.
23         So -- so, all people that I could say I was
24     affiliated with personally, but they had no
25     officialdom -- official role with Jewish Hospice, and I

Page 104

1      didn't mean --
2  Q.  Not on payroll; correct?
3  A.  Not on payroll.  We didn't pay these rabbis to go visit
4      them, you know.  So, when they went to visit people --
5      and I have to make one exception, but let me make this
6      clear.
7          When they went to visit, these rabbi -- these
8      patients, they were -- generally speaking, they were
9      members of their congregation or former members of
10     congregation.
11         We always ask, as a matter of course, when we -- we
12     take on a new patient, we ask them, "Do you -- is there
13     a rabbi in your life?"
14         That's how we ask the question, because we don't
15     want to imply that you should have a rabbi or you don't
16     have a -- or you do have.  "Is a rabbi in your life?"
17         And then we say, "Would you like us to contact
18     them?"
19         That's what I mean there, and that's what we have
20     always done.
21         One of the reasons we do it for our own interests
22     is we don't want rabbis to think that we're taking over
23     their role, and we really don't want to take over their
24     role because they're the rabbi.
25 Q.  Okay.  So, before -- how we all got on this is, I was

Page 105

1      asking you about Krakoff.  And I said -- you said he
2      came to JHCN in 2015; that Techner had recommended him.
3      He was leaving his congregation.  And I asked was he a
4      spiritual care advisor for Hospice of Michigan patients
5      before 2015.
6          So, now that we've gone through the congregational
7      rabbis and what you've just told us, was Krakoff, before
8      2015, one of the congregational rabbis who would see
9      patients?
10 A.  Yes.
11 Q.  Okay.  And in that role, he was not paid by Hospice of
12     Michigan to your knowledge; right?
13 A.  (Nods head.)
14         THE REPORTER:  I'm sorry.  Is that --
15 BY MS. PRESCOTT:
16 Q.  Correct?
17 A.  Correct.
18 Q.  And then when he does come to JHCN and -- is he now what
19     you would consider part of JHCN's rabbinical team?
20 A.  Yes.
21 Q.  And he's paid by JHCN to do what when he comes?
22         What is his job when he comes to JHCN?
23 A.  2015?
24         Back in 2015?
25 Q.  Yes.

Rabbi E.B. 'Bunny' Freedman
March 13, 2024

Page 106

```
1          What is his job?
2   A.   It evolved, but it started as -- while you're
3        searching -- here is how it -- I'll give you the
4        narrative.
5          "While you're searching for your next role in -- in
6        life, why don't you come work with us and get a taste of
7        what it means working for us, and let us see --" and as
8        I refer to it, "Let's date before we get married."
9   Q.   Okay.
10  A.   And the -- so, he came to work with us part-time.  I
11       should note without any specific hours, and he was going
12       to give us -- the conversation was about half his time.
13       And -- and he -- he'll get trained by us in pastoral
14       care, and he'll get to know a few hospices, and he'll
15       tag along with people and shadow them, and then learn
16       what this organization is all about.
17          And it evolved into many, many conversations with
18       me and -- and my people that were there at the time.
19          And it turned into where he became a full-time
20       rabbi with us.  And that took about a year or two until
21       that happened and -- where he decided this is where he
22       wants to stick around for at least the meanwhile.  If I
23       recall, he wanted to stay around at least until his kids
24       grew up, went beyond high school.  And as it turned out,
25       he became a full-time rabbi with us.
```

Page 107

```
1   Q.   Okay.  At no time was he hired for servicing Hospice of
2        Michigan particularly; am I -- is that fair?
3   A.   Correct.
4   Q.   Okay.  So, what are his job duties?  I understand he got
5        some training and whatnot, but what is his -- what are
6        his job duties once he takes on the full-time role?
7   A.   Pastoral care, development and fundraising, taking on
8        select roles of management, sort of my assistant
9        associate or, you know -- you know, and sharing some of
10       my roles or taking over pieces of my role.
11          And at a -- yeah.
12  Q.   Okay.  We talked about one of the roles of Hospice of
13       Michigan -- or -- excuse me -- JHCN from the day you
14       founded it was community engagement, community
15       visibility, breaking down barriers, educating hospices
16       and hospitals and caregivers.
17          Did you -- have you always done that work as long
18       as JHCN has been in existence?
19  A.   Yes.
20  Q.   Okay.  Did Rabbi Krakoff join in that very work?
21          And we talked about, it could be a seminar; it
22       could be the Caring Coalition; it could be the Holocaust
23       Museum.  More -- much more casual interactions about the
24       holidays or the custom -- did he always do that
25       educational piece as long as he's been employed?
```

Page 108

```
1   A.   Fully employed.
2   Q.   Fully employed?
3   A.   Yes.
4   Q.   Okay.  And am I right in thinking that he is -- again,
5        I -- he wasn't assigned to only do that at Hospice of
6        Michigan; right?
7   A.   Correct.
8   Q.   Have you and Rabbi Krakoff always, as long as you have
9        both been fully employed, full-time employed by JHCN,
10       always engaged in pastoral care?
11  A.   Yes.
12  Q.   Okay.  Your document that's in the notebook, it talks
13       about how there came a time where the patient load was
14       too high and you started to more delegate to some of
15       these -- the rabbinical team; right?
16  A.   Uh-huh.
17          MR. McGORISK:  "Yes"?
18  A.   Yes.
19  BY MS. PRESCOTT:
20  Q.   Do you know what percentage of your time was in direct
21       caregiving to individuals in 2017 to 2021?
22  A.   I couldn't answer that question.
23  Q.   Okay.  Without charge, as long as it has existed, JHCN
24       has provided to Jewish people who come for care a
25       coordination effort between, you know, different
```

Page 109

```
1        entities and agencies?  That's -- that's universal;
2        correct?
3   A.   Correct.
4   Q.   And that's not special that -- something it only does
5        for people who go to Hospice of Michigan; right?
6   A.   Correct.
7   Q.   Have you been involved at some level in coordination
8        efforts for Jewish patrons or -- or, I guess, what do
9        you call your -- the people who come to JHCN?
10       "Patients" or --
11  A.   We do call them "patients."
12  Q.   "Patients."  Okay.
13          For those who are -- have become patients of JHCN,
14       have you been involved in the coordination effort as
15       long as it's existed?
16  A.   Yes.
17  Q.   And as long as he's been full-time, Krakoff has been
18       involved, right, in -- in coordinating care?
19  A.   On different levels, yes.
20  Q.   And you have talked about enrichments, and that this is
21       a benefit that's given to your patients and to sometimes
22       their families, and you've talked about social work.
23          And yesterday Natalie talked about whether it's
24       music or hair and nails or cultural celebrations, those
25       enrichments are offered and have -- through JHCN have
```

Rabbi E.B. 'Bunny' Freedman
March 13, 2024

Page 110

1    always been from its inception?
2  A.  No.
3  Q.  Okay.
4  A.  Earlier years, it wasn't there.
5  Q.  Okay.  That's developed over time?
6  A.  Right.
7  Q.  As long as it's existed -- and each program may have
8      come online at different times or it may have come and
9      gone, but as long as the different programming of
10     enrichments have existed, have they been provided to
11     hospices outside of Hospice of Michigan, patients who
12     are, you know, enrolled or enlisted as patients, whether
13     they're HOM or any other hospice?
14 A.  I would add something to that and say --
15 Q.  Okay.
16 A.  -- it was -- been offered to all of our patients that
17     are not on hospices, not on palliative care, not -- what
18     we would call supportive care that were -- numerous -- a
19     big piece of our census is supportive care earlier than
20     even an assignment to a palliative care program.
21         So, yes, to all our patients, we -- we offer it.
22     And I'd say -- yeah --
23 Q.  Okay.
24 A.  -- the answer to your question, I think.
25 Q.  And -- and for what -- all of these different -- we

Page 111

1      covered, you know, some of the -- the education and the
2      enrichments and the care coordination and the pastoral
3      care, patients do not pay for that directly.  You've
4      already said that; right?
5  A.  Correct.
6  Q.  Okay.  Your point, as the charitable organization, is to
7      provide this as your mission?
8  A.  Correct.
9  Q.  Regardless of payment; right?
10 A.  Uh-huh.
11         THE REPORTER:  I'm sorry.  Is that -- is that
12     "yes"?
13 A.  Did I say -- I said --
14 BY MS. PRESCOTT:
15 Q.  Yeses -- I think you said "uh-huh."
16 A.  Oh, I'm sorry.
17         Yes, correct.  Uh-huh.
18 Q.  If Hospice of Michigan did not exist, if you never
19     worked there but you still had JHCN, you would still be
20     providing the education, the outreach, the enrichments
21     to the Jewish patients to other hospices; right?
22         MR. McGORISK:  Objection.  Improper hypothetical.
23 BY MS. PRESCOTT:
24 Q.  Go ahead.
25         If Hospice of Michigan were erased, if it didn't

Page 112

1      exist, you would go on, as your organization, to provide
2      all these same services to Jewish people in Michigan,
3      wouldn't you?
4  A.  Yes.
5         MR. McGORISK:  Objection.  Improper hypothetical.
6      Requires speculation on the part of the witness.
7  BY MS. PRESCOTT:
8  Q.  Okay.  If you look at the Natalie Exhibit 1, which is
9      the notebook -- oh, I think we have it down here.
10         MS. PRESCOTT:  Would you guys mind passing that up?
11         Or I guess --
12         MS. SMITH-MORRIS:  I think he has --
13 A.  I have one -- I have one right in front of me.
14 BY MS. PRESCOTT:
15 Q.  Let's look at the first few pages.  They have numbers on
16     the top right corner.
17         See if you can see what I mean.
18         The first one is marked Section 1.
19 A.  Uh-huh.
20         MR. McGORISK:  "Yes?"
21 A.  Is that what you want?
22 BY MS. PRESCOTT:
23 Q.  Are you at Section 1 in the exhibit on page 2?
24 A.  Page -- yes.
25 Q.  Okay.  Who did you make -- who -- who made this

Page 113

1      document?
2  A.  Natalie and I.
3  Q.  Okay.  Who did you make it for?
4  A.  For Natalie and I.
5  Q.  Why did you make it?
6  A.  Because we learned of the -- this ongoing thing, and we
7      finally -- I mean, we heard the word "whistleblower."  I
8      don't know when, but it took a while until I understood,
9      at least, that it was about -- had to do with us at all.
10     And then it was a while before I learned that we were
11     integrally involved.  And well after papers were served,
12     I learned that I was served personally.
13         And at that point, Natalie and I -- and I -- when
14     we learned that Natalie was included and I was included,
15     we sat down and we wrote this document to basically show
16     the first part, Section 1, the first, that anyone that
17     would think that we made referrals or kickback or took
18     kickbacks for referral are mistaken.  It's not the
19     foundation of -- of our organization, nor is it our
20     practice of our organization, and never have we ever
21     talked to any organization -- and I'll say that I know
22     that I'm under oath -- about any kind of remuneration
23     other than paying for people -- agencies paying for the
24     services directly given to them.
25 Q.  Okay.  So, the answer to the question is, this document

Rabbi E.B. 'Bunny' Freedman
March 13, 2024

Page 114

1    that's got the page numeration, and it goes 2, 3 -- it's
2    across different sections -- I think it goes up to
3    page -- let's see -- 14 eventually in the exhibit?
4  A. Do you know what?
5  Q. That's the document you and Natalie made when you knew
6    you would be questioned in the lawsuit; right?
7  A. I don't have pagation(sic) on some of this stuff.
8  Q. Some of it skips.
9  A. I don't know.  Yeah.
10 Q. But there are a total of 13 --
11 A. It -- some of it -- it -- if you -- where did you
12    find --
13       MS. PRESCOTT:  Can we have the exhibit?  Because I
14    don't want him to be -- if he has something that I
15    don't.
16 A. Okay.  I see -- okay.  I'm -- I have it under a
17    different -- 6, 7 --
18       MS. PRESCOTT:  There's the other exhibit.
19 A. Okay.  I'm -- I'm getting there, I believe.  Okay.  I
20    got --
21       MS. PRESCOTT:  I marked --
22       (Discussion held off the record.)
23 A. Okay.  Yes.  Through 15.
24       Through 14.  I have it.
25 BY MS. PRESCOTT:

Page 115

1  Q. Okay.  So, this -- the document that's got the page
2    numbers in the upper right corner --
3  A. Yeah.
4  Q. -- that's the document you and Natalie made, as you just
5    testified; right?
6  A. Correct.
7  Q. Okay.  I wanted to go to page 10.
8       There's a list of hospitals and hospices?
9  A. Uh-huh.
10       MR. McGORISK:  "Yes"?
11 A. Yes.
12       MR. McGORISK:  It's all right.
13 BY MS. PRESCOTT:
14 Q. Did you provide the educational, the outreach, the
15    enrichment, the coordination of care and the pastoral
16    services we just covered to patients at all of the
17    entities on pages 10 and 11 --
18 A. I would --
19 Q. -- for the patients and the staffs of these?
20 A. I would qualify the answer as being much of our services
21    evolved.
22       So, if you got training -- Beaumont, for instance,
23    got training in 2005 or a different animal today -- and
24    did we train them in every part of it that you
25    mentioned?  Maybe not.

Page 116

1  But we -- like currently, if there's a new hospice
2    that comes to us or we call on or we end up interacting
3    with them, they'll get a -- a thorough, you know,
4    introduction to JHCN 101, let us say, and they'll get a
5    full discussion of all of the above.
6  Q. Okay.  Let me ask it a different way.
7       JHCN doesn't distinguish between what Hospice of
8    Michigan has access to or gets compared to these other
9    entities on 10 and 11?
10 A. Correct.
11 Q. And earlier you mentioned two hospices where somebody is
12    paid -- that's in the record.  We don't need to review
13    it.  We covered it.
14       But looking at the list on 10 and 11, are there any
15    other hospices that have any payment to any individual
16    or to JHCN itself for any services?
17 A. So, there -- there are a couple that were with us and
18    are no longer with us, as -- as paid.
19 Q. Okay.
20 A. So, that would be looking at residential, St. John's,
21    which went under a different name.
22       Even VITAS, who went out of business a long time
23    ago.
24       You know, there's -- there might be a few other
25    places that were -- we had some financial arrangement

Page 117

1  with.  Oh, VNA, yeah, Mission was -- was paid at one
2    time, Beaumont, Kindred in a different iteration of
3    Kindred.
4       Oh, no, no.  Great Lakes Caring is -- is -- also
5    paid us at some point.  Ascension at one point.
6       There's possibly a few more.
7       So, there were many that we have -- I think there's
8    four now, and there's many that paid us at some point.
9  Q. Okay.
10 A. Paid us or individuals, rabbis.
11 Q. Which entities paid you individually personally, like a
12    check to your home or to your name?
13 A. Only Hospice of Michigan.
14 Q. Okay.  So, who did the St. John's and VITAS and VNA and
15    Beaumont and whatnot pay?
16 A. There were about -- over time, when we were preparing
17    this, we got a sense that there were 20 or 25 -- I can't
18    say -- 20 or 25 instances where agencies paid some of
19    our employees.
20       Are you following what I'm saying?
21       Do -- do you understand?
22 Q. Is it 25 different entities that paid --
23 A. Yes.
24 Q. -- or 25 moments in time?
25 A. It's not people.  You asked me about people.

Rabbi E.B. 'Bunny' Freedman
March 13, 2024

Page 118

1    Q.   Yeah.
2    A.   I would say there were about 25 different entities that
3         have paid some of our people at some point.
4    Q.   Okay.  And so maybe I'm extrapolating -- and don't let
5         me go too far, but are you saying that it's -- the
6         number is high enough that you're not going to be able
7         to remember who got paid when or by whom?
8    A.   Correct.
9    Q.   Okay.  The ones that you've just mentioned that you did
10        recall by looking at the exhibit, those relationships
11        have all ended where there is no longer pay or it's
12        ongoing?
13   A.   I think today there are three or possibly four agencies
14        that do pay our employees.
15   Q.   And are those the ones that you already testified
16        about?
17   A.   I believe so, yes.
18   Q.   All right.
19   A.   I might have missed one there.  I -- I think there's
20        four, but I think I only named three.
21   Q.   Whether Beaumont, for example, paid at one point and
22        then stopped paying, did Beaumont continue to get
23        outreach, educational services, enrichments, pastoral
24        care, et cetera?
25   A.   Yes.

Page 119

1    Q.   Okay.  And I picked on Beaumont, but that would be the
2         same for Ascension or St. John's.
3              In other words, they weren't -- the paying or not
4         paying the care is still given?
5    A.   Yes.
6    Q.   Okay.
7    A.   That particular point, yes.  That -- the service comes
8         no matter what.
9    Q.   Hospice of Michigan, from time to time, received census
10        documents from JHCN.
11             Is that familiar to you?
12             Like who JHCN was tracking and caring for.
13             Is that familiar?
14   A.   You mean our general census where the stuff --
15   Q.   Yeah.  It's a spreadsheet that shows where everyone is;
16        right?
17   A.   Yeah.  Uh-huh.
18   Q.   So big, so heavy.
19             I'll just pull it out.
20   A.   Somewhere in the next five minutes, I would like to take
21        a restroom break.
22   Q.   Sure thing.  Let me just get this -- it's not --
23             The PHI has been eliminated from the version I just
24        handed you, but does the JHCN total patient census that
25        I handed you --

Page 120

1    A.   Uh-huh.
2             MR. McGORISK:  "Yes"?
3    BY MS. PRESCOTT:
4    Q.   -- is that -- that's what you're looking at?
5    A.   Yes.
6    Q.   Okay.  That document was given to Hospice of Michigan
7         from time to time; right?
8             Not this exact one because it was constantly
9         updated.
10   A.   I can't be sure of that.
11   Q.   You don't know whether JHCN gave the total patient
12        census to Hospice of Michigan?
13   A.   JHCN -- their data system developed this for us, and --
14             MR. McGORISK:  You mean HOM?
15   A.   -- they have access to it.
16             HOM.  I'm sorry.  Thank you.
17             HOM has been providing us data, and that's been the
18        subject of other questions along the line.  And these
19        documents are created on their system.
20             All-- Allscripts, at the last --
21             THE REPORTER:  I'm sorry?
22             MS. PRESCOTT:  All- --
23   A.   Allscripts is the brand name of the system they're
24        using.
25             And so they have Allscripts and they were kindly

Page 121

1    provided to us.
2             So, this -- this may be available to them.  So, I
3         want to make that clear, you know.
4             Was it provided?  Does that -- did we provide it to
5         them?
6             Did we -- I don't know where we would have to have
7         provided it if they wanted it because they could have it
8         on their own if they wanted to.
9             But I don't know if anyone handed them these
10        documents.
11             MS. PRESCOTT:  Okay.  Did you need a break?
12   A.   I do.
13             (Deposition recessed at 12:20 p.m.)
14                        *  *  *
15
16
17
18
19
20
21
22
23
24
25

Rabbi E.B. 'Bunny' Freedman
March 13, 2024

Page 122

1           Wednesday, March 13, 2024
2           Bloomfield Hills, Michigan
3           1:28 p.m.
4                  *   *   *
5      (Deposition resumed pursuant to
6      its recess; parties present, same
7      as before. Mr. Herschfus is
8      present after the break.)
9                  *   *   *
10      RABBI ELCHONON BUNIM "BUNNY" FREEDMAN,
11  after having been previously duly sworn, was examined
12  and testified further as follows:
13         EXAMINATION (Continued)
14  BY MS. PRESCOTT:
15  Q.   Okay. Do you have any affiliation with Jewish Family
16       Services?
17  A.   Yes.
18  Q.   What is your -- what is it?
19  A.   I'm trying to turn my phone off. I'm sorry.
20            And someone just -- a spam call just hit me.
21       I'm sorry. Let's go.
22       The Jewish Family Service.
23            We are providing space at Jewish Family Service
24  where our headquarters are at a very reduced rate and
25  with much accommodation, and we try to work as -- as

Page 123

1   combatively and synergist with them, and we're -- most
2   of the time it works pretty well.
3   Q.   Are you employed there?
4   A.   No.
5   Q.   Okay. Did you come to the conclusion that you were --
6        would like to start planning for your retirement in
7        2020?
8   A.   Correct.
9   Q.   And was the idea -- was one of your ideas that
10       Rabbi Krakoff would take over the role as CEO, even all
11       the way back in 2020?
12  A.   I think it's safe to say that.
13  Q.   And did you -- did you kind of originally plan that --
14       maybe about a two-and-a-half-year sort of handoff period
15       and, at the end of about two and a half years, you would
16       hand off and retire from the role?
17  A.   The -- the number -- the idea is correct, but it was a
18       five-year idea.
19  Q.   I see.
20            Did you communicate the idea that you wanted to
21       potentially retire and transition out to Patrick Miller
22       at Hospice of Michigan in late 2020?
23  A.   I don't remember the exact timing but that seems to make
24       sense.
25  Q.   All right. And did you ask him if Rabbi Krakoff could

Page 124

1        be a -- person who was paid by Hospice of Michigan?
2   A.   I did.
3   Q.   And was this a conversation with the two of you at
4        first, or was it a larger setting with others?
5   A.   The first conversation was directly with Patrick alone,
6        the two of us.
7   Q.   All right. And --
8            THE REPORTER: Can you take your hand down? Sorry.
9   A.   Thank you.
10  BY MS. PRESCOTT:
11  Q.   It's covering.
12  A.   I get it. I got it.
13  Q.   Did you make a proposal of what the -- that they're --
14       they could pattern it on the same relationship I've had
15       with you, Patrick; give him a contract? Is that how it
16       basically started?
17  A.   Uh-huh.
18           MR. McGORISK: "Yes"?
19           THE REPORTER: Is that --
20  A.   Yes.
21           Sorry.
22  BY MS. PRESCOTT:
23  Q.   What was his -- what do you recall being his initial
24       reaction?
25  A.   I remember it not exactly, but I remember leaving,

Page 125

1   feeling that Patrick was -- was happy to make this
2   happen and thought it was a good idea and thought it was
3   thoughtful on my part to keep the, you know, succession
4   including Hospice of Michigan into the plan.
5        That's how I remember it. And based on more
6   emotion and reaction than remembering all the words.
7   Q.   Exact words. I understand.
8        Okay. So, that sort of valence or sentiment of how
9        the -- it was received, did that continue on until the
10       agreement was ratified or entered with Rabbi Krakoff.
11  A.   We never ratified or entered an agreement to my
12       knowledge.
13  Q.   All right. Did that feeling or sentiment on your part
14       that it was positively received by Patrick ever change?
15  A.   So, what transpired after that meeting is -- it was
16       COVID time, and time was choppy, you know. There were
17       periods -- you know, there were periods of breaks in
18       people's relationships all over the place. But sort of
19       Patrick went silent with me, and it -- you know, to use
20       a vernacular, I felt like he was ghosting me and not
21       getting back with an answer. And I was not even
22       pressing him to get it started but to -- to give us an
23       answer, you know, which had a lot of implications,
24       different ways, you know, him starting going to meetings
25       initially and, you know, RD- -- RDT and IDG.

Rabbi E.B. "Bunny" Freedman
March 13, 2024

Page 126

1      And we -- it was getting more frustrating as time
2  went on, and I was getting more perturbed as time went
3  on.  And I have no idea why he wasn't getting back to
4  me, and he wasn't telling me anything about any other
5  goings on except blowing me off and saying, "Yeah, we'll
6  meet.  I've got to run it up the flagpole," or whatever
7  he said to me, and it wasn't coming to fruition.
8  Q.  As the fall goes into the beginning of 2021, he starts
9      also pressuring you for how many people are we really
10     servicing that are JHCN patients, isn't he?
11 A.  I don't recall that.
12 Q.  Okay.  Did you start to give him some of the census
13     information that was in the document when we left off?
14 A.  I don't recall that either.
15 Q.  Okay.  Did you start to report to him, hey, look, you're
16     getting a large chunk of all of our patients, like not
17     just -- in other words, hey, we're servicing 50 but also
18     giving him the denominator of the fraction.  Like we're
19     giving you a big chunk?
20 A.  I don't know if I did that in conversation or provided
21     documents.  I'm sure that was a tone in saying, hey, you
22     know, it -- it's worth your while.  You know, all these
23     things -- services we're giving you for -- for our
24     patients and joint patients and, you know, we're
25     spending a whole lot -- when I had any conversations

Page 127

1  like this, it would be in the tone of, you know, we lay
2  out thousands -- hundreds of thousands of dollars each
3  year to take care of your patients that cost us a lot of
4  money.
5      I was -- I was telling him, and you're getting
6  mutual -- we're getting mutual benefit for this.  I'm
7  taking care of the -- our mission to take care of the
8  Jewish patients fully, and you're, you know, serving
9  them and getting paid for, you know, services rendered
10 from the government, reimbursement, and let's -- you
11 know, let's continue this.  It's good for everybody.
12 Q.  But you --
13 A.  And I was --
14 Q.  I just want to understand that.  Because you would
15     provide those services whether there was an agreement
16     for Krakoff or not.  That's what you testified this
17     morning; that you did that for all kinds of hospices and
18     all kinds of hospitals for all Jewish patients, paid or
19     unpaid; right?
20 A.  Yes.
21 Q.  Okay.
22 A.  But --
23 Q.  What's the "but"?
24 A.  The but is, whenever I start a relationship with any
25     hospice, I always say, "There's no cost to you.  There's

Page 128

1  no fee to you, but understand that, when we get into --"
2  and this is the language I use.  "When we get into
3  double-digit patients, it's going to be an important
4  service for the two of us that we have very tight
5  communication, and you have one rabbi that takes
6  responsibility."
7      And I've told that to Hospice of Michigan, and I
8  told it to all the people that -- that arrange to pay
9  our people or pay us for services.
10     I said, "I'm going to come to you at a time, and
11 there's two ways to do this."
12     And this is all in this document, you know, these
13 numbered pages that we're going through in that first
14 initial document that we created, Natalie and I.
15     MR. McGORISK:  Sorry.  Am I in your way?
16     (Discussion held off the record.)
17 A.  And that's -- and that's -- when we get to double-digit
18     patients, we're going to be wanting to have much better
19     communication, because there's not going to be one or
20     two patients, but it's four or five, it's going to be
21     10, 12, 15.
22     And at that point, we would expect you to help in
23 paying for one of our employees to be in charge, and it
24 could be a social worker.  It could be a rabbi, but
25 preferably, it's going to be a rabbi, and we're going to

Page 129

1  give you even more services.  That rabbi will come to
2  the team, report to you, will be the anchor person that
3  you call and will -- will be massive services, which
4  we're paying out-of-pocket, paying out-of-pocket, and we
5  would come to you for contributions or you put them on
6  your payroll, what you prefer.
7      But I tell them in the first meeting.  I don't
8  think I ever missed a time when I'm involved in signing
9  on a new -- creating an arrangement that I don't tell
10 the people on the other side and make sure that they
11 understand, as I'm telling them, we will never make
12 referrals, and if you're doing this arrangement for the
13 referrals, you're in the wrong place.
14 BY MS. PRESCOTT:
15 Q.  Sure.
16     Because it would be -- if you add explicitly the
17     word "referral" to what you just told me, you understand
18     that's a federal felony; right?
19 A.  I don't understand anything.
20     I think that's morally incorrect, and I would never
21 do it, and I don't think words like that ever cross my
22 mouth.
23     And I'm under oath.  I'm just saying I don't think
24 so.
25 Q.  Yeah, I'm sure you didn't say, "It would be a felony for

Rabbi E.B. 'Bunny' Freedman
March 13, 2024

Page 130

```
1    me to ask for a referral."
2    A.  No, no, no.  My words.  My words where I say, you know,
3        "If you're looking for referrals, go somewhere else.
4        It's not happening here."
5            And I sort of put a damper on the -- the
6        arrangement.
7    Q.  It's just --
8    A.  This I learned from experience because people signed on
9        and then start yelling at me, "We're not getting
10       referrals."
11           And I tell them where to go, and I walked away from
12       a significant amount of money along the way.
13   Q.  Because you were giving them all to Hospice of Michigan,
14       who was paying you the lion's share; right?
15   A.  Pardon?
16           MR. McGORISK:  Object to form.  Misstates his
17       testimony.  Argumentative.
18   A.  Could you say what you said again?
19   BY MS. PRESCOTT:
20   Q.  Because you were giving them all to the one place that
21       was paying you to your personal home and your social
22       security number --
23   A.  Is that --
24   Q.  -- right?
25   A.  -- a question or an assumption?
```

Page 131

```
1    Q.  Well, did you --
2            MR. McGORISK:  You know, don't answer that.
3        You're getting argumentative with him; okay?
4            MS. PRESCOTT:  You can't talk over me.
5    BY MS. PRESCOTT:
6    Q.  You just said, "Is that a question?"  But you didn't let
7        me finish and say, "right?"
8            So, we -- it doesn't help when we don't --
9        What does "right" mean?
10   Q.  -- when we talk over each other.
11           You've got to stop talking over me; okay?
12   A.  And you should not make accusations to us, our
13       reputation --
14   Q.  Sir --
15   A.  -- and our people.
16   Q.  Sir --
17   A.  You're talking over me.
18   Q.  Sir, you're not here to tell me how to do my job; okay?
19           You can't -- I know you have --
20   A.  Are you here to make accusations at me?
21   Q.  Yes.
22   A.  Oh, yeah?
23   Q.  I am.
24   A.  So, go ahead.
25   Q.  Okay.  So, that's my job --
```

Page 132

```
1    A.  I will make accusations to you as well.
2    Q.  Sir -- sir, do you need a break?
3            Because you seem --
4    A.  No, I don't need a break.
5    Q.  -- like you're shaking.
6    A.  I'm not even mad.  I don't need a break.
7    Q.  Well, your lips are shaking and you seem like you're
8        leaning in.
9    A.  Oh, really?
10   Q.  Yeah.
11   A.  I like to lean in and make a point.
12   Q.  Okay.
13   A.  I'm not upset.
14   Q.  Are you okay?  Can we keep going?
15   A.  I'm perfect.
16   Q.  Okay.  Good.
17           So, the problem was, you couldn't be sending all
18       the referrals to places that weren't paying you because
19       you were sending them to the one place that was paying
20       you to your home personally, privately, at your social
21       security number; correct?
22           MR. McGORISK:  Objection.  Form.  Argumentative.
23   A.  I don't know if that's a statement or a question.
24           And I'm not upset.  I'm just telling you, don't
25       make accusations.  If it's a statement, then it's an
```

Page 133

```
1        accusation.  If you have a question, ask the question.
2    BY MS. PRESCOTT:
3    Q.  I did.
4            Thanks for doing your job.
5            I didn't hear the question.
6            Could you repeat the question?
7    Q.  Are you okay?
8            Because, again, you seem like you're losing --
9    A.  You have no idea how happy I am now --
10           MR. McGORISK:  We're getting argumentative --
11           THE REPORTER:  I'm sorry.  One at a time, please.
12           MR. McGORISK:  We're going to take a break in the
13       deposition; okay?
14           MS. PRESCOTT:  Okay.
15           MR. McGORISK:  And don't -- don't make accusations
16       like that because he's not going to answer.
17           I'm going to tell him not to -- it's an
18       argumentative question.  That's what it is.
19           MS. PRESCOTT:  You don't need to raise your voice.
20           MR. McGORISK:  Do you know what?  This is not your
21       time for your closing argument; okay?  Really?
22           MS. PRESCOTT:  I -- okay.
23           They're walking out of the room.  You can go off
24       the record.
25           MR. McGORISK:  We're taking a break.  I told you.
```

Rabbi E.B. 'Bunny' Freedman
March 13, 2024

Page 134

1  A.  Did someone say --
2       THE REPORTER:  I'm sorry.  Are we off the record?
3       MR. McGORISK:  Rabbi, come on.
4       MS. PRESCOTT:  Yes.
5        (Short recess at 1:40 p.m.)
6              *   *   *
7        (Record resumed at 1:46 p.m.)
8  BY MS. PRESCOTT:
9  Q.  All right.  The vast majority of patients of JHCN that
10      go to hospice care ended up at Hospice of Michigan;
11      correct?
12      MR. McGORISK:  Object to form.
13 A.  Wrong.
14      MR. McGORISK:  "Majority" being vague and
15      misleading.
16 BY MS. PRESCOTT:
17 Q.  Why am I wrong?  How am I wrong?  Where -- where did
18      they go instead?
19 A.  You're wrong.
20 Q.  I then followed up and said, what other hospice got the
21      majority of the patients?
22      MR. McGORISK:  Object to form to the extent --
23 A.  No hospice got the majority --
24      MR. McGORISK:  -- it's --
25      THE REPORTER:  I'm sorry.  I'm sorry.  One -- one

Page 135

1       at a time, please.  Sorry.
2       MR. McGORISK:  When I --
3  A.  I'm sorry.  Okay.
4       MR. McGORISK:  -- give an objection, let me just
5       get it out; okay?
6       MS. PRESCOTT:  Did you have something?
7       No?  You're done; right?
8       MR. McGORISK:  I just -- I said objection.
9       Misleading.
10      MS. PRESCOTT:  Okay.
11      MR. McGORISK:  Form.
12 BY MS. PRESCOTT:
13 Q.  Which hospice had more JHCN patients than Hospice of
14      Michigan?
15 A.  Not a clear answer.
16      Are we judging on -- based on a year?  Based on a
17      historic record?  Is it -- I mean, what do you mean?
18 Q.  At any time.
19      You said I was wrong.  So, I followed up by saying,
20      well, which hospice has treated more patients affiliated
21      or coming through JHCN than Hospice of Michigan?
22 A.  I wouldn't be -- have that information with --
23 Q.  Well, then why did -- why did you say I was wrong?
24      I said -- when I originally asked, I said the
25      majority of patients at any given time that get hospice

Page 136

1       care that are -- come through JHCN got hospice care at
2       Hospice of Michigan, and you said "wrong."
3  A.  Do you know that there were -- they do the majority of
4       our patient -- of our hospice patients?
5  Q.  I'm asking you.
6       I know the answer, yes.  I think I do, according to
7       the records, but you're the witness here today.
8  A.  So --
9  Q.  Do you know?
10 A.  No.
11 Q.  Okay.  So, you don't know that the -- at any given time,
12      the number of patients being seen at Hospice of Michigan
13      that are in hospice care, your census of people, the
14      majority of them are at Hospice of Michigan?
15 A.  When?
16      Give me a date.
17 Q.  At all times, sir.
18 A.  No.
19      At all times, do you know -- I don't know.
20 Q.  You -- okay.
21      How about most all of the time?
22 A.  I don't know.
23 Q.  Okay.  So, did you ever look at the documents that were
24      the census document, like the one in front of you that
25      we --

Page 137

1  A.  Every week.
2  Q.  -- finished on but -- you've got to let me finish.
3       The one that I handed you before the break, you
4       looked at those census documents every week, it sounds
5       like?
6  A.  (Nods head.)
7       THE REPORTER:  I'm sorry.  Is that --
8  BY MS. PRESCOTT:
9  Q.  "Yes"?
10 A.  Well, I didn't -- I was interrupted.
11      So, if you want to ask the question again, you can.
12 Q.  Okay.  Before lunch I handed you the documents in front
13      of you.  It's a census document, and you just said, "I
14      looked at that document every week"; right?
15 A.  (Nods head.)
16      THE REPORTER:  I'm sorry.  Is that "yes"?
17 A.  Correct.
18 BY MS. PRESCOTT:
19 Q.  Okay.  And those documents reflect, week after week
20      after week, that more patients are at Hospice of
21      Michigan than any other hospice by a large number;
22      correct?
23 A.  Do you mean hospice patients?
24 Q.  Yes.  Hospice patients.
25 A.  Not cumulative, palliative and support and all -- all

Page 138

1   the other agencies?
2   Q.   Hospice.  Right.  Hospice patients.
3   A.   Okay.
4            Hospice, it may be true.
5   Q.   You don't know?
6   A.   I don't.
7   Q.   Okay.  Back to the question that started us off on this.
8            You began with Patrick Miller not only telling him
9        how many people are JHCN-affiliated patients, but also
10       telling him the denominator of the fraction, out of
11       our -- our total census, you're getting this many?
12           Do you recall doing that in the fall of 2020?
13  A.   I don't remember --
14  Q.   Okay.
15  A.   -- a conversation that I had in 2020.
16  Q.   It --
17  A.   It was during COVID, and I -- it was while I was in
18       Cleveland Clinic with a -- getting a heart operation.
19       And I'll have a very hard time nailing any dates or
20       necessarily the conversations I had.
21  Q.   Did you take any leave from -- from your everyday duties
22       because of your medical condition?
23  A.   Two weeks, yes.
24  Q.   Did you take any leave to travel out of the country in
25       the last ten years, for example, to Israel or elsewhere,

Page 139

1        for lengthy -- more than two weeks?
2   A.   I don't believe so.
3   Q.   Do you have any reason why you would need to report --
4        can you think of any reason why you would be telling
5        Hospice of Michigan you're getting a third of our total
6        patients?
7            Why would they need to know that or why would that
8        be something you would tell them?
9   A.   I did tell them very recently, as I -- I don't remember
10       if I told them, no.
11           I -- oh, I did tell them recently, I -- we have a
12       calculation.  I mentioned earlier that, when we heard
13       that we were the subject of involvement in a lawsuit,
14       we -- we took the effort to defend ourselves against any
15       implications of -- or accusations that were made, and I
16       personally looked into a number of -- of the -- I picked
17       out random weeks to see what we did, and my estimation
18       is that they were doing -- were doing a third of our
19       patients, at that point, I do remember.  It was recent,
20       in the last couple months.
21  Q.   Did you do that before?
22  A.   I don't recall.
23           (Deposition Exhibit 4 marked
24            for identification.)
25  BY MS. PRESCOTT:

Page 140

1   Q.   Did you do that in the fall of 2020 when you were trying
2        to convince Hospice of Michigan to bring in Rabbi
3        Krakoff as a contractor?
4   A.   Possibly.
5            MS. PRESCOTT:  I've handed the witness what I
6        marked as Exhibit 4.
7   A.   I think I must have done that, yeah.  It looks very
8        authentic and it looks in keeping with -- you know, we
9        could go back easily to the census and see if these were
10       the exact numbers.
11  BY MS. PRESCOTT:
12  Q.   Why --
13  A.   Probably is.
14  Q.   Why were --
15  A.   Sounds very authentic.
16  Q.   So, just to be -- for people who might not know the --
17       the Arbor Hospice, Ann Arbor -- Arbor Palliative and
18       Northstar Palliative are all Hospice of Michigan
19       affiliates, as you understand it; correct?
20  A.   Uh-huh.
21           THE REPORTER:  I'm sorry.  Is that --
22  A.   Yes.
23  BY MS. PRESCOTT:
24  Q.   And that's why you collect them together in the chart?
25  A.   Correct.

Page 141

1   Q.   Right?
2            And the reason that you're telling Patrick Miller
3        this in 2020 -- late 2020 is why; if you recall?
4   A.   Because that would imply that we're spending a real lot
5        of money on them.
6   Q.   But what does it matter?  That's your mission.
7   A.   Correct.  And we asked all the people that benefit and
8        appreciate the work we're doing that they help us reach
9        there, like all fundraising is about.
10  Q.   So, you were fundraising from Hospice of Michigan?
11  A.   Yeah.  I was asking for contributions.  I never asked
12       for anything based on -- he might have asked me -- I
13       don't remember, but -- but I was telling him we're
14       giving a hell of a lot of service -- excuse my
15       language -- the -- a heck of a lot -- a lot of -- real
16       lot of service to Hospice of Michigan.  Something they
17       know, and we spend a lot of -- lot of money on that.
18       And it doesn't say that in the -- the document, but that
19       money that we -- we spend, we ask you to help us, very
20       much like the conference that we have.  We ask you --
21       our people that -- philanthropically to -- to help us do
22       this mission.
23           We've got a big budget.
24  Q.   And by "help us," meaning help JHCN?
25  A.   Yes.

Rabbi E.B. 'Bunny' Freedman
March 13, 2024

Page 142

1  Q.  Then why, sir, did you get paid at home to your personal
2      self instead of to JHCN?
3  A.  I got paid by direct deposit.  I didn't receive checks
4      from Hospice of Michigan.  As to the best of my
5      recollection, I was getting deposited to my account and
6      I got W -- whatever forms I got, 1099, W-2 came to my
7      house, yes.
8  Q.  Yeah.  But what you said is, you asked for help because
9      of all what JHCN was giving to people.  They needed
10     to -- Hospice of Michigan, you would ask that they give
11     back.
12         Well, then why didn't you have Hospice of Michigan
13     give back the forty-some-thousand dollars a year to JHCN
14     instead of to you personally?
15 A.  I think I stated earlier that they wanted me to serve
16     their patients because I had a reputation and built on
17     HOM, and they wanted to retain that relationship.  So,
18     they said, "We'll keep you on."
19 Q.  Do you have any other reason why you would we paid
20     personally and individually?
21 A.  I was working on their behest.  If I wasn't working on
22     their behest, I wouldn't get any money.
23 Q.  What --
24 A.  I was spending a lot, a lot of time on their patients,
25     and they wanted that service, and they wanted it from

Page 143

1      me.
2  Q.  You can't identify any patient you did any particular
3      hours of care for any particular month; right?
4         Like we could go through every month iteratively
5      from 2010 to 2021, and you could not say what month you
6      did what hours of care, what hours of follow-ups?
7  A.  No, I couldn't.
8  Q.  Okay.
9  A.  I didn't punch a clock, and I didn't bill on time.  I
10     billed on a flat salary as I saw it, and then it changed
11     as consulting, and -- but I was rendering the service
12     they asked me to render, and it was worth a lot, lot
13     more than they paid me.
14         And as -- in terms of the agency, spending $700,000
15     on care for their -- the patients that we jointly
16     served, and I was doing a heck of a lot more work.  If I
17     wouldn't be taking care of the patients and wouldn't be
18     going to team and I wouldn't be looking after all --
19     overseeing all the different rabbis and making sure that
20     everything was organized and was good service, then that
21     might be the case.  But I was working additional hours,
22     way above a normal working week.  And I mean, I -- do
23     you want me to find a time clock?  There's no time
24     clock, but --
25 Q.  Did the board of JHCN retain the services of somebody to

Page 144

1      set your compensation?  Like did they get like market
2      analyses for --
3  A.  Sure.  Dottie Deremo.
4  Q.  Okay.  Let me just finish my question.
5         Did they get paid like a -- an outside service to
6      show salary bands to sort of level your compensation?
7  A.  Dottie Deremo was a consultant working for Hospice of
8      Michigan for pay and was in charge of our compensation
9      committee and called the meetings and set rates and
10     showed, you know, whatever demonstrations she had to
11     make to justify salaries.
12 Q.  Did Dottie Deremo -- okay.  I want to -- did -- I want
13     to be clear just because I -- Ms. Deremo was the CEO of
14     Hospice of Michigan.
15         Are you saying that, at some point, she sat on the
16     compensation committee of JHCN?
17 A.  Correct.
18 Q.  Okay.  So, Dottie Deremo, while being paid by Hospice of
19     Michigan as the emeritus, comes over --
20 A.  I don't want to talk over you.
21 Q.  -- comes over -- right.  So, I'll start over because you
22     did.
23         Dottie Deremo, the emeritus CEO of Hospice of
24     Michigan, while being paid in her tail years after her
25     immediate retirement, comes to JHCN and sets your

Page 145

1      compensation?
2         MR. McGORISK:  Object -- object to foundation,
3      whether he knows where she was getting her money.
4  A.  And I would -- I would tell you I don't know.
5  BY MS. PRESCOTT:
6  Q.  Okay.  Let's drop the part where someone else will fill
7      in the Dottie Deremo remained on the payroll of HOM.
8         So, Dottie Deremo remains on the payroll or
9      doesn't, but one thing we know is -- from you is she
10     comes over and now joins your board -- executive board;
11     is that right?
12 A.  Yes.
13 Q.  And then she leads your compensation committee?
14 A.  Yes.
15 Q.  And did you ask her to come over and be on your board?
16 A.  I did.
17 Q.  And then did you ask her to lead your compensation
18     committee?
19 A.  I did.
20 Q.  Okay.  So, she comes over and they -- did you -- part of
21     the question was whether there was like a -- a
22     benchmarking study or some sort of data or whatever that
23     was collected to set your pay as CEO?
24 A.  Again, please?
25 Q.  Sure.

Rabbi E.B. 'Bunny' Freedman
March 13, 2024

Page 146

1      Did the compensation committee get some sort of
2    data or expertise involved in benchmarking what would be
3    an appropriate amount of pay for you?
4  A.  I don't know.
5  Q.  Okay.  Isn't it true that you told Hospice of Michigan
6    that you wanted to be paid at your home by your social
7    security number individually because your board would be
8    uncomfortable with you earning over the amount that they
9    had set for you to earn?
10 A.  I don't recall, and I don't know that I ever said that.
11   But --
12 Q.  Okay.
13 A.  I don't believe so because my board knew, and
14   Dottie Deremo certainly knew, and she was in charge of
15   compensation.
16     So, I didn't hide it from anyone, but --
17 Q.  So, you think that the people at Hospice of Michigan,
18   the CEO, COO, certainly Patrick Miller knew, say, in
19   2020, when you're talking about Krakoff, and 2021 that
20   you were a social security paid-at-home, individually
21   being paid this amount?
22 A.  I don't know what he knew.
23     But if you want to ask me do I -- would I assume,
24   then ask me.
25 Q.  Well, he says in his recordings that -- that he's

Page 147

1    talking, he says, you know, Bunny needs -- I think he's
2    getting paid at home because his board -- he doesn't
3    want his board to know what he's making, and he -- you
4    know, his board has caps or something to that effect.
5  A.  To the best of my knowledge, from the time I started
6    working at Hospice of Michigan in 1992, I don't think
7    the manner of payment has ever changed.
8      I mean maybe in earlier years before there was
9    direct deposit possibly, but I -- I think I was getting
10   paid direct deposit for the longest time.  So, I --
11 Q.  Does that continue to today?
12 A.  Pardon?
13 Q.  Do you get direct deposit through today?
14 A.  From who?
15 Q.  From Hospice of Michigan.
16 A.  I don't get paid from Hospice of Michigan.
17 Q.  Okay.  When did that stop?
18 A.  That stopped in 20- -- 2002.  The beginning of 2002.
19   I didn't realize that I wasn't getting paid until
20   late in 2002.  Because it was --
21   MR. McGORISK:  I think you mean '22.
22 A.  2022.
23     The -- so, I didn't pay attention to that check.
24 BY MS. PRESCOTT:
25 Q.  Okay.

Page 148

1  A.  The check went generally into my retirement savings, and
2    I didn't look at it.
3  Q.  Okay.
4  A.  So --
5  Q.  So, is the answer to my question -- sorry to
6    interrupt -- I didn't mean to.  Finish if you remember
7    what you were going to say.
8  A.  (No verbal response.)
9  Q.  Okay.  2022 --
10 A.  Doesn't make a difference.
11 Q.  -- is when --
12   THE REPORTER:  I'm sorry?  Was that --
13 A.  Doesn't make a difference.
14   THE REPORTER:  Sorry.
15 BY MS. PRESCOTT:
16 Q.  2022 is when you stopped being paid by Hospice of
17   Michigan, you personally directly?
18 A.  Correct.
19 Q.  Why not continue on with Rabbi Krakoff getting paid, him
20   individually, personally at his social security number?
21 A.  I have no idea.
22 Q.  No one has ever discussed that with you?
23 A.  No.
24 Q.  Never talked about that with Bob Cahill?
25 A.  Pardon?

Page 149

1  Q.  You've never talked about that with Bob Cahill?
2  A.  No.
3  Q.  You never talked about that with Patrick Miller?
4  A.  No.
5      (Deposition Exhibit 5 marked
6      for identification.)
7  BY MS. PRESCOTT:
8  Q.  All right.  So, I'm going to hand you what I've marked
9    as Exhibit 5.
10   MS. PRESCOTT:  If you can pass those to David, too?
11   MR. McGORISK:  It's a two-page document?
12   Oh, no.
13 A.  Is this -- it's very similar language.
14   The date is 10-26 and 11-16.
15   Yeah.
16 BY MS. PRESCOTT:
17 Q.  Okay.  So, in Exhibit 5, you're again giving not only --
18   here is all of the patients that, you know, came from
19   JHCN but are -- and you're also giving him the total of
20   169; right?
21 A.  One second.
22 Q.  At the bottom, just before your name.
23 A.  Our total current census, yes.
24 Q.  Why would you not e-mail Patrick Miller this detail from
25   your Hospice of Michigan e-mail if you had one?

Rabbi E.B. 'Bunny' Freedman
March 13, 2024

Page 150

1  A.  I think we stated earlier that --
2      MR. McGORISK:  Jewish Hospice.
3  A.  -- I don't know that I had one.
4  BY MS. PRESCOTT:
5  Q.  Jewish Hospice.
6  A.  My Jewish Hospice?
7  Q.  No, no.  Your Hospice of Michigan e-mail.
8      You don't think you had one?
9  A.  No.  Hospice of Michigan -- I -- I think I've stated
10     earlier that I don't believe I have one.  I haven't used
11     it.
12 Q.  You e-mailed this from your Gmail.
13     You also have a Jewish -- I don't remember --
14 A.  JHCN.
15 Q.  It's a JHCN, but it's -- that's not the handle.
16 A.  Yeah.
17 Q.  Anyway, you have a JHCN e-mail but you're using your
18     personal Gmail for these?
19 A.  I think you would -- yeah.  The answer is that I always
20     use this e-mail, and my JHCN goes into this e-mail.  So,
21     it's one and the same.
22 Q.  Okay.  Did Patrick Miller ever express any concern or
23     issue with you using a personal e-mail to conduct
24     business?
25 A.  No.  Not to the best of my knowledge.

Page 151

1  Q.  Okay.  Did Patrick Miller ever express to you that they
2      would need to sever ties with you individually because
3      you were employed both by Hospice of Michigan and Jewish
4      Hospice Chaplaincy?
5  A.  No.
6  Q.  You understand that's why he claims he got rid of
7      Natalie Miller -- Natalie Rosenfield; correct?
8  A.  Yeah.  I -- yeah, I pretty much understand that.
9  Q.  Okay.
10     Take me to that day when Natalie calls you and she
11     says, "I just got a call from Patrick saying they're
12     going to separate me."
13     Had you heard anything at all from anyone at HOM
14     about Natalie's role or concern with Natalie's role
15     before that call from Natalie herself?
16 A.  No.
17 Q.  Okay.  So, if I say it the right -- if I -- say it
18     another way.
19     Natalie is calling you.  She testified to the date
20     yesterday.  I think the record will be it was in early
21     July of 2021.
22     That was the first you hear a word about Hospice of
23     Michigan changing their relationship with Natalie?
24 A.  I believe so, yes.
25 Q.  Okay.  And what did she tell you she had been advised

Page 152

1      about why they were doing this?
2  A.  I get the -- I don't exactly remember, but there was a
3      prelude to this that set my mind -- you want to know my
4      state of mind.
5      I was called in by Patrick and Bob to come up to
6      Ann Arbor and visit with them.  I had no idea why they
7      were calling me.  And they called me to tell me, not to
8      ask me or not to discuss with me, there were going to be
9      new arrangements with Jewish Hospice Chaplaincy Network.
10     And they told me at that time that we would have
11     to -- we would have to backpay for the data system that
12     they were providing, which they offered to us some time
13     ago.  We were using it for, I think, years, and -- and
14     that was going to have to stop.  Or -- or, no, that we
15     had -- it didn't have to stop.  We would have to pay
16     from now on a certain amount of money.  And -- and --
17     and we have to backpay something, I think, if I remember
18     the number, was $57,000.  And at some point, they
19     offered some kind of payment plan, I believe.  And I had
20     no idea why that happened.
21     And I think -- and this has been -- based on -- I
22     don't remember exactly what Natalie told me, but
23     Natalie, I think, has told me since then, subsequently
24     that she was told about a whistle-- whistleblower of
25     some sort, and that -- and that she was told that's why

Page 153

1      they have to end the relationship with her.
2  Q.  Okay.  So, the -- that's a -- fair.
3      So, I had asked if Natalie -- the first you ever
4      heard of a thing to do with Natalie and the relationship
5      changing vis-à-vis Natalie and Hospice of Michigan was
6      this early July call?
7  A.  (Nods head.)
8  Q.  And that's --
9      THE REPORTER:  I'm sorry.  Is that --
10 A.  Yes.
11 BY MS. PRESCOTT:
12 Q.  Right?
13     And -- and so I think what you're saying is, I
14     hadn't heard a word about Natalie, but sometime in this
15     timeframe, there was a separate issue which was about
16     the IT?
17 A.  Uh-huh.
18     THE REPORTER:  I'm sorry.  Is that --
19 A.  Yes.
20 BY MS. PRESCOTT:
21 Q.  Yeses and nos.  Okay.
22     There was a day in mid-July -- it was actually the
23     15th of July, where you and Patrick and Bob get
24     together, and they actually gave you an invoice about
25     IT.  And there was follow-up e-mail, and there was

Rabbi E.B. 'Bunny' Freedman
March 13, 2024

Page 154

1   preplanning of the meeting.
2       Do you know whether that call was before or after
3   you heard from Natalie?
4       Or that meeting -- excuse me -- was before or after
5   you heard from Natalie?
6   A.  It was before, I believe.
7   Q.  Okay.  So, when Natalie calls and says, "I'm being
8   separated by Hospice of Michigan," did you connect that
9   there was some reason that that had anything to do with
10  IT?
11  A.  I believe that Natalie told me at that time, it was a
12  whistleblower, although I don't remember the
13  conversation, but Natalie has told me subsequently that
14  she told me at that point.
15  Q.  Okay.  Before our lunch break, you said something -- you
16  used the word "whistleblower," and I can't recreate
17  exactly what you said.  But you said, "We were hearing
18  things about a whistleblower."
19      Was this conversation with Natalie or this phone
20  call what you were referring to, or were there other
21  times you heard things about whistleblowing or
22  whistleblowers?
23  A.  I heard from someone related to Hospice of Michigan that
24  there was a whistleblower.  Someone whispered in my ear,
25  you know, there's a whistleblower.

Page 155

1       It was -- no -- that person didn't tell me that we
2   were involved.
3       I didn't know when I went there why this was
4   happening.  I was puzzled and I was angry and upset,
5   and -- and then I think it was subsequent to that,
6   Natalie told me about a whistleblower.
7       I still did not know from Natalie -- and I don't
8   think -- I don't know if Natalie knows -- that we were
9   implicated from any whistleblower about anything.
10      So, I -- I thought in my mind -- you asked me my
11  state of mind, and I all could tell you was -- is my
12  recollection of my state of mind.  I thought that there
13  was an overall whistleblower putting pressure on Hospice
14  of Michigan, and I thought they're trying to re-track --
15  you know, go back and fix whatever they think might
16  be -- you know, a problem.
17  Q.  Who is the first person you did hear something about
18  whistleblowing, or there's a whistleblower from?
19  A.  Joey Krakoff.
20  Q.  Okay.  Is that who you meant when you said someone kind
21  of whispered in your ear?
22  A.  No.  No.
23  Q.  Well, who is that person, the person who sort of
24  whispered in your ear?
25  A.  Dottie Deremo.

Page 156

1   Q.  Okay.  Dottie.
2       And that's -- this is before you ever get called in
3   about IT paying back Natalie --
4   A.  I believe so.
5   Q.  You hear it -- something from Dottie about there's a
6   whistleblower at Hospice of Michigan?
7   A.  (Nods head.)
8       THE REPORTER:  Is that --
9   BY MS. PRESCOTT:
10  Q.  Yeses and nos, if you can.
11  A.  Yes.
12  Q.  Yeah.
13      Did you -- did Dottie tell you anything, like yes
14  or -- did she say, "It's a lawyer there," or "It's a
15  man," or "It's a woman," or "It's a newer employee"?
16  Any information?
17  A.  I think she told me they have a problem with a lawyer.
18      I mean, I don't know if those were the words, but I
19  think I knew that it was a lawyer, and I don't know if I
20  heard a name or -- I don't know that I would
21  recognize -- have recognized the name.
22      And that's all I know.
23  Q.  Okay.
24  A.  And I didn't think it had anything to do with us.
25      And I don't think I tied it together -- I didn't

Page 157

1   know about a whistleblower -- I didn't know about --
2       THE REPORTER:  I'm sorry.  Excuse me.  "-- didn't
3   know about --"?
4   A.  What?
5       THE REPORTER:  Can you repeat?  Can you repeat?
6   I'm sorry.
7   BY MS. PRESCOTT:
8   Q.  " -- didn't know about a whistleblower --"?
9   A.  I didn't know about a whistleblower when I -- that
10  meeting that you said happened on June 15th, was it, or
11  July?
12      Whatever.  The meeting I had in -- in Ann Arbor
13  with Patrick, and when they gave me the bill for the
14  data, I didn't -- they didn't say anything about a
15  whistleblower.  I didn't hear anything about a
16  whistleblower, and I didn't connect.
17      And I'm trying to get the sequence, and I won't
18  promise this -- you know, swear to the fact that those
19  were the dates.  But I believe Dottie told me about this
20  earlier in that meeting.  Then I had a meeting with
21  Patrick and -- and Bob, where they -- I told you about
22  that.
23      And then I heard from Natalie that there was a
24  whistleblower.  They told her that's why they're --
25  they're asking her to resign or whatever happened.

Rabbi E.B. "Bunny" Freedman
March 13, 2024

Page 158

```
1         And I didn't -- still didn't know that.  And I
2    think Natalie didn't know at the time that we were
3    enmeshed in that.  And, maybe naively, I figured they're
4    just cleaning up their act and going through and -- with
5    accountants or whatever and straightening out their
6    problems, which made me only angrier.
7  Q.  Why -- why angrier?
8  A.  Because I thought everything that we were doing was
9    perfect and fine and good and didn't involve anything
10   that was a problem.  So, why are they even cleaning it
11   up?  Why are they back -- back-billing me for stuff that
12   was very, very clear that this was -- you know, they
13   were servicing -- giving us service so we could better
14   take care of our patients together in -- with the data.
15        And --
16 Q.  Well, because, I mean, let's -- let's explore that a
17   minute.
18        It's -- are you pointing to the fact -- I mean, we
19   have the spreadsheet, and there's the database where you
20   can enter in who is where, if they're the palliative,
21   are they not yet in hospice; right?
22        Is that the support network you're talking about?
23 A.  Yeah.
24 Q.  Okay.  The IT, in other words, the tech?
25 A.  Right.  IT.  Yes.
```

Page 159

```
1  Q.  Okay.  Because do you get that like -- I mean, giving
2    you technology, software, licenses, tech support,
3    computers, to do work that isn't related to Hospice of
4    Michigan, that's -- why -- why would someone just give
5    that away?
6  A.  I don't know what IT information they were doing and
7    tracking for us.  But it involved a lot more than
8    census.  I mean, this -- they were tracking our -- our
9    patients and -- and what we -- what we were doing and
10   who was going where and what was going -- how.
11 Q.  But that was all related to enrollees of Hospice of
12   Michigan care; right?
13 A.  Uh-huh.
14      THE REPORTER:  I'm sorry.  Is that --
15 A.  Yes.
16 BY MS. PRESCOTT:
17 Q.  What was -- what was only for JHCN was its census
18   database and keeping census through the electronic
19   system; right?
20      That was outside of Hospice of Michigan.  It could
21   be Hospice of Michigan people.  It could be Beaumont
22   people.  It could be someone who is not in hospice at
23   all; right?
24 A.  As I understand it, Sarah, I -- I'm not an IT expert or
25   doing -- I'm not an expert at exactly what we're
```

Page 160

```
1    tracking, but to the best of my assessment, if you're
2    making the system and -- and while you're making the
3    system for you guys, it doesn't seem like it gets more
4    complicated if you track all of our census so that we
5    could be efficient, not only for them, for other
6    agencies as well.
7         And, you know, I don't know if there would be more
8    cost related to it or -- I can't answer those questions
9    as it's not my field of expertise, for sure.
10 Q.  But you were angry because you felt -- I mean -- well,
11   how about free computers?  Do you think that free
12   computers is a thing that Hospice of Michigan should be
13   giving you because you happen to sometimes use those
14   computers for a person who happens to be at Hospice of
15   Michigan?
16 A.  Yeah.
17 Q.  I see.
18      So, why did you pay?
19 A.  I didn't.
20 Q.  You refused?
21 A.  (Nods head.)
22      THE REPORTER:  I'm sorry?
23 A.  Yes.
24 BY MS. PRESCOTT:
25 Q.  Joey had to sign later?
```

Page 161

```
1  A.  Joey later covered it.
2  Q.  And you likewise refused to track your time.  Joey
3    started writing down, you know, what -- who he saw on
4    what days, but you also --
5  A.  All the other rabbis did that.  I didn't.
6  Q.  Yeah.
7  A.  From the beginning, as we discussed, I never tracked my
8    time for Hospice of Michigan.
9  Q.  Why -- they wanted you to; right?
10 A.  I don't --
11      MR. McGORISK:  Objection.  Form.
12 A.  -- recall them asking.
13      MR. McGORISK:  Vague as to when.
14 A.  I think Natalie wanted me to.
15 BY MS. PRESCOTT:
16 Q.  Okay.  Your -- your lawyer made a point about my
17   question was vague because -- and that's a fair point.
18      For most all of your relationship, Hospice of
19   Michigan in no way, shape or form ever told you we care
20   about you tracking your time, who your -- what patients,
21   what days, how much hours; right?
22 A.  I can't talk to 25 years of experience, but I would
23   presume that, in my earlier days, that they were asking
24   me to do it.  And I did do some recording in my earliest
25   days while I was working for Hospice of Michigan.
```

Rabbi E.B. 'Bunny' Freedman
March 13, 2024

Page 162

1   Q.   Okay.
2   A.   By the time I left, I wasn't doing it.
3   Q.   And were you doing it basically by patient by the day?
4   A.   I -- I went to people that called me.  I -- I had the
5        independence to -- to make the visits and set the
6        visits, and -- and my core job was to build relationship
7        with the Jewish community.  I also did their spiritual
8        care, and they wanted to keep me for the spiritual care.
9             I don't believe -- when I was at JHCN, I don't
10       believe they asked me to -- to track the -- our visits.
11       And I believe that Natalie did track the visits.  I
12       don't know if she wrote, you know, reviews of the -- of
13       the visit or anything like that, but she -- I think she
14       did track the visits.
15  Q.   All right.  So, let me just unwind your answer for a
16       minute.
17            So, in the period you're working for Hospice of
18       Michigan, before you go part-time -- so, you're an
19       employee there.  It's the 2000 to 20-- -- or nineties to
20       2000 range.  Your point was, you believe in there, you
21       did track when you did do patient care in some sort of
22       timekeeping?
23            Is that what you just said?
24  A.   Repeat the last part of that.
25  Q.   Sure.

Page 163

1             So, I'm -- I'm trying to understand your last
2        answer, and I want to clarify if I understood it.
3             That in the time that you worked at Hospice of
4        Michigan, before you're part-time, which you think was
5        around 2000, 2001, before that time, it sounds like you
6        did have some expectation to keep track of your patient
7        encounter time for Hospice of Michigan?
8   A.   Early on.
9   Q.   Okay.
10  A.   I believe, as there became a more -- comfort level
11       between the arrangement between me and -- and -- and my
12       employers, I think they -- they weren't demanding it any
13       longer.
14  Q.   Okay.  From 2010 to 2021, did you ever have any pressure
15       to identify dates of service, what the service was, from
16       Hospice of Michigan?
17  A.   Well, to qualify, I always did a report by -- I don't
18       know how much detail, but at the team meetings, I would
19       always report the patients I was working with, and, at
20       least the narrative of visits that I made.  And -- but I
21       didn't fill out like time sheets or -- or notes, you
22       know, on paper.
23  Q.   And nobody -- my point is, nobody had any problem with
24       that.  Nobody said, "You're failing us.  You're doing a
25       bad job.  We need this"?

Page 164

1   A.   You know, you're asking me no -- nobody.  I will --
2        again, I'm sorry.  I interrupted you.
3   Q.   Am I correct that nobody asked you, "You're doing a bad
4        job.  You're not doing your recordkeeping.  You need to
5        do this better"?
6   A.   The only person that I recall was Natalie wanting those
7        records from me, and I didn't write reports, but I told
8        her about the different visits that I was doing.
9   Q.   And when you talk about Natalie asking that, that
10       happened in 2022; right?
11  A.   Happened all the time.
12  Q.   That happened in 2011 and 2013 and --
13  A.   Whenever Natalie joined us, she wanted my -- my
14       records --
15  Q.   Okay.
16  A.   -- to put it in our system.
17  Q.   But you don't have any records that show which days you
18       did which services; is that just a fair summary?
19  A.   That's a question better asked of Natalie when she
20       recorded it.
21  Q.   Okay.
22  A.   But Natalie was very informed about where I was
23       visiting, when I was visiting, because it was integral
24       to her to have that information.
25            But in terms of reporting it, we -- I have to

Page 165

1        remind us, that we don't get reimbursement, and we don't
2        get paid from people.  So, keeping track, as far as I'm
3        concerned, was not important to me.  For -- for Natalie,
4        it was important.
5   Q.   Okay.  Nobody from Hospice of Michigan's C suite -- the
6        COO, the CEO -- ever came to you and said, "Rabbi
7        Freedman, you must keep track of your time" prior to
8        2021; am I correct?
9   A.   I can't say no one, because that goes back like 25 years
10       or so.
11            But I can say that I don't recall anyone pressing
12       me other than the earliest phase of my -- and I can't
13       tell you how long that was.  It could be one, two, three
14       years.  I -- I saw my role if that -- if this is helpful
15       to you, as an administrative role that also took on the
16       spiritual responsibility, the spiritual care
17       responsibilities.  And I always thought when I was
18       part-time -- when I was part-time and full-time, I saw
19       my role as an administrative role to see that all these
20       patients are attended to.
21            Very often that would be me.  Very often it was
22       other people, but we reviewed every single patient,
23       Jewish patient, on the two team -- two teams, and that
24       had my input on a regular basis that I told you, I
25       think, numerous times now.

Rabbi E.B. 'Bunny' Freedman
March 13, 2024

Page 166

1  Q.  I want to just make sure I've got a clear answer that,
2      until Natalie called you and said anything to you about
3      being separated from Hospice of Michigan, no one else
4      had previously fronted that to you, in other words,
5      warned you or let you know that might be coming?
6  A.  To the best of my recollection, no.
7  Q.  Okay.  So, when Natalie picks up the phone and you have
8      this conversation, what -- did you follow up with anyone
9      at Hospice of Michigan about why they did that?
10 A.  I don't -- I don't remember.
11 Q.  Well, did it make you mad that Natalie was being --
12 A.  Angry, you mean?
13 Q.  Did it make you angry that Natalie was being separated
14     from Hospice of Michigan?
15 A.  Yes.
16 Q.  So, with that in mind, did you ever talk to anyone at
17     Hospice of Michigan about why that decision was made
18     ever at any point?
19 A.  I don't believe so.
20         I'm -- could I have a moment to --
21 Q.  Sure.  Give it some --
22 A.  -- think about it?
23 Q.  Yeah.  Yeah.
24 A.  I do remember, because I made it clear to Natalie, that
25     we would find a way to pick up the difference because

Page 167

1      she's --
2          THE REPORTER:  I'm sorry?  Could you keep your
3      voice up?
4  A.  Yeah.  I'm sorry.  I'm sorry.  That's my way of
5      thinking.
6          THE REPORTER:  Sorry.
7  A.  The -- to the best of my recollection, I took it at face
8      value and -- that there was a whistleblower, and that
9      they needed to clean this up.  And just as it was
10     irrevocable when they told me the data, "you must pay,"
11     "you must pay," I wasn't going to argue with it, but I
12     still was angry.
13 BY MS. PRESCOTT:
14 Q.  Okay.
15         THE REPORTER:  "-- still was --"?
16 A.  I still was angry.
17         THE REPORTER:  Thank you.  Sorry.
18 BY MS. PRESCOTT:
19 Q.  Okay.  So, if I understand, though, you're angry.  Your
20     trusted employee, Natalie, has told you, "I'm being let
21     go," something about a whistleblower.  And you -- for
22     many months after that, if not almost a year, you had no
23     idea what more was about that or how you might be -- why
24     she would be swept up in that?  No idea?
25 A.  I had no idea why -- no, I had no idea.

Page 168

1          I don't know why they stopped paying me.  I don't
2      know anything -- I don't know anything about this case
3      because no one talked to me about it.
4  Q.  And --
5  A.  No one from Hospice of Michigan ever talked to me about
6      this particular case that we're -- we're dealing with.
7  Q.  Well, maybe about the case or not the case, but why they
8      would stop paying Natalie --
9  A.  Well, they told her it was -- there's a whistleblower.
10 Q.  I understand.
11         But weren't you worried that -- what about a
12     whistleblower?  Should I know something about Natalie?
13     Is she a bad person?  Did she do something wrong?
14         MR. McGORISK:  Objection.  Argumentative.
15 BY MS. PRESCOTT:
16 Q.  I mean, that's what I'm trying to understand is, didn't
17     that alarm you that -- that Hospice of Michigan would
18     feel that getting rid of Natalie somehow cured or
19     corrected a whistleblower?
20         Wouldn't that worry you that, should I know
21     something about that?
22         MR. McGORISK:  Objection.  Asked --
23 BY MS. PRESCOTT:
24 Q.  Did she do something wrong?  Is she -- you know, like,
25     you didn't have any question about that?

Page 169

1          MR. McGORISK:  Same objection as before, and it's
2      been asked and answered.
3          Whatever you can -- you can --
4  A.  I became very -- I was very angry, but I did not discuss
5      it with anyone.  No one in Hospice of Michigan took the
6      initiative to talk to me.  And I just took care of our
7      patients just as I always did, just as when they stopped
8      my salary, I did it.  And my primary interest is that
9      our patients are served.  If there's -- if we're spending
10     $671,000 to care for their patients, that's fine.  We'll
11     do it.  We'll do it in the same way we always do it, and
12     I never made a peep about not being paid to anyone,
13     because I don't work for money.  I work to take care of
14     people.  That's my mission.
15         And the $39,000 that was spent against the
16     $671,000, that I factored that -- that we were spending
17     on their patients didn't mean anything to me.
18 BY MS. PRESCOTT:
19 Q.  Well, six hundred --
20 A.  And it didn't make me like Hospice of Michigan any more
21     or be favorable towards them, but I just took it in
22     stride.
23 Q.  But the six hundred-and-some-thousand wasn't your money,
24     sir; right?  That's not your money that you're spending,
25     whereas the $43,000 was coming to you; right?

Rabbi E.B. 'Bunny' Freedman
March 13, 2024

Page 170

1  A.  Who do you think raises --
2  Q.  Am I right?
3  A.  -- that money?
4      Yeah -- no.
5      I raised the money and take responsibility for --
6  there's other people on the staff that raise money as
7  well.  I take the responsibility to pay our entire
8  budget every year.  I've done it for 25 years.  I'll do
9  it for the next few years.  And if it comes from one
10 place or comes from another, I'll have to raise the
11 money.
12     So, now I have to raise, you know, whatever, the
13 same thing.
14 Q.  So, you looked at it as you had this, you know,
15 essentially responsibility to earn it.  And equally,
16 what, it was money out of your pocket if you spent it on
17 HOM staff?  I -- I'm not understanding.
18 Or HOM patients, I mean?
19     MR. McGORISK:  Objection.  Compound.  Form.
20 A.  I was happy to do my work and excited to do my work, not
21 just where the money came from.  My responsibility was
22 to raise the money.  I looked for Hospice of Michigan,
23 not to put my money away -- I think earlier I said that
24 I got the money.  I didn't look at it.  I didn't know
25 about it.  And, frankly, I don't really care about it.

Page 171

1      I build relationships, and I ask people that work
2  with us, I ask them to share in the responsibility that
3  I have to raise all the money.
4      I asked Hospice of Michigan to do what people
5  throughout the community and organizations throughout
6  the community and foundations all over the place, I
7  asked them to pay a fair share of how much they benefit.
8      So, I don't know who is implying that that was a
9  kickback, but it never crossed my mind that that was a
10 kickback.
11     It crossed my mind that it's -- that Hospice of
12 Michigan is getting a heck of a lot of benefit from all
13 the work we do, and I think they would have a moral
14 obligation to pay, not the whole thing, because they
15 didn't hire -- you know, tell me to do enrichments or
16 things like that.  I understood that.  But in the fact
17 that how much we're helping them with their patients and
18 building patient satisfaction and -- and -- and
19 improving their reputation all throughout the community
20 and encouraging them to help us do the education that we
21 do in the entire community, that's why I did it.
22     The $39,000 was a haircut that I took and took the
23 risk with no other income to start fundraising and do
24 this mission.
25     We did pretty well, with Hospice of Michigan or

Page 172

1      without.
2  BY MS. PRESCOTT:
3  Q.  Did all of the entities in Exhibit 1 on page 10 that we
4      looked at earlier, the hospices and the other hospitals,
5      did they all have a moral obligation to pay you as well?
6  A.  Yeah.  And I went to them and I asked them to help, and
7      some did a small amount.  It often was related on their
8      side to how many patients they had with us and whatever.
9      Their intentions were great as long as they were helping
10     us.
11 Q.  But none of them -- did you ask any of them to pay you
12     personally and individually?
13 A.  I was paid --
14 Q.  I'm asking if you --
15 A.  -- from not --
16 Q.  -- asked any of the entities on 10 and 11 to pay you
17     personally and individually --
18 A.  No, but --
19     THE REPORTER:  I'm sorry?
20 A.  May I continue?
21 BY MS. PRESCOTT:
22 Q.  No, that's the answer.
23     Did you talk to Bob Cahill and Patrick Miller that
24     Greg Parry had said that the relationship with Hospice
25     of Michigan and Jewish Hospice Chaplaincy Network could

Page 173

1      be seen as violating the anti-kickback statute?
2  A.  No.
3  Q.  Are you sure about that?
4  A.  I don't recall.
5  Q.  Well, don't you think that would be something that would
6      stand out if Bob Cahill had a meeting with you and told
7      you our lawyers are saying there could be an
8      anti-kickback statute violation?
9      Wouldn't that stand out?
10 A.  Well -- ask the question again, please.
11 Q.  Sure.
12     I mean, let's back up a little bit and -- so, do
13     you know -- you know generally what the anti-kickback
14     statute is?
15 A.  I do.
16 Q.  Okay.  And do you know that if you violate it, you can
17     go to jail?
18 A.  Yeah.
19 Q.  Okay.  And also people can get shut down and fined giant
20     amounts; right?
21 A.  I do.
22 Q.  Okay.  So, in other words, not something you want to be
23     caught up in; fair?
24 A.  Correct.
25 Q.  Okay.  So, my question was, that -- did Bob Cahill and

Rabbi E.B. 'Bunny' Freedman
March 13, 2024

Page 174

1    Patrick Miller talk to you at any point and say,
2    "Greg Parry, this lawyer at our offices, is sending us
3    the anti-kickback statute, is telling us that there's an
4    issue or concern or problem"?
5         Did they ever convey anything like that to you?
6  A.  I don't recall.  I don't think it happened.
7  Q.  And then I followed up and said, well, that would
8    probably stand out to you, right, if you were being
9    accused --
10 A.  Yes.
11 Q.  -- of violating federal law --
12 A.  Yes.
13 Q.  -- fair?
14      Okay.  Cahill testified that in the mid-July
15   meeting, he specifically talked to you about the
16   anti-kickback statute, Parry sending copies of the
17   statute, and that he gave you a heads-up, and he thought
18   you might have said, because you're religious, you're
19   protected, or words to that effect.
20 A.  Not true.
21 Q.  Do you recall any of that?
22 A.  No.
23 Q.  So, if he --
24 A.  I believe it didn't happen.
25 Q.  Okay.

Page 175

1  A.  Do you want a little more information on that?
2       MR. McGORISK:  No.
3  A.  Okay.  Thank you.
4       MR. McGORISK:  Just answer the questions; okay?
5  A.  Yes.  Thank you.
6  BY MS. PRESCOTT:
7  Q.  Did you ever say anything to the effect of, as a
8    religious organization, JHCN was exempt or protected or
9    wouldn't be looked at carefully?
10 A.  No.
11 Q.  Okay.  Did -- whether it was mid-July or any other time,
12   did you ever have a discussion with Cahill about the
13   anti-kickback statute?
14      MR. McGORISK:  Objection.  Asked and answered.
15 A.  Shall I answer it?
16      MR. McGORISK:  Yeah.  Go ahead.
17 A.  Okay.
18      I don't believe I have ever -- ever had a
19   conversation with Bob Cahill about anti-kickback.
20 BY MS. PRESCOTT:
21 Q.  How about with Patrick Miller?
22 A.  No.
23 Q.  Did Patrick Miller ever suggest to you that Natalie
24   should be removed from the JHCN website so that her role
25   with JHCN wouldn't be so transparent and easy to see?

Page 176

1  A.  I don't recall.  I --
2  Q.  Is that something you would ever think about doing?
3  A.  No.
4  Q.  Did Patrick Miller ever joke with you about, you know,
5    avoiding prison time in -- in any way?
6  A.  No.
7  Q.  So, suffice it to say that the -- you had no questions
8    asked -- just to close out, you had no questions asked
9    when Natalie Rosenfield came to you and said, something,
10   something, whistleblower, Hospice of Michigan is letting
11   me go?  You just --
12      MR. McGORISK:  Objection.  Asked and answered.
13 BY MS. PRESCOTT:
14 Q.  You just decided not to -- you didn't ask any questions
15   thereafter?
16      MR. McGORISK:  You already asked him that about 30
17   minutes ago.
18      Objection.  Asked and answered?
19 A.  My presumption -- and this is what remains in my memory,
20   which may not -- may be imperfect like all humans, that
21   there was no conversation with me informing me that this
22   was brought to their attention.
23      All I knew is they were changing the rules in the
24   middle of the game, and I presumed it was about -- I --
25   as I told you earlier, I attached it with what

Page 177

1    Dottie had told me, that they have some problems and
2    they need to clean up their act.
3       And I don't believe there was a conversation ever.
4    I don't believe I heard Mr. Parry's name until quite
5    recently.
6  BY MS. PRESCOTT:
7  Q.  Fair enough.  Maybe not the name but the role.
8       It sounds like even the role, nothing -- this just
9    is not familiar to you?
10 A.  Yeah.
11 Q.  Until the lawsuit happens; is that --
12 A.  Correct.  Yeah.
13 Q.  Okay.
14      (Discussion held off the record.)
15 BY MS. PRESCOTT:
16 Q.  Same thing with the IT.  They just explained to you,
17   "Hey, look, we need to have you repay," and you never
18   got an explanation why?  Is that a good summary?
19 A.  I distinctly recall, after the meeting, I wrote some
20   notes but I -- I tried to look for them, find those
21   notes that I wrote contemporaneously.  I couldn't find
22   them.  But I remember my frame of mind that they were
23   incredibly disrespectful to me.  They were -- they
24   called me to come have a conversation, and it wasn't a
25   conversation.  They told it -- told me the rules.  I

Rabbi E.B. 'Bunny' Freedman
March 13, 2024

Page 178

1    kept saying, "but," "but," "but," and they said, "Well,
2    here is what -- it's being -- here is your bill."
3         And I thought some wicked accountant decided to
4    tell them that they better get the money, and -- and
5    they were sticking me with the bill.
6         And, as I told you earlier, I paid -- never paid
7    it. And -- and I -- I wouldn't pay it.
8    Q.   Yeah.
9         Did you tell them that, like this is -- "I'm not
10   paying this"?
11   A.   No.
12   Q.   You just --
13   A.   I just walked out with the bill, and I don't even
14   know -- I might have thrown it out right there.
15   Q.   But months passed, and eventually you started getting,
16   what, letters from a lawyer saying, "If you don't pay
17   this, we're going to take action."
18        Do you remember that happening?
19   A.   No.
20   Q.   Do you remember them coming to you over and over again
21   saying, "Sign it," "Sign it," "Sign it"?
22   A.   I don't recall.
23   Q.   Okay.
24   A.   I -- put it this way. If they did come to me, I -- I
25   ignored it.

Page 179

1    Q.   Okay. And that goes back to ghosting, which is how we
2    got on this whole --
3    A.   What?
4    Q.   That -- now I want to go back to ghosting.
5         So, Patrick -- you go to him about Krakoff.
6    Initially he seems happy to make it happen. Eventually,
7    he goes silent on you. He's ghosting.
8         Does he, at any point, say to you, "We do not think
9    we should extend this agreement to Rabbi Krakoff"?
10   A.   I don't believe so.
11   Q.   Did he ever tell you, "We have a legal problem. Our
12   lawyer is throwing up concerns and we're not going to be
13   able to do this"?
14   A.   Again, I don't recall that that happened.
15        My presumption is it doesn't -- I'm just trying to
16   give you a sense of my -- you asked me about frame of
17   mind. And my presumption is that it didn't happen. And
18   I think you're correct. It would probably have stuck in
19   my memory.
20   Q.   Certainly, no one says, "That would be a kickback.
21   We're not doing that. We're -- we're not -- that's not
22   happening"; right?
23        MR. McGORISK: Objection. Foundation.
24   BY MS. PRESCOTT:
25   Q.   Am I correct?

Page 180

1    A.   Yes.
2    Q.   Okay. And was there any dialog or discussion with JHCN
3    about how they would extend this payment to Rabbi
4    Krakoff and then he would increase their census by
5    getting more Jewish patients to come there?
6    A.   I'm pretty sure --
7         MR. McGORISK: Objection. Foundation.
8         THE REPORTER: I'm sorry?
9    A.   I -- I'm pretty sure there was never a conversation of
10   that nature.
11   BY MS. PRESCOTT:
12   Q.   Would that surprise you to know that that's what they
13   were discussing in internal e-mail?
14   A.   That's judgment. I don't know.
15   Q.   Okay. So, what was going to change once Rabbi Krakoff
16   signed the contract from your perspective?
17        When you went to Patrick and said, "Let's get him
18   on an agreement," what was going to be the difference in
19   the way he served HOM from before the contract to after?
20   A.   My expectation was that -- and this is why -- what --
21   where -- why I went to him, is that Rabbi Krakoff was
22   going to be my successor, and we had succession plans in
23   place.
24        And if he is going to be my successor, it is
25   presumed that he'll be the man, the go-to person

Page 181

1    for J- -- for Hospice of Michigan when they interact
2    with JHCN, matters of patient, policy. All the other
3    questions that I was dealing with, he would deal with.
4    And if there were problems in the service of delivery,
5    he would be on the scene. If there were problems with
6    specific patients, he would be on the -- you know, he
7    would be actively involved.
8         And I thought it would be a really good idea for
9    them to transition where both he -- for some period of
10   time, undeclared, we would be working together, and I
11   would be mentoring him and coaching him, and, you know,
12   teaching him the ropes and introducing around to all the
13   patient service people for -- at Hospice of Michigan and
14   the teams, and it would be a wise thing for the
15   succession planning and continuity of the relationship
16   that he start while during this transition point and
17   that be offered some compensation just like I was.
18   Q.   Was Rabbi Krakoff going to the IDT meetings prior to
19   2022?
20   A.   No. May have -- might have -- he was probably
21   introduced, but I don't think he was -- well, 2022.
22        Prior to '22?
23        He might have been at some meetings. Yeah.
24   Q.   Was he also someone who could be called if there was a
25   patient care issue or unacceptable service or sorting

Rabbi E.B. 'Bunny' Freedman
March 13, 2024

Page 182

1    things out by HOM before 2022?
2  A. Not principally. Maybe.
3  Q. Was he doing that role at all in November 2022?
4  A. Well -- well, he -- I was -- there was the succession
5     plan, and wherever I could include him on -- on stuff, I
6     was doing that --
7  Q. Okay. So --
8  A. -- as we learned, you know --
9  Q. -- why would he get paid after the contract? What would
10     be the additional services that he was not doing and not
11     getting -- because he wasn't getting paid before a
12     contract was in place by HOM; right?
13  A. Uh-huh.
14      THE REPORTER: I'm sorry. Is that --
15  BY MS. PRESCOTT:
16  Q. Yeses and nos.
17  A. Ask me the question again.
18  Q. Rabbi Krakoff was not getting paid by Hospice of
19     Michigan before 2022; correct?
20  A. Correct.
21  Q. Okay. So, is there any new duty that he had never done
22     before that he was going to do only after 2022?
23  A. Attend meetings and --
24  Q. But he attended meetings in 2021.
25  A. Occasionally. He wouldn't attend regularly, like I was.

Page 183

1      So, he would -- he was called in to introduce him,
2   to my -- to the best of my recollection and show up at
3   certain meetings, but it was not on -- on any kind of
4   permanent role. He was going to take over a permanent
5   role, and we would double-duty so that he could -- we
6   could -- I could give him guidance and -- and support
7   and help until he filled into this role.
8  Q. And you would both be paid for a period? You would get
9     your amount. He would get his amount; right? That was
10     your pitch to Patrick Miller?
11  A. I think. Again, I don't know if I have any records of
12     these conversations.
13      Remember, it was COVID then, and I was -- we met in
14   a park, and I would bring two lawn chairs, and we would
15   sit in the park and talk, me and him, not because of any
16   big secrecy. That was the most convenient place during
17   COVID to meet. And we talked about, in -- in more vague
18   terms, about splitting immediately.
19      You know, let's say I was getting paid 39 -- I'm
20   just giving an example of what could have happened --
21   you know, could -- we never came to any real agreement,
22   ultimately.
23      But I was suggesting that, why don't we just
24   gradually reduce me and increase it, and let's take --
25   let's say we would increase it maybe by $10,000. I'm

Page 184

1    just throwing out what -- what is a possibility. Let's
2   increase my -- my rate of payment, not to me but the
3   total amount, $50,000, and let's say we did $25,000 and
4   $25,000. I must have suggested something like that
5   or -- and -- and then decrease mine, not over five
6   years, but, you know, take a little time until I step
7   back and I'm not attending those meetings and Joey has
8   taken over the whole shebang.
9  Q. You didn't attend full IDT meetings; right?
10  A. We -- no, I did not.
11  Q. Do you have any record of what portion of IDT meetings
12     you did attend?
13  A. Well, as long as it took. And it was very different
14     each time that we covered all the patients.
15      Biweekly, we divided the -- our patients in half,
16   and each week we would cover them, and then that would
17   rotate continually.
18  Q. What did you cover?
19      Mrs. Jones is being seen by Rabbi Kaluzny, and
20   she's got a care plan in place.
21      What else would you cover?
22  A. Well, what we did is, we heard from the team what they
23     had been doing. They heard from us what we were doing,
24     and then they had a complete report. And it was to --
25     to make it very smooth and clear that we were sharing

Page 185

1    responsibilities and we were sharing information.
2      So, we would hear about her conditions, if it was a
3   woman, condition, how much it changed or where it
4   changed, what we have been doing in her spiritual care
5   and her social work and our enrichments and we -- we
6   would have a full-blown discussion as part of a joint
7   team that was working together.
8  Q. And so if -- were there spiritual care advisors at
9     this -- these IDT meetings? Not JHCN?
10  A. HOM?
11  Q. Yeah. HOM's people?
12  A. Yeah. Yes.
13  Q. Right?
14  A. Yes.
15  Q. So, if these were people that were HOM staff that were
16     spiritual care advisors for Mrs. Jones, then they
17     just physically, actually that spiritual care advisor
18     went to the meeting; right?
19  A. (Nods head.)
20      THE REPORTER: I'm sorry?
21  BY MS. PRESCOTT:
22  Q. Yeses and nos, if you can.
23  A. The -- the team meetings, you're talking about?
24  Q. Yeah, the IDTs.
25  A. Yeah. Yeah.

Page 186

1          So, the IDT --
2    Q.   So, but if -- by contrast, if, you know, my hypothetical
3         Mrs. Jones is being seen by Rabbi Kaluzny, Rabbi Kaluzny
4         wouldn't attend the IDT?  You would, and then it was
5         from you to her?
6    A.   To her, Rabbi Kaluzny?
7    Q.   Yeah.
8    A.   Yeah.  Yeah.
9    Q.   And then if it was a non -- if it was one of the 30 or
10        so that were not part of your paid staff, same story;
11        right?  You would report back to them?
12   A.   Sure.
13   Q.   They would not attend?
14   A.   They would stay in touch with their rabbis or who else
15        is serving them.  And -- or if they declined our
16        services, you know, then there wouldn't be that much
17        conversation, but there could be.  We might be talking
18        to relatives and things like that.
19   Q.   And how would you report to Hospice of Michigan about
20        what 30 different people who don't work for you, the --
21        the rabbis from around town of every description, what
22        they're doing with the hypothetical Mrs. Jones or
23        Mrs. Lee?
24   A.   We -- I would or Natalie would or other staff members
25        would be in touch with those rabbis.  And knowing that

Page 187

1         we would be reviewing those patients in the next couple
2         weeks, we would make sure to call into those rabbis if
3         they had anything to report about changes that they're
4         witnessing or, you know, those kinds of things.
5    Q.   How often was each patient reviewed?
6              Like did you need a one-time-a-month IDT for each
7         patient or as-needed or every day, or how did --
8    A.   We -- we -- the system that we used is every -- twice a
9         month, we would be reviewing patients, the same patient.
10        We -- we do it every --
11   Q.   The same patient?
12   A.   Yeah.  The -- each patient would be reviewed twice a
13        month.
14   Q.   Okay.  So, why would the actual spiritual care advisor
15        on the file not attend the IDTs?
16   A.   The rabbi, you know, was a --
17   Q.   The rabbi, right.  Yeah, that -- yeah.
18   A.   They were very busy people and they're -- oftentimes,
19        many of these referrals were made by the rabbis who
20        would call us because they don't have the expertise that
21        we do in -- in hospice services and ask us, "Could you
22        please?"  "I sent someone to talk to you.  Could you
23        please?"
24             And we would engage with the rabbi, and -- and we
25        would -- and each time we -- someone came to us and

Page 188

1         said, "We want services," we would ask specifically, "Is
2         there a rabbi in your life?"
3    Q.   I understand.
4    A.   I think I said that earlier.
5    Q.   You did.
6    A.   Right.
7              So, we would make contact with that rabbi and stay
8         in touch with them and convey to them what they needed
9         to know, if there was change in condition and so on and
10        so forth.  And --
11   Q.   But, I mean, just as you derived some value out of
12        sitting and hearing from the team about Mrs. Jones or
13        Mrs. Lee or whoever it is, you know, isn't the system
14        set up that the actual care team for the actual patient
15        be together to share knowledge together in real time?
16             Isn't that what the insider SCAs are doing, the
17        spiritual care advisors?
18   A.   So, these are rabbis.  These are pulpit rabbis.  They
19        delegate to us.  These are the people -- and tell
20        people, "These are the people that know what they are
21        doing.  I will be in constant contact with them.  They
22        will be in constant contact with me."
23             In hospice, generally -- there is nothing quite
24        like Jewish Hospice Chaplaincy Network anywhere that I
25        know of.  But in hospice, in general, you don't invite

Page 189

1         all the spiritual care people to -- to the -- the
2         meetings.  But, in our case, we really specialize in
3         this work, and they invite us to be liaisons to -- to
4         the rabbis, and we would communicate that.
5              So, to bring every rabbi, it wouldn't happen.  It's
6         not possible that every rabbi that's looking at their
7         patients will be making reports.  We were the conduit to
8         where -- so, we -- it was essentially a team, and we --
9         the rabbis will delegate us to give the input that
10        they're giving to us over to the table.
11   Q.   Did you insure the different rabbis that gave care,
12        like medical malpractice or other malpractice-type
13        insurance?
14   A.   No.
15   Q.   Did you carry insurance for the on-staff rabbis of JHCN?
16   A.   Yes.  Yes.
17   Q.   Did you ever get asked to provide proof of malpractice
18        insurance to Hospice of Michigan?
19   A.   I don't recall.
20             THE WITNESS:  But we have the malpractice
21        insurance?
22   BY MS. PRESCOTT:
23   Q.   Do you --
24             MR. McGORISK:  What's that?
25             THE WITNESS:  Do -- do we have malpractice

Rabbi E.B. 'Bunny' Freedman
March 13, 2024

Page 190

1    insurance?
2            MR. McGORISK:  I --
3    A.   Apparently so.  Or whatever.
4    BY MS. PRESCOTT:
5    Q.   Well, insurance --
6    A.   We're on a malpractice -- but we have malpractice
7         insurance, yes.
8    Q.   Do you --
9    A.   Were we asked?  I don't know.
10   Q.   Okay.  So, you, obviously, have insurance.  We know that
11        because your lawyer mentioned it in another deposition
12        about being retained by the -- a company.
13            That makes sense.
14            But I'm talking about insurance if the caregiver
15        provides care that is negligent in the medical sense of
16        the word.
17            Do you know if you have that kind of particular
18        insurance?
19   A.   Yes, we do.
20   Q.   Okay.  But you don't know if you were ever asked to
21        provide proof of that to HOM; right?
22   A.   I don't know.
23   Q.   Okay.  Do you know if a -- like did you ever provide or
24        do any kind of like criminal background search for the
25        different rabbis who would be providing care and guided

Page 191

1    by you, as you've just testified, through the IDT?
2    A.   So, let's make a distinction.
3            There are employees of ours, part-time, contingent,
4         or -- or full-time, and then there were these other
5         rabbis that -- we're using the term "other rabbis."
6         Let's call them "pulpit rabbis" just -- so, who are you
7         talking about?  My employees or pulpit?
8    Q.   Well, I'm not sure you and I agree on what an employee
9         is.  I'm still confused about that.
10            But the pulpit rabbis who are not getting paid, and
11        they're not getting paid by HOM and -- but you're
12        attending the IDTs and relaying the care back and forth,
13        you're the pivot point.  You just testified about that.
14            Did you have -- you didn't have malpractice
15        insurance for them, first of all; right?
16   A.   Correct.
17   Q.   You didn't do criminal background searching for them;
18        right?
19   A.   Correct.
20   Q.   You didn't do any kind of medical training, HIPAA and,
21        you know, all those?
22   A.   We offered training to all the rabbis numerous times
23        and -- but it was not extensive training.  We were --
24        you know, let them -- you know, gave them some tips or
25        so.

Page 192

1    Q.   Did you require the pulpit rabbis to do any training?
2    A.   No.
3    Q.   Okay.
4    A.   Require?
5            No.
6    Q.   Did you -- what are contingent employees in your world?
7            You mentioned that as a category.
8    A.   Some of the rabbis are staff, and they work -- well,
9         really, they're part-time.  That would be more accurate.
10        I'm not sure if we have any contingent to pay -- we used
11        to have them.  We changed -- changed our system.  We
12        used to have a number of rabbis that would get paid for
13        particular visits.  We don't have that any more.  We
14        have either part-time employees that go through all this
15        training and testing or full-time rabbis.
16   Q.   Okay.  So, when you -- you don't -- in -- as of 2017 to
17        2021, do you know whether there were any so-called or --
18        air quotes -- I'm going to use the word "contingent
19        employees" at JHCN, contingent rabbis?
20            I gave you a time frame on that one.
21   A.   Yeah.  I know, but I'm -- fitting the --
22   Q.   Don't know?
23   A.   -- time frame, I -- I don't know.
24   Q.   Okay.
25   A.   I don't think so, but that doesn't mean anything really

Page 193

1    concretely.
2    Q.   With -- with regard to the full- or part-time-employed
3         rabbis, people that sometimes get paid, do you criminal
4         background check those people?
5    A.   Yes.
6    Q.   Have you since 2010?
7    A.   I don't recall.
8    Q.   Do you know when you started?
9    A.   I think so.  I think so.  No, I think we did, but I -- I
10        wouldn't know.
11   Q.   Okay.  Do you require any particular set of modules of
12        training relative to any set of subjects?
13            It could be EEO.  It could be sharps.  It could be
14        HIPAA.
15            Do you have a certain set of training that you
16        require of the full- or part-time employee rabbis?
17   A.   Well, we require all our employed rabbis to come to the
18        sessions that we train by -- it was Mike Paletta before
19        he retired.  He would do trainings for us that included
20        HIPAA, included all -- all of these kinds of
21        regulations.  And I can't say every single one, but --
22        but we were -- made sure that we were trained and in
23        progress of disease and -- and background on hospice
24        history, all kinds of stuff.
25            So, I -- I don't know if we covered everything.

Rabbi E.B. 'Bunny' Freedman
March 13, 2024

Page 194

1  And we have been trained in price-fixing and, of course,
2  HIPAA.
3  Q.  Okay.  So, you were paid about $400,000 a year as CEO of
4  JHCN to do -- well, that you were -- that's what your
5  approximate annual pay was; correct?  Or is it today
6  even?
7  A.  I don't know what "pay" means, but with benefits and,
8  you know -- I -- I'm not sure.
9  Q.  Okay.
10  A.  But something like that.
11  Q.  Okay.  Your sal- -- it's a salary amount, and it's about
12  $400,000.  There may be some benefits in there.
13     Is that right?
14  A.  Correct.
15  Q.  Do they provide your housing?
16  A.  Well, they -- see, that's where it gets complicated.
17     There was a parsonage for -- for clergy.  So, part
18  of that salary is parsonage, yes.  But they don't
19  provide any housing for me --
20  Q.  Did you ever --
21  A.  -- per se.
22  Q.  Okay.  Did you ever tell JHCN -- excuse me -- HOM that
23  you didn't provide employee benefits, and so Natalie
24  Rosenfield needed to be an employee because there were
25  no -- nobody got employee benefits at JHCN?

Page 195

1  A.  I -- I don't know if I said "employee benefits," but she
2  wasn't provided health care.
3  Q.  Why wasn't she provided health care?
4  A.  Because we didn't have people -- we didn't have a
5  policy.  We didn't have a health care -- we didn't
6  provide health care.
7  Q.  But you got health care through JHCN from the beginning?
8  A.  That was part of my salary.  I got paid, that it
9  included -- but it was given to me as salary.
10  Q.  Did you convey, in any way, to HOM that benefits weren't
11  available at JHCN to its staff?
12  A.  Health care, I did.
13  Q.  Okay.  While at the same time you were, in fact,
14  receiving health care from JHCN?
15  A.  I'm not --
16     MR. McGORISK:  Objection.  That misstates his
17  earlier testimony.  That's incorrect.  He didn't say he
18  was receiving health care.  He said he was receiving
19  salary to pay for health care.  That is different.
20  A.  It was incorporated in my salary.
21  BY MS. PRESCOTT:
22  Q.  Okay.
23  A.  But that's internal, you know, things.  We didn't have a
24  policy that you could sign on with us --
25  Q.  Yeah, I don't want to -- okay.  So, I think your counsel

Page 196

1  made a point that we should clarify.
2     Did JHCN contract with an insurance company to
3  provide you with medical, dental, those kinds of health
4  benefits?
5  A.  No.
6  Q.  Okay.  Did JHCN have any employee benefit plan, medical
7  specifically --
8  A.  Medical, no.
9     Go ahead.
10  Q.  -- at any time?
11  A.  No.
12  Q.  So, all --
13  A.  To my -- best of my knowledge, you know.
14  Q.  Okay.  So, up until today, if anyone gets medical, then
15  it's because they get some sort of pay that is for that,
16  and then they go buy it wherever they buy it?
17  A.  Uh-huh.  It's -- they're paid a salary, and it's called
18  salary, and it incorporates, you know, the -- the cost
19  of -- of -- when they're paid a salary, it's
20  incorporated into their salary.  Is that --
21  Q.  I -- I don't mean this to be complicated.  I guess what
22  I want to know is, do staff go buy their own policy --
23  A.  Yes.
24  Q.  -- through their -- or not?
25  A.  Or not.

Page 197

1  Q.  Right?
2     Like -- and that's what you always did?
3  A.  Right.
4  Q.  Right?
5     So, it's not like there's a Blue Cross plan and
6  open enrollment every whatever?  You don't do that at
7  JHCN?
8  A.  Correct.
9  Q.  Okay.  Including for Natalie?
10  A.  Correct.
11  Q.  Okay.  What happened that caused Natalie to be hired at
12  Hospice of Michigan?
13  A.  Want to be more specific?  "What happened"?
14  Q.  Do you know why they hired her?
15  A.  Yes.
16  Q.  Why?
17  A.  Because I went to Patrick and said I got a problem,
18  therefore we have a problem.
19     You know, I'm paraphrasing.
20     Because Natalie just went through an operation that
21  is not covered, and she's being billed all kinds of
22  things and her -- her whole stability is being
23  challenged.  And if we don't have Natalie -- the two of
24  us, our agencies, don't have Natalie, we will never be
25  able to provide the services that -- that we are doing

Rabbi E.B. 'Bunny' Freedman
March 13, 2024

Page 198

1    so thoroughly. And I'm worried that a lot could fall
2    apart, particularly at Hospice of Michigan where Natalie
3    is the -- makes everything happen. You know, she -- she
4    gets the rabbis and gets their -- their paperwork and
5    does a whole lot of things that -- and stays in touch
6    with the staff at -- at HOM. And there's a whole lot of
7    things that coordinate this -- this stuff. She's our
8    care coordinator. And that's vital to -- to us getting
9    the job done, and if we don't have her, I'm afraid --
10   I'm going to have conversations with her. And although
11   she didn't threaten that she's going to leave, I'm
12   afraid she's going to want to go to somewhere that would
13   provide these benefits. Can you help?
14        And so I prodded. I made Patrick aware. And I
15   asked, "Could you help?" And I -- I -- that was
16   really -- so, I prodded it, if -- if that's your
17   question.
18   Q.   Okay.
19   A.   That's where it came up from me.
20   Q.   Why didn't you just pay her some more?
21   A.   Because I didn't think we could do that because there's
22        so many other employees that we're not providing this
23        to, and if I started doing that, it would be a huge
24        expense.
25   Q.   Well, couldn't you just give her a raise of 4,000 bucks

Page 199

1    a year and be done with it?
2    A.   $4,000, did you say?
3    Q.   Whatever.
4         I mean, let's call her cost of insurance $12,000,
5    $1,000 a month in 20- -- whenever she started. 20- --
6         MR. McGORISK: '17.
7         MS. SMITH-MORRIS: '17.
8    BY MS. PRESCOTT:
9    Q.   -- '17? Why couldn't you advance her salary by 12,000
10        bucks?
11   A.   Essentially, I was asking her -- him to help whatever
12        the cost is.
13        I didn't propose to him how we could do it, what he
14        could do. I just said, "We have a problem. What can
15        you do?"
16   Q.   My question isn't what you said or what he could have
17        done or not done. My question is why you didn't just
18        pay her a raise. "Hey, I --"
19        MR. McGORISK: Object --
20   BY MS. PRESCOTT:
21   Q.   "I focused on how important you are, and I realize how
22        many things you're handling. I'm going to give you a
23        raise"?
24        MR. McGORISK: Objection. Asked and answered.
25   BY MS. PRESCOTT:

Page 200

1    Q.   Go ahead.
2    A.   I was under -- I was under immediate threat of her
3         leaving and finding another more lucrative position.
4         And I think -- thought she was worth a lot more. And I
5         thought one of the places that we could -- what we do is
6         we don't sell a product and then make money off of it,
7         as you know. We have to go raise it. And anything --
8         so, I look at who are the prospects that I could raise
9         money from to -- to help different expenses. And
10        that's -- that's what we do for a living and how we all
11        get paid.
12   Q.   Okay.
13   A.   So, I went to what I thought was a very reasonable
14        person who benefits from -- from Natalie, and I said,
15        "Could you help on this problem?"
16   Q.   I --
17   A.   Because I needed help.
18   Q.   -- understand what you did. I understand what you did,
19        but what I was asking was a different question.
20        Why -- I understand the value you saw in her.
21   A.   Uh-huh.
22   Q.   I understand what you did.
23   A.   Uh-huh.
24   Q.   I'm -- my question is, why, understanding her value, you
25        didn't devote some of the millions of dollars a year

Page 201

1    that you've been so successful in fundraising to pay for
2    her benefits?
3         MR. McGORISK: Objection. Asked and answered.
4    BY MS. PRESCOTT:
5    Q.   Or just --
6    A.   Essentially that's exactly what I did. That's a good
7         suggestion. I went out and sought the money from people
8         that take an interest in -- in the work that we do. And
9         I -- I -- and, you know, I could have went to someone
10        else and got the money or tried to get the money or --
11        you know, so -- but I went to a reasonable prospect,
12        what it's called in fundraising.
13   Q.   But then --
14   A.   I didn't specify an amount. I asked, "Can you help?"
15   Q.   And how?
16   A.   Very much like I do all day long in fundraising. I
17        develop.
18   Q.   Natalie provided services across the entire spectrum of
19        southeast Michigan hospices without respect to whether
20        they paid or helped in 2017, didn't she?
21   A.   Correct.
22   Q.   And she was a care coordinator in the center of all of
23        those relationships; right?
24   A.   Correct.
25   Q.   But no one in 2017 had the number of patients that they

Rabbi E.B. 'Bunny' Freedman
March 13, 2024

Page 202

1    were caring for that was as high as Hospice of Michigan
2    when it came to JHCN patients; isn't that correct?
3    A.   The -- correct.
4         MR. McGORISK:  Objection.
5    A.   On the last --
6         MR. McGORISK:  Go ahead.
7    A.   The -- the -- it's correct.  On the last statement you
8         said that no one had as high -- I mean, I think we
9         established that, but you said it and I didn't know if
10        that was the case always or sometimes or -- but --
11   BY MS. PRESCOTT:
12   Q.   There's an -- there's an endowment you've raised money
13        for at JHCN in -- in addition to the operating -- the
14        amount that goes to operating every year?
15   A.   Uh-huh.
16        THE REPORTER:  I'm sorry.  Is that "yes"?
17   A.   Yes.
18        Yes.  I'm sorry.
19   BY MS. PRESCOTT:
20   Q.   And that was in the millions of dollars in 2017 as well;
21        correct?
22   A.   I don't recall, but I'll -- as for purposes of
23        conversation, let's say, I'll answer the question.
24   Q.   Did Natalie Rosenfield deliver more and different
25        services to Hospice of Michigan in 2018 than she did in

Page 203

1    2016?
2         MR. McGORISK:  Objection.  Foundation.
3    A.   I think Natalie's role -- I think Natalie's role expands
4         and expands and expands with our -- our census, our
5         census size and with all the additional programs
6         we're -- we're adding and including her care --
7         THE REPORTER:  I'm sorry.  "-- including --"?
8    A.   Care coordination.
9         She's providing these services.  And, yeah, her
10        role is constantly expanding.  So, she's providing more
11        services each year.
12   BY MS. PRESCOTT:
13   Q.   What did you understand she was going to do for Hospice
14        of Michigan when hired by them that she did not do for
15        them before being hired?
16   A.   I don't know that.  I don't know that she was going to
17        do more or less.
18   Q.   Okay.
19   A.   I asked for help.
20   Q.   Okay.
21   A.   I was looking for a contribution or some sort.
22   Q.   Why have her hired rather than, "Give us a donation,
23        please.  We have a special need?"
24        They gave you dotations other times; right?
25   A.   Well, I would suggest --

Page 204

1         MR. McGORISK:  Objection.
2    A.   I would suggest --
3         MR. McGORISK:  Misstates his earlier testimony.
4    A.   -- that you ask that question to Bob Cahill or Patrick
5         or -- I don't -- I don't know the answer to it.
6    BY MS. PRESCOTT:
7    Q.   Because you didn't structure -- you didn't suggest an
8         employee.  Your point has been -- and I'm just catching
9         on --
10   A.   Thank you.
11   Q.   -- "can you help?"
12   A.   Yes.
13   Q.   And so are -- is it your position that they came in
14        with, "We will put her on our payroll as an employee"?
15        That wasn't from you; that was from them?
16   A.   Correct.
17   Q.   I see.  Okay.
18        So, you did not ask for her to be -- become an
19        employee of Hospice of Michigan?
20   A.   I would have been just as happy if they -- they gave a
21        donation towards that.
22   Q.   Do you remember anything from the call when she says
23        she's let go by them that you haven't told me about
24        today?
25   A.   Frankly, I don't remember the call, but Natalie has told

Page 205

1    me that she told me at that time, and I accept that at
2    face.
3    Q.   Okay.  You mentioned Joey Krakoff and Dottie Deremo both
4         mentioned something about a whistleblower.  You
5         mentioned one -- somehow along the way you thought that
6         it was a lawyer.
7         Do you remember anything else from the conversation
8         with Dottie Deremo and something to do with a
9         whistleblower?
10   A.   No.
11   Q.   Context or any other details?
12   A.   Actually, I remember that she told me, you know, there's
13        a whistleblower with a lawyer -- involving a lawyer.
14        Nothing about the context and our relationship to
15        it, and I don't know if she knew about that.
16   Q.   And she didn't share with you how she had heard; is that
17        right?
18   A.   No.
19   Q.   Okay.  You mentioned Joey Krakoff had also said
20        something to you about a whistleblower.  I think the
21        context was before -- you know, sometime before you ever
22        understood it was related to JHCN.
23        What -- what do you recall about Joey telling you
24        about a whistleblower?
25   A.   I don't recall.  Joey told me -- again, he told me that

Rabbi E.B. 'Bunny' Freedman
March 13, 2024

Page 206

1    he told me.
2  Q.  Okay.  So, Joey knew about -- anybody else that ever
3      mentioned to you anything about a whistleblower that --
4      before you knew there was a lawsuit?
5  A.  I -- I don't believe so.
6  Q.  And didn't -- do you remember asking Deremo or Krakoff
7      any questions about what -- "Is it involving someone we
8      know?" or did you ask anything to find out?
9  A.  I was blindsided --
10       MR. McGORISK:  Excuse me.
11  A.  -- that -- that I didn't even know that I was -- there
12      was a subpoena and that someone answered for it for me.
13       I was -- had no information about the
14      whistleblower.
15  BY MS. PRESCOTT:
16  Q.  Are you talking about the subpoena at your office and
17      that someone had answered for you at your office?
18  A.  Uh-huh.
19       THE REPORTER:  I'm sorry.  Is that "yes"?
20       MR. McGORISK:  "Yes"?
21  A.  Yes.
22  BY MS. PRESCOTT:
23  Q.  Okay.  Did you know that we tried many times to get
24      agreement of your lawyers that no one would be coming to
25      your home, no one would be coming to your office?  We

Page 207

1      would be happy to give it to them?
2       Did you know that?
3       MR. McGORISK:  Well, let me just object insofar as
4      I was not involved at that time.  So, when you're
5      pointing to the lawyers --
6       MR. HERSCHFUS:  Nor was I, by the way.
7       MR. McGORISK:  Are you talking about the subpoena
8      for his deposition --
9       MS. PRESCOTT:  Yeah.
10       MR. McGORISK:  -- or the records?
11       MS. PRESCOTT:  The subpoena for the deposition.
12       MR. McGORISK:  Oh, well --
13       MS. PRESCOTT:  That's the only thing that got
14      delivered to his office.
15  BY MS. PRESCOTT:
16  Q.  Did you know that your lawyers pushed us into having to
17      track you down at your home?  Some people came to your
18      home, people came to your office because they wouldn't
19      just take it in their office?  Did you know that?
20       MR. McGORISK:  Well --
21       MR. HERSCHFUS:  Well, while you're swinging --
22      while you're swinging your hand across the table, you've
23      never had any contact with me whatsoever.  So, that --
24      I'm certainly not included in that.
25       Brian, am I correct?  You -- you were never

Page 208

1      included in any of that?
2       MR. McGORISK:  No.  I was included early on and
3      advised you on January 9th, even before that, when I
4      talked to Annemarie in December, that I was representing
5      the rabbi through a phone call.  And then I sent a
6      letter and indicated I was responding to the subpoena
7      and the request for documents.  So --
8       MS. PRESCOTT:  Well, actually, in your e-mails, you
9      said, "I do not have authority to accept a subpoena,"
10      and we asked you to please accept it.
11       Do you remember that?
12       MR. McGORISK:  I -- I said at that point in time, I
13      had not made contact with my client as of yet, and I
14      didn't get -- receive authorization to -- to accept
15      service.
16  BY MS. PRESCOTT:
17  Q.  Okay.  So, you were blindsided?
18  A.  Yes.
19  Q.  If you think I think it's fun to go running around
20      trying to find people instead of going to your lawyer's
21      office, you're -- you would be sadly mistaken.  I would
22      much rather serve your lawyer and leave you alone.
23       MR. HERSCHFUS:  Is that a statement or a question?
24       MS. PRESCOTT:  It's a statement because I think
25      he's being misled by you.

Page 209

1       MR. HERSCHFUS:  Well, let -- let me make it
2      abundantly clear.
3       You don't know me, and before you make any
4      accusations on the record, you better be very careful,
5      because while you've got some professional issues that
6      you are crossing the line on, you also have to be
7      abundantly careful about what you say about what an
8      attorney did or didn't do, particularly when you've
9      never ever dealt with me.
10       MS. PRESCOTT:  Oh, I'm sorry.  You were on the
11  record to the federal court yesterday saying --
12       MR. HERSCHFUS:  I give you --
13       MS. PRESCOTT:  -- you were in all the meetings --
14       THE REPORTER:  I'm sorry?
15       MS. PRESCOTT:  I give you some --
16       MS. PRESCOTT:  -- and that you were part of all of
17  this.
18       MR. HERSCHFUS:  I give you some caution because
19  your behavior --
20       MS. PRESCOTT:  I give it right back to you, sir.
21       MR. HERSCHFUS:  -- in both -- in both depositions
22  has been less than professional, and your behavior right
23  now --
24       MS. PRESCOTT:  Well, the feeling is so mutual.
25       MR. HERSCHFUS:  -- while the --

Rabbi E.B. 'Bunny' Freedman
March 13, 2024

Page 210

1    MS. PRESCOTT:  Believe me.
2    MR. HERSCHFUS:  -- deposition may not be picking up
3  your -- your bodily genaflections(ph) or the way you're
4  behaving or when you decide to raise your voice, it's
5  just unprofessional.
6    MS. PRESCOTT:  Okay.  Well, luckily I don't define
7  my professional duties in the same way you do because I
8  don't lie to federal judges.
9    MR. HERSCHFUS:  Right.
10    MS. PRESCOTT:  But we can move on.
11    MR. HERSCHFUS:  Right.
12    MR. McGORISK:  You know, we're about ready to
13  terminate the deposition, and you're going to have to go
14  to court to -- to continue on.  Because making your
15  accusations against the lawyers here, I think, is
16  totally inappropriate, irresponsible and a breach of
17  your fiduciary duty.
18    So, if -- we're here to ask him questions, not make
19  accusations.
20    So, please, let's proceed because you're running
21  out of time.
22    MS. PRESCOTT:  I'm comfortable.
23    MR. McGORISK:  The seven and a half hours is going
24  to be done pretty quickly.
25  BY MS. PRESCOTT:

Page 211

1  Q.  Did you increase the pay of anybody at JHCN or pay
2    anybody at JHCN so that they could get benefits besides
3    Natalie at any point?
4  A.  I don't understand your question.
5  Q.  Well, earlier I asked you if you received benefits
6    through JHCN, and you said yes.  And then we teased it
7    out that actually you consider some of your salary to be
8    for benefits, and you apply it accordingly; okay?
9  A.  Uh-huh.
10  Q.  Do you -- does anybody else get paid for benefits that
11    they then can apply accordingly?
12  A.  I don't know.
13  Q.  Have we talked about everything you do recall from
14    whatever the meeting was at somewhere in July with Bob
15    and Patrick in which they provide you an invoice, and
16    you're frustrated or upset by the way they treated you,
17    they disrespected you at that meeting?
18    Is there anything else you recall being said in
19    that -- in that meeting or any other subjects that were
20    raised?
21  A.  I don't believe so.
22  Q.  After Natalie was let go by Hospice of Michigan, not
23    only did you pay her so that she could buy benefits, but
24    you also paid her to replace what Hospice of Michigan
25    had been paying her; correct?

Page 212

1  A.  I think so, but I couldn't answer accurately.
2  Q.  Did Natalie's duties change from before she was
3    separated from Hospice of Michigan to after?
4  A.  As I mentioned earlier, this may not be what you're
5    answered, but as mentioned earlier, she constantly is
6    expanding her role.
7    So, I don't know if we added in anything, but her
8    intensity is really incredibly, incredibly impressive,
9    to me and to everybody on our team.
10    So, she is -- she is maxed out, I would think.  I
11    really do think that.  We hired another -- well, one of
12    the things we did for her is we -- we hired another
13    social worker to -- to work with her.  So, that changed,
14    and I couldn't give you a date on that.
15  Q.  Do you know of any duties she did before the separation
16    relative to Hospice of Michigan that she stopped doing
17    after they let her go?
18    She still served the patients.  She still
19    coordinated the care.  She still attended the IDTs.  She
20    still educated people; right?  She -- if anything, her
21    census only grows and grows; is that fair?
22  A.  No.  It's only fair to say that I don't -- can't label
23    anything in particular right now, but that doesn't mean
24    I won't figure it out or maybe even ask her if it
25    changed.

Page 213

1  Q.  I --
2  A.  So, I don't -- I don't have any reliable information
3    about that.
4  Q.  Okay.  Sitting here today, you know of no change in her
5    duties -- you don't know right now any change of her
6    duties from before and after her separation --
7  A.  Correct.
8  Q.  -- from Hospice of Michigan?
9  A.  That is correct.
10  Q.  Did -- did you discuss with Ms. Rosenfield her getting a
11    lawyer or anything, consulting legal, about being
12    separated from Hospice of Michigan so unceremoniously?
13  A.  I don't believe so.
14  Q.  When did you hear for the first time that Hospice of
15    Michigan took the position that they fired Natalie
16    because she was dually employed?
17  A.  In reading depositions.
18  Q.  Okay.  Does that mean no one at Hospice of Michigan ever
19    came to you and said, you know, "You should know, this
20    is a dishonest person that we think has been very
21    wrong"?
22  A.  No one at Hospice of Michigan ever spoke to me about
23    this case.
24  Q.  Fair enough.
25  A.  Nor did they --

Rabbi E.B. 'Bunny' Freedman
March 13, 2024

Page 214

1  Q.  But they might say your employee is -- is, you know --
2  A.  I never heard anything -- any complaint about her.
3  Q.  And did anyone from Hospice of Michigan indicate in any
4      way they didn't want to work with her any longer, she
5      wasn't an honest person and they didn't think much of
6      her?
7  A.  No one ever expressed that to me.
8  Q.  So, you don't know that Bob Cahill testified that he
9      thinks she's dishonest and basically stole from Hospice
10     of Michigan all those years she was employed?
11 A.  I heard that from Natalie last night.
12 Q.  And what's your reaction to that?
13         You don't agree; right?
14 A.  Profound anger.
15 Q.  Yeah.
16         Do you know anybody who does a job similar to what
17     you do or -- and with regard to various hospices?
18     It sounds like JHCN has a pretty unique model?
19 A.  The last statement is true.  Do I --
20 Q.  Here in Michigan.  Here in Michigan.
21 A.  No.  No.  I would agree with that statement even beyond
22     Michigan.
23         I'm not sure what you're defining as my duties
24     or -- if you'll ask a question about JHCN, is there any
25     organization that does what we do, I would say

Page 215

1      definitely not.
2  Q.  Okay.
3  A.  That I know of, certainly, and I don't think -- and I've
4      been around long enough that I would hear about it or
5      learn about it.
6  Q.  Did you ever discuss the fair market value of your
7      services with Patrick Miller or Bob Cahill?
8  A.  The services rendered to Hospice of Michigan?
9  Q.  Like an hourly rate of pay that was fair market value,
10     did you ever discuss that with them?
11 A.  If I could add to that, I could -- the answer is no.
12 Q.  Okay.
13 A.  May I add some comment on that, or you're not
14     interested?
15 Q.  If you -- if you need to answer it and answer the
16     question.
17 A.  Yes.  I -- I have never --
18 Q.  Okay.
19 A.  I -- what I told you is no.
20         I don't believe I've ever talked salary with any of
21     them ever.  It was a flat $39,000 or whatever the number
22     was.  It came direct deposit.  I paid no heed to it, and
23     I didn't have a conversation about my salary.
24 Q.  Just like --
25 A.  I didn't ask for more or -- I didn't ask for cost of --

Page 216

1      whatever.  Nothing ever changed to the best of my
2      knowledge.
3  Q.  Just like someone came to you and said, "We need you to
4      start paying for computers that we gave you seven years
5      ago," did anyone ever come to you and say, "We think you
6      should pay back any money that -- that was paid to you
7      as salary?"
8  A.  Yeah.  That was a meeting in Ann Arbor that we --
9  Q.  For your salary.
10         I understand they wanted you to pay back for the
11     computers.
12         Did anyone similarly say, "We want you to pay back
13     for salary that was paid to you or amounts that had been
14     paid to you?"
15 A.  I don't believe so.
16 Q.  No one ever suggested that.  Okay.
17             (Deposition Exhibit 6 marked
18              for identification.)
19 BY MS. PRESCOTT:
20 Q.  I'm handing you Exhibit 6.
21         MS. PRESCOTT:  And, David, it's his -- it's his
22     Employment Agreement and whatever it is.  We'll find
23     out.  Letter of Agreement from 3-18-2010.
24         MR. McGORISK:  Do you want to look at this, David?
25         MR. DEROMEDI:  No.  I've seen it enough.

Page 217

1          MR. McGORISK:  Probably read it enough.
2  BY MS. PRESCOTT:
3  Q.  Okay.  Who did you negotiate this agreement with?
4          I know Nancy Malovey signed it, but who did you
5      negotiate Exhibit 6 with?
6          MR. McGORISK:  Again, so let me just object to the
7      extent your question is misleading to the extent that
8      you're presuming that there was a negotiation on his
9      part.
10         MS. PRESCOTT:  Okay.  Well, let's back up.
11 BY MS. PRESCOTT:
12 Q.  Did you sign Exhibit 6?
13         Is that your signature?
14 A.  That is my signature.
15 Q.  There's a little bit of a weird scratch out of "2000"
16     versus "2010."
17         Do you know if this was signed in 2010?
18 A.  Where -- where is that?  Where is that scratch out?
19 Q.  Under your signature.  Under your signature.
20 A.  Well, that would just be me being sloppy, I presume.
21 Q.  Okay.
22 A.  I presume that, yeah.  Yeah.
23 Q.  Do you know if the lady Nancy Malovey signed this?
24         Did you have any negotiation with her or anyone
25     else about Exhibit 6?

Rabbi E.B. 'Bunny' Freedman
March 13, 2024

Page 218

1   A.   I don't recall.
2         No, I don't think I did.
3         My inclination is that I didn't.
4         THE REPORTER:  I'm sorry.  "My inclination is
5    that --"?
6   A.   Pardon?
7         THE REPORTER:  "My inclination is that I --"?
8   A.   I did not.
9         THE REPORTER:  Thank you.
10  BY MS. PRESCOTT:
11  Q.   Okay.  Do you know how it came to be that there was an
12       Exhibit 6, like whose idea was it to enter this?
13  A.   I'm guessing now.
14        Do you want to get my guess or --
15  Q.   Okay.
16  A.   My guess is, this is when it changed from a salary to
17       a -- W-2 to a 1099.
18        That's what I guess.
19  Q.   Okay.  And do you understood -- did you understand that
20       you would now be paid hourly and not a salary going
21       forward, or did you understand that you would get a
22       salary like just --
23  A.   To the best of my memory and inclination and
24       understanding, they came to me and said whatever reasons
25       they said.  They want me to be a contract worker instead

Page 219

1    of a employee because of my -- and I presume -- I
2    presume now -- I presumed then that -- I believe I
3    presumed then that nothing was changing except the
4    manner I was being paid as a 1099 fit better to them.
5         I wouldn't swear to the fact that I read this
6    agreement.  Guilty as charged that I might have signed
7    stuff that I, you know, didn't read, but could be that I
8    read it, could be that I didn't.  And as I understood
9    this document when I saw it -- digging up documents, I
10   saw this.  I said, "Oh, that's probably one."  That's
11   what I just told you -- that's what I assumed.  I can't
12   tell you that's for certain.
13        So, I thought we were just changing, and they, you
14   know, were just -- this was filler stuff that they --
15   that they did.
16  Q.   Okay.
17  A.   I don't know that I ever looked at it and found any
18       difference in hours or anything like that.
19  Q.   All right.  So, let me break that down just a little
20       bit.
21        Nothing was changing -- you already testified
22   earlier you weren't -- your -- your essential job
23   functions or roles were --
24  A.   Consistent.
25  Q.   -- were going to continue?

Page 220

1   A.   Pardon?
2   Q.   Were going to continue, and you said "consistent"?
3   A.   Yeah.  Right.  Yeah.
4   Q.   Okay.  And that continued up until the changes that
5        happened in 2022; right?
6   A.   Uh-huh.
7         THE REPORTER:  I'm sorry.  "Yes"?
8   BY MS. PRESCOTT:
9   Q.   Yeses and nos, if you can.
10  A.   Yes.
11  Q.   Okay.
12  A.   Thank you.
13  Q.   Yes, I know.
14        Okay.  So, what you would be doing would be the
15       same.  How you would be paid would now go from a W-2 to
16       a 1099.  That's as far as you basically understood the
17       change?
18  A.   That is correct.
19  Q.   Okay.  And then you started to send billing to Hospice
20       of Michigan after that; right?
21  A.   Correct.
22  Q.   And do you ever, until -- do you ever change Exhibit 6?
23       Do you ever go into a negotiation with Hospice of
24       Michigan or enter into any other later contract than
25       Exhibit 6?

Page 221

1   A.   Correct.
2   Q.   Am I -- you're -- I'm correct you never did that?
3   A.   To the best of my recall.
4   Q.   Okay.  You don't -- I guess I just want to understand.
5         Like I don't have -- you know, do you have
6        something that is later than Exhibit 6 that is some
7        other agreement that you ever struck with them?
8   A.   I think not.
9   Q.   Okay.
10  A.   But I couldn't -- I might be able to check with what's
11       in this book, but no.  I'm -- I'm assuming not, but I
12       couldn't be certain.
13  Q.   Did you ever get paid any cash payments from JH- --
14       excuse me -- from HOM?
15  A.   No.
16  Q.   Okay.  Do you know why their internal accounting records
17       would show cash payments?
18        You don't have -- that doesn't ring a bell?
19        MR. McGORISK:  Objection.  Foundation.
20  A.   I -- no, I don't know.
21  BY MS. PRESCOTT:
22  Q.   And not only does cash payments not ring a bell, but I
23       think you earlier said you really weren't paid by check
24       either.  It was just --
25  A.   Direct deposit.

Rabbi E.B. 'Bunny' Freedman
March 13, 2024

Page 222

1   Q.   Into a bank; right?
2   A.   Right.
3   Q.   And was it your understanding that if you were sick or
4        if you were on vacation or if there was one month you
5        worked more or one month you would worked less, it
6        wouldn't -- your pay wouldn't fluctuate with your actual
7        hours worked?  Your pay was sort of like a salary?
8   A.   It was constant.
9             And I believe it was Patrick that asked me to, you
10       know, put a -- put a -- you know, a monthly statement
11       together.  So -- and it just gave me broad sense, you
12       know, give us some statement.
13            So, I wrote a statement, which sort of described
14       what I do, and I sent it to him and said -- he said,
15       "Oh, that's great.  Really good."
16            And then I -- I told him, "Is it okay if I send the
17       exact same thing every month?"
18       And he said, "That's fine."
19  Q.   That was a phone call you guys had?
20  A.   Pardon?
21  Q.   Do you think that was a phone call you had?
22  A.   E-mails -- I -- I remember -- I think really we just
23       discussed it over a phone call probably.
24  Q.   In other words, he wasn't expecting that every month
25       would be identical, but you could send the same --

Page 223

1   A.   Yeah.
2   Q.   -- form?
3             MR. McGORISK:  Well, I object to foundation.
4        What Patrick might be expecting, I don't think --
5             MS. PRESCOTT:  Fair.
6   BY MS. PRESCOTT:
7   Q.   What he communicated to you, was it -- whether it was --
8   A.   I came away with the sense that it was fine to send the
9        exact same thing every month, and I wouldn't have to
10       track or -- or record.  And I think -- yeah.
11            (Deposition Exhibit 7 marked
12                 for identification.)
13  BY MS. PRESCOTT:
14  Q.   Okay.  I'm handing you what I've marked as 7, and it's
15       Bates 3804.
16            MS. PRESCOTT:  Some of these I don't have all four
17       copies of.
18            Sorry, David.
19  BY MS. PRESCOTT:
20  Q.   So, when you've had a chance to look at it, I'm just
21       questioning, did you write this?
22  A.   It sounds like my language, is what I comment.
23            Do I recall writing it?
24            It seemed -- I don't recall writing it, but it
25       seems like this would be something I would write.

Page 224

1   Q.   Okay.  Do you know when?
2   A.   I would -- I would understand -- I would think that this
3        is what we talked about earlier, the ghost period.  You
4        know, I wouldn't call it that, but when -- when I was
5        not getting an answer about anything --
6   Q.   Did Bob, in 2018 time frame, tell -- tell you that he
7        loved the relationship with JHCN and -- I'm gathering it
8        means he would do anything to strengthen the
9        relationship and call him first --
10  A.   Yes.
11  Q.   -- and they would do what they could?
12  A.   Yes.
13  Q.   So, he was -- he didn't beat around the bush that --
14       about, you know, wanting to make sure that you were
15       happy with him; right?
16  A.   Correct.
17  Q.   Okay.
18            "We will never leave HOM because the care
19        you provide is the best."
20            Is that something that you communicated -- like do
21        you know whether this is something -- like do these
22        notes sound like something you told him, or do you know
23        anything?
24  A.   I don't -- see, it doesn't say Bob Cahill on this.
25            I would think that I would have sent -- if I sent

Page 225

1        this, I would send it to Patrick, is my -- because I
2        referred to "Bob."  "Bob told me I --"
3   Q.   Not like "You --"
4   A.   I would say, "You told me."
5   Q.   "-- told me."
6             I see.
7   A.   And I -- the only two people that I could imagine I was
8        talking to at the time was -- on these matters was
9        Patrick or -- or -- or Bob.  And I think we ruled out
10       that it's Bob.  Bob --
11  Q.   When we go to "Expenses," it says:
12            "We are being nickled and dimed to death."
13            Does that sound like -- I mean, did you have that
14       feeling that -- that Hospice of Michigan was nickeling
15       and diming you?
16  A.   Yes.
17  Q.   Okay.
18  A.   This is clearly -- there's no date on it or anything,
19       but this is clearly post where they tried to bill us for
20       things, for -- for data and stuff like that.  And there
21       were other things that indicated that, you know,
22       they're -- they're just trying to, you know, like
23       diminish the -- the relationship.
24  Q.   With regard to yesterday's --
25  A.   Now, what -- could I ask a question of you?

Rabbi E.B. 'Bunny' Freedman
March 13, 2024

Page 226

1   Q.   Yeah.
2           MR. McGORISK:  Well --
3   A.   Yeah.
4   BY MS. PRESCOTT:
5   Q.   Do you need a break, or --
6   A.   Do you want to hear what I want to ask before I ask it?
7           MR. McGORISK:  We'll take a break in a second.
8           Just why don't you finish up what topics you have
9        here.
10          MS. PRESCOTT:  Okay.
11  BY MS. PRESCOTT:
12  Q.   Yesterday we --
13  A.   I -- I was going to ask a question about --
14          MR. McGORISK:  Is it a question about one of her
15       questions --
16  A.   No, no, no.
17          MR. McGORISK:  -- so you can clarify?
18  A.   No.
19          MR. McGORISK:  Okay.  No.  I --
20  A.   No.  I want to know where this came from.
21  BY MS. PRESCOTT:
22  Q.   I don't know where it came from.  That's why I asked
23       you.
24  A.   Okay.  So, I --
25  Q.   Sometimes I know, and I know when I --

Page 227

1   A.   Okay.  So --
2   Q.   -- before I hand it to you --
3   A.   -- I've answered you that, assuming someone knows that
4        it's me, but it -- it's --
5   Q.   Someone may know.  They may know.  I don't know.
6   A.   All right.
7   Q.   Okay.  Let's look at yesterday.  We -- do you know what
8        this document is?  It was marked as Rosenfield 10.
9   A.   By who?
10  Q.   So, it was marked in her exhibit -- in her deposition as
11       an exhibit.  So, the question for you is, do you
12       recognize that document?
13          (Discussion held off the record.)
14  A.   I don't recognize the document, but if you want me to
15       share a sense that --
16  BY MS. PRESCOTT:
17  Q.   That's okay.  That's okay.
18  A.   Okay.  Good.
19  Q.   There was a part of the document in which a script was
20       worked out that people who come to Hospice of Michigan
21       mark that they're Jewish but haven't been affiliated
22       with JHCN yet, they would be offered a connection to
23       JHCN by the HOM staff; okay?
24          That's part of Rosenfield 10.
25          Was that something that was familiar to you that --

Page 228

1        that Hospice of Michigan was saying, "Hey, you might
2        want to check in with JHCN"?
3   A.   Well, I'm aware of conversations internally at Jewish
4        Hospice that covered a lot of this ground that I'm
5        reading about, but I don't know it as a document.  But I
6        was involved in -- people filled me in that there were
7        conversations to this nature.
8   Q.   I guess what I want to know is, in -- in 20- -- let's
9        call it 2017 to 2021, would you have known that people
10       who marked that they were Jewish were getting sent by
11       Hospice of Michigan to JHCN if they opted to?  If they
12       opted to no, that's fine, but --
13  A.   Yes.
14  Q.   -- did you know that that process was ongoing?
15  A.   Yes.
16  Q.   Okay.  Do you know if Hospice of Michigan did this with
17       anyone else?  In other words, "Hey, go find --"
18  A.   Did I know?
19  Q.   "-- this imam.  Go -- they can hook you up with the
20       Muslim community"?
21          Do you know if that was happening?
22  A.   Well, so what I said to you earlier, I don't know of an
23       organization that replicates what we do.
24  Q.   Okay.  Okay.  Exhibits 12 and 13 and 14 in the
25       Rosenfield deposition -- so, Rosenfield 13, 14, 15 are

Page 229

1        some personnel file-type policies.
2           The question I have for you is whether you signed
3        policies like these; if you know?
4   A.   I --
5   Q.   After 2010, did you sign any policies like these ones
6        that Natalie signed?
7   A.   You asked me if I know.
8           I don't.
9   Q.   Okay.  That's fair enough.
10          MS. PRESCOTT:  Do you want to take that break?  I
11       can whittle my notes and give you a minute.
12          MR. McGORISK:  How much longer have you got?
13          MS. PRESCOTT:  I don't know.
14          MR. McGORISK:  Do you want a break, or do you want
15       to keep going?
16  A.   I could use a restroom break just for a couple minutes.
17          MR. McGORISK:  Okay.  Why don't we take five, then.
18  A.   Thank you.
19          (Short recess at 3:42 p.m.)
20              *   *   *
21          (Record resumed at 3:56 p.m.)
22  BY MS. PRESCOTT:
23  Q.   Sometimes I think I know, but I need to just review and
24       I make sure I pinned it down.
25          I know you've said Hospice of Michigan stopped

Rabbi E.B. 'Bunny' Freedman
March 13, 2024

Page 230

1    paying you directly and you don't know why.
2         Does that mean for a time they stopped, or they
3    just stopped and you -- and they -- they never started
4    up again?
5  A.  Again, please?
6  Q.  Yeah.
7         Do you get checks every month from Hospice of
8    Michigan --
9  A.  Currently?
10 Q.  -- now?
11 A.  No.
12 Q.  Okay.  The last time you did was a catch-up payment that
13   paid you basically through 2022; right?
14        They stopped in 2022 and then they paid you a big
15   check to catch you up?
16 A.  They paid JHCN a big check.
17 Q.  Okay.  When was the last time you got a check?  Spring
18   of '22?
19 A.  Assumption that it was at the beginning of 2022.
20        I don't have a date.
21        As I mentioned earlier, I wasn't following the --
22   those checks, and it stopped somewhere.  And I -- maybe
23   I looked it up on a record or somewhere, but I just
24   accepted that they're, you know, doing things by -- by
25   fiat, so to speak.

Page 231

1         THE REPORTER:  I'm sorry.  "-- doing things by --"?
2         MR. McGORISK:  "-- fiat."
3  A.  Fiat.
4  BY MS. PRESCOTT:
5  Q.  Unilaterally?
6  A.  Pardon?
7  Q.  Does that mean unilaterally?
8  A.  Yeah.  That's what it --
9  Q.  Okay.  So, did you stop doing work to care for patients
10   at HOM?  Did you stop doing care coordination,
11   education, pastoral care and enrichment --
12 A.  No, I --
13 Q.  -- after they stopped paying?
14 A.  -- did it straight through 2022.
15 Q.  After 2022, they stopped paying you.  We just
16   established that.  So, therefore --
17        MR. McGORISK:  No.  He said they stopped paying him
18   at the beginning of 2022.
19 A.  Right.  The beginning of '22, but she never asked a
20   year, whatever.
21        MS. PRESCOTT:  I -- I misspoke.  It's -- that's
22   fair.
23 BY MS. PRESCOTT:
24 Q.  So, when they stopped paying you, did you stop giving
25   pastoral care to Hospice of Michigan patients and the

Page 232

1    enrichments and the -- being the point person who could
2    always be on call and -- fix issues with quality?
3  A.  Through '22, for sure, I did.  I continued as if nothing
4    happened.
5  Q.  And then what about today?  Do you give the best care
6    you can and be that point person and the quality person
7    and available when calls are made?
8  A.  Today, I would -- I'm not doing all those services.  I'm
9    taking care of a number of Hospice of Michigan patients.
10   I take care of patients that ask for my services, or I
11   have a familiar relationship with them or service them
12   on -- and their family earlier.
13        (Discussion held off the record.)
14 BY MS. PRESCOTT:
15 Q.  All right.  Hospice of Michigan records just to, you
16   know, move through this, have you ever seen their pay
17   records for you?  Payroll records for you?
18 A.  I think I've seen it in the deposition somewhere
19   possibly or some other documents that --
20 Q.  Some -- somewhere along the way?
21 A.  Yeah.  I might have seen them.  I don't know.
22 Q.  Their records show that they cut a check for you for
23   $36,000 to catch up the 2022 payments that did stop for
24   a while waiting for an agreement to be signed.  But do
25   you know?

Page 233

1  A.  They were made to me?
2  Q.  Well, direct-deposited or wrote a check or somehow paid
3    $36,000 --
4  A.  They -- they wrote -- I believe they wrote a check to
5    JHCN for $36,000.
6  Q.  Okay.  Their records also show that you had a -- you
7    were paid more in 2022 than really any prior year.
8         Do you dispute that?
9         MR. McGORISK:  Let me just object because he said
10   he didn't get the payment.  So, when you say "he" --
11 BY MS. PRESCOTT:
12 Q.  Okay.  I mean you personally.
13        Did you personally get the payments that are
14   reflected --
15 A.  Could you show me what you're -- you're asking me about?
16   Where was the payment -- in what year?  Where?
17 Q.  This is a record of the -- of HOM's payment.  I've
18   handed you 3622, and it shows payments to you by year,
19   including 2010 to 2022, where the 2022 line item is
20   bigger than any prior year.
21 A.  $525,000?
22        MR. McGORISK:  No, that's not the total --
23 A.  That's the total of all the years.
24        MR. McGORISK:  Yeah.
25 A.  So -- oh, I get it.

Rabbi E.B. 'Bunny' Freedman
March 13, 2024

Page 234

```
 1        MR. McGORISK:  2022 is $42,000.
 2        MS. PRESCOTT:  I think this is a JHCN document.
 3        MR. McGORISK:  You're saying you didn't get the
 4    check.  It went to JHCN --
 5        (Discussion held off the record.)
 6  A.  I -- I didn't get paid for 2022.  This may be something
 7    that they paid out.
 8        (Discussion held off the record.)
 9        MR. McGORISK:  Just testify.  Don't worry.  Don't
10    guess.  Don't speculate.
11  A.  Okay.  Okay.
12        I have no idea why there was more payment.
13  BY MS. PRESCOTT:
14  Q.  Okay.  Do you dispute that there was more payment or you
15    just don't know?
16  A.  I don't know.
17        I said to you that I didn't get paid for 2022.  A
18    check went to JHCN.
19  Q.  Okay.
20  A.  Which I never got.
21  Q.  And even though a check went to JHCN, throughout 2022,
22    you continued to -- as you just testified, you continued
23    to be the point person and take all the care you --
24  A.  Correct.
25  Q.  Okay.
```

Page 235

```
 1  A.  I attended all the IDTs and --
 2  Q.  Another quick point of clarification.
 3        We talked about the timing of your thinking about
 4    starting to retire, maybe having a handoff period with
 5    Rabbi Krakoff being at the end of 2020, beginning of
 6    2021.  You talked to Patrick, and then a period of
 7    ghosting begins; all right?
 8        Just to refresh where -- where I want to start on
 9    the question.
10        What's the next thing that happens after -- like
11    what change -- does -- does he finally break cover and
12    come talk to you after the ghosting period?  What's the
13    next time you do connect with Patrick Miller?
14  A.  Never.
15  Q.  Okay.  So, let me ask it a little bit different way.
16        You asked him for the Krakoff contract and then we
17    also know that, at some point, in July, there's a
18    sit-down where people are handing you invoices and
19    you're feeling disrespected; right?
20  A.  Yeah.  Correct.
21  Q.  Was there -- was that kind of the first you heard from
22    anyone at HOM management after the ghosting period?
23  A.  Pretty sure.
24  Q.  Okay.  How long after they start to hand you invoices
25    for computing and IT services do they say they now want
```

Page 236

```
 1    a new deal where checks will go to JHCN, and we'll have
 2    a new business agreement and whatnot?
 3  A.  Are you asking about conversations that I had?
 4  Q.  I guess.  Maybe -- or maybe you learned of them through
 5    Natalie or something.
 6        But I guess -- so, there -- there's the disrespect
 7    meeting.  It's in person.  They pass you an invoice.
 8        Is it familiar to you that they follow that up not
 9    too long with a bunch of other contracts they want you
10    to sign?  A new set of agreements with -- with HOM?
11  A.  Me?
12        I'm not recalling.
13  Q.  JHCN --
14  A.  If you have it.
15  Q.  Yeah.  Okay.  I do.
16  A.  In what -- in what period are you asking me what --
17  Q.  Well, that's what I was trying to ask --
18  A.  What year?
19  Q.  -- was -- so, after the ghosting, the ghosting ends with
20    the unpleasant meeting about the IT?
21  A.  Uh-huh.
22        MR. McGORISK:  "Yes"?
23  BY MS. PRESCOTT:
24  Q.  Have I got that right?
25        MR. McGORISK:  "Yes"?
```

Page 237

```
 1  A.  Yes.
 2  BY MS. PRESCOTT:
 3  Q.  Okay.  And around that time, Natalie is let go but you
 4    don't ask a lot of questions.  Somewhere in here, you're
 5    hearing about whistleblowers.
 6        How long after those -- that sort of nucleus of
 7    events is it until Hospice of Michigan also comes and
 8    now wants you to change the relationship with JHCN?
 9  A.  Do you have a document that might remind me --
10  Q.  Yeah.  I can --
11  A.  -- of what we're talking about?
12        (Discussion held off the record.)
13        MS. PRESCOTT:  All right.  I'm going to give you
14    the clip in just a second here.
15        Here's your clip.
16        MR. McGORISK:  Okay.  Thank you.  Yeah.
17  A.  Okay.
18        MR. McGORISK:  Are you marking this?
19        MS. PRESCOTT:  Yeah.
20        MR. McGORISK:  Okay.  She's going to give you the
21    original.
22  A.  Oh, okay.
23        (Deposition Exhibit 8 marked
24        for identification.)
25  BY MS. PRESCOTT:
```

Rabbi E.B. 'Bunny' Freedman
March 13, 2024

Page 238

1  Q.  All right.  I'm giving you Exhibit 8.
2  A.  Did I give you -- you gave me a document that I handed
3      back to you.
4          Is that for me to retain?
5          MS. SMITH-MORRIS:  It's a payment document.  It
6  wasn't an exhibit.
7  A.  Okay.  Fine.
8          This was signed by Joey Krakoff.
9          I don't think I've seen it.
10         But --
11 BY MS. PRESCOTT:
12 Q.  Well, did you sign a Confidentiality Agreement?
13 A.  Did I?
14 Q.  Yeah.  In 2022.
15 A.  I don't think so.
16         (Discussion held off the record.)
17         (Deposition Exhibit 9 marked
18          for identification.)
19 BY MS. PRESCOTT:
20 Q.  I'll hand you Exhibit 9.
21 A.  Isn't this a document we already discussed, or is it
22      coming up again?
23         (Discussion held off the record.)
24 BY MS. PRESCOTT:
25 Q.  This document, unlike the prior one that we have already

Page 239

1      marked and talked about --
2          (Discussion held off the record.)
3  A.  So, this --
4  BY MS. PRESCOTT:
5  Q.  Again, my records internal to HOM show that
6      Lee Ann Myers sent this to Patrick in September of '21
7      and -- and asked him to have you sign Exhibit 9.
8          Did you ever see Exhibit 9?
9          Let me -- and just to like crib sheet and move this
10     along a little bit faster, the difference to the prior
11     one is in the compensation and fees provision.  This
12     Exhibit 9 refers to 80 hours a month to be billed
13     whereas the 2010 version was up to 40 hours a month.
14 A.  So -- and what date was this sent?  Do you know?
15         I can't find it.
16 Q.  That's the question I want to understand is, if you ever
17     got Exhibit 9 from Patrick Miller.
18 A.  I think not, but --
19 Q.  Did Patrick Miller ever talk to you about 40 hours
20     versus 80 hours and there was an issue of you were
21     billing more than what was contracted for?
22 A.  I don't recall that conversation.
23         And that would be in '21?
24 Q.  Let's -- let's focus on '21 or '22.
25         Did you ever remember discussing with Patrick that

Page 240

1      he wanted a contract that talked about 80 hours a month,
2      which was similar to your invoices, instead of the 2010
3      signed document that was for 40 hours a month?
4  A.  Yeah.
5  Q.  Do you recall any discussion about that?
6  A.  No.
7  Q.  Did anyone ever --
8      2021 -- 2022 --
9  Q.  Did anyone ever tell you they thought Exhibit 6, which
10     was the 40-hour version, the one you signed --
11 A.  In --
12 Q.  -- in 2010 --
13 A.  Yeah.
14 Q.  -- that there was something wrong with it or erroneous
15     or typo or inappropriate?
16 A.  I'm not recalling.
17 Q.  Okay.
18 A.  Yeah.
19 Q.  Okay.  But suffice it to say with regard to the later
20     version, Exhibit 9, you don't remember getting that --
21     MR. McGORISK:  I don't have 9.
22     MR. HERSCHFUS:  Do you have an extra 9?
23 A.  I don't believe so.
24     Yeah, I --
25     MR. McGORISK:  Oh, he's got it.  Okay.  Yeah.

Page 241

1      MS. PRESCOTT:  I thought I gave it.
2      MR. McGORISK:  We've got it.
3  BY MS. PRESCOTT:
4  Q.  Don't remember?
5  A.  By the way, 7, 8, were -- are theses document the exact
6      same thing, just changed hours?  Do you know?  I -- I
7      didn't --
8  Q.  I don't know.  I think they're basically identical.
9  A.  They look very similar.
10 Q.  Except one isn't signed and one has more hours than the
11     other.  So --
12     MR. McGORISK:  This one says "80."
13 A.  Uh-huh.  Okay.
14     MR. McGORISK:  This one says "40"; okay?
15 A.  Okay.
16 BY MS. PRESCOTT:
17 Q.  All right.  So --
18 A.  Who -- do we know who provided this unsigned document,
19     may I ask?
20     MR. McGORISK:  No, just --
21 A.  Okay.  Okay.
22     MR. McGORISK:  -- just answer questions.
23 A.  Okay.  Okay.
24     The next -- next time I do seven and a half hours,
25     I'll be better at this.

Rabbi E.B. 'Bunny' Freedman
March 13, 2024

Page 242

BY MS. PRESCOTT:

1  Q.  I don't know if I'm going to mark this, but you guys can
2      take a look at it if you like.
3          In October of 2021, you write from your Gmail to
4      Patrick and copy Joey Krakoff about a meeting and just
5      say your available to meet October 28th.
6          The remainder of this document doesn't go to you,
7      it looks like, but Patrick is apparently saying to Bob
8      that -- I guess, you know, he'll have to testify to
9      this -- what he intended the meeting to be.
10         But the question for you is, do you remember, in
11     October of 2021, meeting with Patrick Miller regarding
12     the -- your contract and the signing of the IT cost
13     agreement?
14 A.  No.
15 Q.  Okay.
16     MR. McGORISK:  She didn't know whether she was
17     going to mark this.
18     MS. PRESCOTT:  Yeah.  I'm not going to if it's not
19     something that he recognizes.
20     MR. McGORISK:  Okay.  Just give it back to them.
21     MR. HERSCHFUS:  Can I see it?
22     MR. McGORISK:  Oh, yeah.  Sorry.
23 BY MS. PRESCOTT:
24 Q.  Did you ever receive a termination letter from Hospice

Page 243

1      of Michigan?
2  A.  No.
3          (Discussion held off the record.)
4  BY MS. PRESCOTT:
5  Q.  Did you -- did I ask when you stopped being the CEO of
6      JHCN?
7  A.  That was at the beginning of 2022.
8          So, I don't know if you asked me or not, but --
9  Q.  Beginning of 2022.
10 A.  Uh-huh.
11 Q.  Okay.  Did you have a position on whether or not Joey
12     should sign the payback agreement to pay back the IT and
13     computing?
14         Did you talk about that with him?
15 A.  No.
16         (Deposition Exhibit 10 marked
17          for identification.)
18 BY MS. PRESCOTT:
19 Q.  I'm handing you 10.
20     All right.  Exhibit 10 is an unsigned version of a
21     "Confidentiality Agreement" that was proposed to be
22     effective March 1st, 2022.
23         Do you know if you ever signed it?
24 A.  No, I don't know.
25 Q.  Do you know when people started talking to you about

Page 244

1      they wanted some kind of agreement of this kind with
2      you?
3  A.  I don't recall that.
4  Q.  Would it have been after the -- in any case, no one ever
5      approached you about changing the relationship between
6      yourself and Hospice of Michigan before the unpleasant
7      meeting in July of 2021; correct?
8  A.  Before that?
9  Q.  So, we know that anything they wanted to change, the
10     first you heard of it was after July 15th, 2021; right?
11     MR. McGORISK:  Well, let me just object.  I don't
12     know if that misstates his earlier testimony.  He -- I
13     think the only thing that he testified to about the
14     meeting was the IT agreement that they wanted him to
15     start paying.
16     MS. PRESCOTT:  I'm not sure -- can you clarify your
17     objection?  I'm not sure what you're objecting.
18     MR. McGORISK:  Well, your -- the question is
19     misleading because it incorporates testimony that he
20     didn't testify to.
21     You're saying that the relationship changed, and I
22     don't think that that was his testimony.  He had the
23     meeting with them and -- so, I'm just -- I'm just
24     objecting to the form of the question because I think
25     it's misleading.

Page 245

1  BY MS. PRESCOTT:
2  Q.  Did the form of your relationship with JHCN or yourself
3      change vis-à-vis Hospice of Michigan after they started
4      coming at you with "pay us back" and firing Natalie and
5      whatnot?
6  A.  The form of the relationship?
7  Q.  Yeah.
8  A.  Explain what --
9  Q.  Like they stopped paying you, for example.
10 A.  So, yeah.
11 Q.  Yeah.
12 A.  So, I think it changed.
13 Q.  Okay.  Okay.  I thought so, too.
14 A.  Yeah.  Okay.
15 Q.  But they didn't want to stop paying you only.  They
16     wanted you to be paid through JHCN and that they would
17     pay it, and you and -- and Rabbi Krakoff would sign a
18     bunch of different agreements?
19 A.  I can't speak to that because I don't know anything
20     about it.
21 Q.  Okay.  You don't know about that.
22     Okay.  So --
23 A.  I don't know about a confidential agreement.
24     MR. McGORISK:  Confidentiality.
25 A.  Confidentiality Agreement.

Rabbi E.B. 'Bunny' Freedman
March 13, 2024

Page 246

1                (Deposition Exhibit 11 marked
2                  for identification.)
3   BY MS. PRESCOTT:
4   Q.  Okay.  All I can do is ask.
5           I'm going to hand you 11.
6   A.  Or -- or that 80 and 40, I -- I said earlier, I -- I
7       don't think we had a conversation.
8   Q.  Okay.  That's -- all I can do is ask.
9   A.  Nothing that stands out, that's for sure, in my memory.
10  Q.  Okay.  So, I've handed you 11.
11          And I'm going to keep -- let's make sure I've got
12      the same thing here.
13          Now the question is with regard to 11.  This would
14      be a "Spiritual Care Agreement" between HOM, you and
15      Mr. -- or Rabbi Krakoff.
16  A.  This is very interesting.
17          (Discussion held off the record.)
18  BY MS. PRESCOTT:
19  Q.  So, the question is with regard to Exhibit 11, if you
20      ever remember anyone presenting this -- 11 to you?
21  A.  I don't remember anyone presenting this.
22  Q.  Does that mean you think it didn't happen or it could
23      have been?  You're just not sure?
24  A.  I'm pretty sure it didn't happen.  I'm looking at the
25      agreement and, you know --

Page 247

1   Q.  Okay.
2   A.  It's a lengthy agreement, and I don't think I've seen
3       this agreement before.
4   Q.  Okay.  At the end, there's some time sheet templates
5       that are blank, and the only question I have about that
6       last couple pages, just to be sure you never filled out
7       any template like you see in -- in this exhibit?
8   A.  (Shakes head.)
9   Q.  You did not?
10  A.  These time sheets?  No.
11          (Deposition Exhibit 12 marked
12            for identification.)
13  BY MS. PRESCOTT:
14  Q.  I'm handing you Exhibit 12.
15          MR. McGORISK:  Two.
16          Oh, here.
17  BY MS. PRESCOTT:
18  Q.  Okay.  These are e-mails from this place Health Law
19      Partners that was the lawyer for Hospice of Michigan.
20          These people, Monique and Adrienne, who are on
21      these e-mails, seem to be Health Law Partners staff, and
22      they're sending an IT Service Agreement, a Settlement
23      Agreement, a Spiritual Care Agreement in January of
24      2022, and then following up and saying, "You said you
25      would sign.  Can you please do so?"

Page 248

1   Q.  My question for you is, did -- does this refresh
2       your memory that you received an amended and updated
3       Spiritual Care Agreement and IT Services and -- and
4       other items that we've marked here now?
5   A.  I'm not recognizing this.
6   Q.  They give you a deadline, January 30th, 2022.
7           Do you remember that?  They were imposing deadlines
8       and --
9   A.  I don't remember.
10  Q.  Okay.
11  A.  So, is there any record -- this came from Jewish
12      Hospice?
13  Q.  Yep.  You-all produced this to us.
14          (Discussion held off the record.)
15  A.  This is interesting.
16  BY MS. PRESCOTT:
17  Q.  Okay.  Suffice it to say, it sounds like, you -- you did
18      not execute any new agreement with Hospice of Michigan?
19  A.  To the best of my memory.
20  Q.  Do you recall that -- I mean, I can get documents -- I
21      can -- or you may recall -- it's fine either way -- that
22      in this same time frame of 2022 is when Hospice of
23      Michigan started asking Natalie to give detailed time
24      records, kind of like the template that we saw.
25          Do you recall that that was going on in 2022?

Page 249

1   A.  For Natalie?
2   Q.  That Hospice of Michigan was asking you and Rabbi
3       Krakoff to document your time.
4           Were they -- were they asking you to do that in
5       early 2022 that you can recall?
6   A.  I don't recall.
7   Q.  Okay.
8   A.  My assumption is that they didn't, but I can't recall.
9           THE REPORTER:  -- "is that they did" or "did not"?
10          MR. McGORISK:  "My assumption," he said.
11  A.  Yeah.  My assumption is that I didn't sign it, but I
12      cannot talk about accuracy in my --
13          MR. McGORISK:  That wasn't the question.
14  A.  -- memory.
15          MR. McGORISK:  She was --
16  A.  Okay.
17  BY MS. PRESCOTT:
18  Q.  Yeah.  Just to clarify.
19          We know you -- I don't think you signed.  You don't
20      think you signed.  I don't have evidence that you've
21      signed.  I -- I just wanted to make sure I didn't --
22  A.  Yeah.  I'm seeing a bunch of documents that were
23      addressed to me, must have came to my e-mail.  I don't
24      know that anyone presented it to me.
25          I'm trying to reconstruct what was going on in

Rabbi E.B. 'Bunny' Freedman
March 13, 2024

Page 250

1    20- -- this is the beginning of '22?
2  Q.  This is late in 2022.
3  A.  Late in '22.
4        It's -- I'm finding it strange.  I -- I'd have to
5        check with my assistant to -- you know, for my own
6        purposes.
7  Q.  Okay.
8  A.  May I ask a question?
9        (Discussion held off the record.)
10        MR. McGORISK:  Just don't worry about it.  Just
11      answer the questions; okay?
12  A.  Okay.  Okay.  Fine.
13  BY MS. PRESCOTT:
14  Q.  Do you know -- Natalie Rosenfield Exhibit 4 was marked
15      yesterday as Rosenfield 4.
16        Did you prepare that document; if you know?
17  A.  I did not prepare this document.
18  Q.  Okay.  Were you giving information to Natalie from time
19      to time so that she could track your hours?
20  A.  Yes.
21  Q.  And --
22  A.  I was giving information -- as I -- I think I've stated
23      earlier that I was always passing on to Natalie where I
24      went to and who I -- who I was visiting and so on and so
25      forth.

Page 251

1  Q.  Okay.  But now you were also giving -- were you also
2      giving her more detail on what that amounted to in
3      specific hours?
4  A.  (Shakes head.)
5  Q.  No, it was always --
6        THE REPORTER:  I'm sorry.  Is that --
7  A.  No.
8  BY MS. PRESCOTT:
9  Q.  Okay.  So, are you saying that all along, you told her
10      both what you were doing and the amount of time it was
11      taking you all the way back to 2010?
12  A.  Yeah.
13  Q.  Okay.  And you didn't -- you don't know of any place
14      that she wrote that down, although some of the
15      information about what you were doing certainly would
16      have translated in the IDTs; is that correct?
17  A.  Sure.
18  Q.  Okay.  Also, we had --
19  A.  I -- my presumption is that everything I was telling
20      Natalie was being recorded as well at IDT -- IDT.
21  Q.  Okay.  The -- yesterday, also at her deposition, there
22      was an e-mail marked as Rosenfield 5.
23        At some point, Natalie is reporting back to Hospice
24      of Michigan, by rabbi, what everyone is doing,
25      apparently, what their hour accounting is.

Page 252

1      Does it -- is it familiar to you that she was
2      breaking it down by rabbi at some point?
3  A.  I --
4  Q.  That -- that Natalie was breaking down by rabbi hours
5      for HOM?
6  A.  I made that assumption.
7  Q.  Okay.  So, even though you weren't getting her e-mails
8      to HOM necessarily, you were reporting hours to her,
9      understanding she would convey it to HOM?
10  A.  As well as IDT.
11  Q.  Okay.  So, when she makes -- do you have any different
12      record, for example, than Exhibit -- Natalie
13      Rosenfield's Exhibit 5 that's in front of you?
14  A.  No.
15  Q.  Okay.  You have no reason to question those hours, do
16      you?
17  A.  Correct.
18  Q.  Okay.  Do those hours seem unusual to you or wrong to
19      you?
20  A.  No.
21      They might be underreported for me.
22  Q.  Okay.  But suffice it to say, for August of 2022, you
23      don't have any different data or memory here today?
24  A.  Correct.
25  Q.  Okay.

Page 253

1        (Discussion held off the record.)
2        (Deposition Exhibit 13 marked
3        for identification.)
4        MS. PRESCOTT:  All right.  I just want to make sure
5      I've got the right thing.
6  BY MS. PRESCOTT:
7  Q.  I'm handing you Exhibit 13, sir.
8        MR. McGORISK:  Thank you.
9        MS. PRESCOTT:  I've only got one of this one.
10  BY MS. PRESCOTT:
11  Q.  All right.  12- -- if you look at the bottom right-hand
12      corner, page 12091 -- so, the little page number is on
13      the right.  You get to page 12091, we have a signed
14      agreement with Hospice of Michigan.
15  A.  12- --
16        MR. McGORISK:  Yes.  Right here.
17  A.  Yeah.  Okay.
18        Is this just that -- or this is the agreement?
19        MR. McGORISK:  The agreement.
20  A.  Is that the one that changes --
21        MR. McGORISK:  This is the 80-hour --
22  A.  Your question?
23  BY MS. PRESCOTT:
24  Q.  Sure.
25        Just on -- if you go to page -- now that you've

Page 254

1    oriented yourself, on page 12091, is that your
2    signature?
3  A.  Yes.
4  Q.  Do you then recognize that, in February of 2022, you
5    signed an updated Spiritual Care Agreement for the
6    80 hours per month at $43.07 an hour?
7      That's on page 12090.
8  A.  Well, I signed that agreement.
9  Q.  Okay.  And what was your understanding, when you signed,
10    about why you were doing this updated agreement?
11 A.  Probably --
12      MR. McGORISK:  Don't guess.
13 A.  -- I didn't have any assumption.  They asked me to sign
14    it, and I signed it.
15 BY MS. PRESCOTT:
16 Q.  Well, you didn't sign so many of the others.  That's why
17    I ask.
18      Like do you -- I mean, we have these others, and
19    there are not signed versions of the other ones.
20      Do you know --
21 A.  Which other ones --
22 Q.  -- why --
23 A.  -- are we talking about?
24 Q.  -- the other exhibits that I've -- we've walked through
25    today that you didn't recognize and didn't sign.

Page 255

1      Do you know why this was different and that you
2    signed this document?
3  A.  I'm going to -- I don't know why.
4  Q.  Okay.  Also, in this document is a letter to you dated
5    January 7th, 2022 from Health Law Partners, if you look
6    at 1986.  It's right after your signature page that we
7    just looked at.
8  A.  Let's look at that.
9  Q.  So, in bold underline, this lady Adrienne Dresevic,
10    D-r-e-s-c-i-v- -- scratch that -- D-r-e-s-e-v-i-c -- is
11    telling you:
12      "If I don't hear back from you by January
13      30th, 2022, HOM will pursue all avenues for full
14      recovery of past due amounts."
15      They wanted a -- and they also said they would send
16    a formal notice of termination for SCA services.
17      Do you see that on 1987 -- page 1987?
18 A.  On mine?
19      MR. McGORISK:  Okay.  You've got the --
20      MS. PRESCOTT:  This will help move it along.
21 BY MS. PRESCOTT:
22 Q.  See that bold, "We're going to send a termination
23    letter --"
24      MR. McGORISK:  This is -- this is the letter that's
25    from -- it's right here, but --

Page 256

1      MS. PRESCOTT:  Yeah.  It's the same.
2  BY MS. PRESCOTT:
3  Q.  Okay.  You've got it now?
4  A.  Okay.
5      MR. McGORISK:  That's -- okay.
6      MS. PRESCOTT:  You guys look on yours, and I'll
7    look on mine.
8      MR. McGORISK:  Okay.  There you go.
9  A.  And your question is?
10 BY MS. PRESCOTT:
11 Q.  Yeah.
12      Does this refresh your memory that you were getting
13    letters telling you they were going to terminate your
14    services agreement and pursue all avenues against JHCN
15    if you didn't sign?
16 A.  I don't recognize this.
17 Q.  Okay.  Do you recognize two pages further, the invoice
18    dated July 15th, 2021 as the thing that was handed
19    across the table to you and you were asked to pay
20    57 grand for stuff that was seven years old?
21 A.  With your prompting, I -- I do remember seeing this.
22 Q.  Okay.  There's also a Settlement Agreement where,
23    instead of having to pay $57,774, the next page is a
24    Settlement Agreement, which reduces the amount to
25    $36,000.

Page 257

1  A.  Uh-huh.
2  Q.  So, the invoice that they originally present you was for
3    $57,000-some, and the next page of this document, we
4    see, hey, we'll settle with you, and you can only pay
5    $36,000.
6      Do you know how that came to be, that there was a
7    settlement proposed?
8  A.  No.
9  Q.  Did you have a lawyer working with you on these threats
10    you were receiving and --
11 A.  No.
12 Q.  -- settlement proposals?
13      No?  Okay.
14      So, you did sign the Settlement Agreement three
15    pages later; correct?
16 A.  It sure looks like my signature.
17 Q.  Okay.
18 A.  Yeah.
19      What's the date on this?
20      MR. McGORISK:  The effective date is when --
21 A.  I -- I see.
22      MR. McGORISK:  -- January of '22.
23 BY MS. PRESCOTT:
24 Q.  So, Cahill has a signature entry of 8-12-21.
25      You don't sign it until 1-28-22.

Rabbi E.B. 'Bunny' Freedman
March 13, 2024

Page 258

1    Does this refresh your memory that you did agree to
2    pay on behalf of JHCN for the old computer equipment?
3  A.  I recognize my signature. That's my signature, and my
4    printed name, as well. That's me.
5  Q.  Okay. What was the reason -- is the reason you waited
6    from August of '21, when Cahill signed, until January of
7    '22, is the reason that you waited that long because you
8    didn't want to sign it, and you didn't think you should
9    need to, and they kept pushing and threatening you?
10 A.  Uh-huh.
11    THE REPORTER: I'm sorry. Is that --
12 BY MS. PRESCOTT:
13 Q.  Yeses and nos.
14 A.  Correct.
15 Q.  And is that what you mean -- earlier you talked about
16    behaving by fiat or unilaterally.
17    Is --
18 A.  Yeah.
19 Q.  Did you feel you were being pushed around here?
20 A.  Yes.
21    I mean, amongst other feelings.
22 Q.  Is one of those feelings a sense of ingratitude?
23    Feeling like HOM didn't sort of value or hadn't --
24    wasn't being a good partner for the things you had given
25    them?

Page 259

1  A.  It was -- I'll -- rephrase it.
2  Q.  You said "among other feelings."
3  A.  Right. So --
4  Q.  You felt pushed around. Was ingratitude one of the
5    feelings going on?
6  A.  There were many feelings going on. And, essentially, I
7    didn't think they were dealing honorably with myself and
8    the organization by acting unilaterally, not explaining
9    themselves and -- and -- and I felt I was being toyed
10    with -- with -- by delaying and ghosting, and I didn't
11    appreciate their behavior at all.
12    And I feel that -- the same way today.
13 Q.  Did you try to get answers from them other ways?
14    I know you said you -- we've said three times you
15    didn't really ask questions about why they were behaving
16    like this.
17    Did you try to get answers from their lawyers about
18    why they were behaving that way?
19 A.  I don't remember any conversation or texting back and
20    forth or communication with their lawyers. I don't,
21    because I ignored all their -- their letters and stuff.
22 Q.  Okay. So, just to summarize and close out this area,
23    you've got a good relationship with JHCN and -- between
24    JHCN and yourself personally and HOM up until you asked
25    for the Krakoff contract. They start ghosting you, and

Page 260

1    then they start doing things that they never explained
2    to you all the way up until today that made you angry?
3  A.  That is a good characterization of what was going on
4    during that period of time.
5  Q.  At the same time, despite your good relationship with
6    them and tight working relationship for decades, you
7    never asked a single question about why are you now
8    acting these various ways, that you can recall; is that
9    fair?
10 A.  I -- do you know what?
11    No. I -- I remember being in meetings with the
12    staff, with Patrick, and -- and having reasonably
13    contentious, but -- contentious by my standards, the --
14    contention, but -- contentious by my standards, the --
15    that, you know, he wasn't playing fair football. He
16    was -- he wasn't staying inside the lines of our
17    relationship that was always built on trust and
18    confidence in each other and -- and high-end
19    performance, both on their side and our side.
20 Q.  Okay.
21 A.  And that was all being ignored as if we had no
22    relationship, and it became very cold and -- and, in my
23    mind, they were acting very irresponsibly to our
24    relationship.
25 Q.  And -- and if I'm --

Page 261

1  A.  A proven relationship, of course.
2  Q.  If I'm understanding -- I want to distinguish between
3    Patrick -- I'm going to continue the analogy -- fumbling
4    with some of his efforts to make you feel better, make
5    you feel less disrespected, maybe never satisfied you
6    but did he try to explain, even if it wasn't satisfying
7    explanations, about why these things were happening?
8  A.  There was one discussion, that I remember visually right
9    now thinking about it, that was held in our offices in
10    the conference room, and I think it was -- I felt that
11    he was blatantly being arrogant and -- and dismissive of
12    all of us. And in -- his answers were vague and -- and
13    like they were -- it wasn't important for him.
14 Q.  And -- and what was the subject?
15    Was it, why are you beha- -- why are you
16    changing -- wanting these changes?
17 A.  Well, you're not responding to my calls on why you're
18    asking for changes in the relationship, payment on --
19    on, you know, the -- the -- the IT, you know, services
20    that were offered to us with no cost, and then backing
21    up. I didn't think that was, from a business
22    perspective, you know, good behavior. I mean, you
23    offered and gave it to us, and then you say, "pay us
24    back."
25    I didn't see there was any basis for that. And

Rabbi E.B. 'Bunny' Freedman
March 13, 2024

Page 262

1    that was, you know -- and based on our relationship
2    until then, until this point where they called me in, I
3    thought we had a very, very trusting and good
4    relationship where there was this -- mutually beneficial
5    for both of us, you know.
6    Q.  Were -- with regard to the vagueness of his responses
7        and sort of the arrogance of not feeling like he owed a
8        response or however that translated to you, did he say,
9        you know, "I can't talk to you because of legal
10       concerns," or did he try to convey a context for why?
11   A.  He was cold and arrogant, is how I would class it.
12   Q.  Okay.  But without -- did he mention of legal problems
13       or legal reasons?
14   A.  You know, if someone told me that he did mention
15       something about legal -- legal, that might be true, but,
16       I mean, it -- it might have happened, but he did not
17       make any impression on me that he was bound by -- by
18       some legal thing.
19   Q.  So, are you saying it's possible?
20   A.  Remember until -- until much later -- I couldn't give a
21       date -- I was left in the dark.
22   Q.  Okay.  Okay.
23   A.  And --
24   Q.  Throughout 2021, you were left in the dark?
25   A.  For sure.

Page 263

1    Q.  Okay.  Fair enough.
2            Now, you also -- one thing I haven't asked you is,
3        how did you-all get the computers and the software and
4        all that like upkeep?
5            And I think you just suggested that they offered.
6        I mean, they were willing to -- to do that, and that
7        came from HOM.
8            Do you know?
9    A.  As I remember, we had a doctor on our staff a while
10       back.  He's since passed away and we -- was never
11       replaced, but that was developing programs together with
12       HOM, and it -- it had to do with a lot of surveying and
13       studies that he was very interested in.
14           And it meant recording via computer stuff.  And it
15       was going to be a joint project.  I believe, you know,
16       this is a broad narrative that -- as I recall it and was
17       probably back in 2015 to '17 or something like that.
18           And he needed computers, and he asked Hospice of
19       Michigan, in this process, you know, could they supply
20       computers.  And they complied.
21           It wasn't -- it wasn't I personally that asked for
22       it.  But it was like a need to work on a project.
23   Q.  Okay.  So, that person -- do you know who that person,
24       what their name was?
25   A.  The doctor?

Page 264

1    Q.  Yeah.
2    A.  Dr. Forman.
3    Q.  And was he paid on the payroll of JHCN at the time?
4    A.  Yes.  And one of his roles was to create studies and --
5        and write grants for them, et cetera.
6    Q.  Who -- do you know who he went to and they said "okay"?
7    A.  No.
8    Q.  Like who at HOM?
9    A.  No, I don't know.
10   Q.  Don't know that.  Okay.
11               (Deposition Exhibit 14 marked
12               for identification.)
13   BY MS. PRESCOTT:
14   Q.  I'm going to give you Exhibit 14.
15           Okay.  So, back when we talked about Exhibit 6,
16       that was when you signed your new deal --
17   A.  Uh-huh.
18   Q.  -- with Hospice of Michigan.  It was 2010 --
19   A.  Uh-huh.
20   Q.  -- in March, and you start to bill them.
21           And in this document, Patrick Miller, at the time,
22       is Senior Vice President of Service and also Chief
23       Operating Officer, according to the document.  We'll
24       have to find out that -- about that later.  But it
25       sounds like you're sending statements, and he's saying,

Page 265

1        "You can't bill us for more than 40 hours per month --"
2    A.  Uh-huh.
3    Q.  "-- according to the contract."
4            And there are other documents where a similar
5        message is sent to you.
6            Do you know how it came to be that Hospice of
7        Michigan went from saying, "Don't send us an invoice for
8        80 hours.  We're not paying you for 80.  We agreed to
9        40, and that's what we're paying you.  Don't do this.
10       You can't do that"?
11   A.  If I -- just seeing all these documents, it seems that
12       they originally had 40 hours, and then they changed it
13       to 80 again arbitrarily.
14   Q.  Yeah, 12 years later.
15   A.  Yeah.
16   Q.  But what I'm asking about is, in 2010, they start paying
17       you for 80 hours a month.  So, but -- but in e-mail,
18       they're saying, "We won't.  The contract says we won't.
19       We'll only pay for 40."
20           Do you know how it came to be -- like what changed
21       where Patrick stopped telling you, "Don't send us the
22       80-hour invoices, only send us 40-hour invoices"?
23   A.  Like many other things Patrick did, I believe it was
24       arbitrarily.  I don't think we had the discussion.  And
25       the -- what I wanted to be continued was the flat rate

Rabbi E.B. 'Bunny' Freedman
March 13, 2024

Page 266

1    that we started in 2002, and I graciously was saying, "I
2    don't need raises.  I don't need an increase.  Just --
3    just pay me what you did, and I'll continue doing all
4    the services as demarcated in -- in past history and --
5    and documents that I -- we did in 2002."
6          So, none of this meant anything to me, other than
7    that I would get the constant -- and, as I said to you,
8    I looked at it as future money that I'll need in
9    retirement.  And --
10  Q.  So, suffice it to say, you don't remember any
11      conversations or dialog with Miller or anyone else that
12      suggested they were changing their tune from what we see
13      in Exhibit 14?
14  A.  None of it meant anything to me.
15  Q.  Fair.  Do you recall any conversations about it?
16  A.  The answer is no.
17  Q.  Okay.
18              (Deposition Exhibit 15 marked
19              for identification.)
20              (Discussion held off the record.)
21  BY MS. PRESCOTT:
22  Q.  I'm handing you 15.
23              MR. McGORISK:  Thank you.
24  A.  Okay.
25  BY MS. PRESCOTT:

Page 267

1    Q.  All right.  So, earlier -- these -- this is one example,
2        but each month, you sent the same invoice except for
3        changing the dates from 2010 to 2021, as what we see in
4        Exhibit 15; correct?
5    A.  I assume so, yes.
6    Q.  Well, does it look like what -- the invoice?
7    A.  Yeah, it does.
8    Q.  Okay.  And the reason that it was always the same, that
9        was something you do recall Patrick okaying and saying
10       that was all right with him?
11   A.  That's correct.
12   Q.  Okay.
13   A.  The reason I say "assume so," that -- this was -- the
14       regular thing never changed.  I'm assuming that, that
15       this was a standard, you know, template that we used
16       just by rote.
17   Q.  And insofar as you can tell, there's nothing you see
18       that's different from what you do recall invoicing and
19       billing?
20          And I'm not going to get out a zillion more
21       examples, but --
22   A.  Thank you.
23   Q.  -- it looks like --
24   A.  Thank you for not.
25          But, yeah --

Page 268

1    Q.  "Thank you for not"; right?
2    A.  -- I -- I recognize this as -- as very routine.
3    Q.  Okay.  We don't have invoices for every month, and I
4        could lay them out here, right, and we could go, "Oh,
5        no.  August of 2013, we don't have it."
6          Do you know whether there is an invoice for every
7        month?
8    A.  I'm going to presume that I was paid based on those
9        invoices.
10   Q.  Yeah.  That doesn't really match up with when they did
11       pay you.  Sometimes the invoice got there after they
12       paid, and sometimes we don't have an invoice.  So,
13       that's why I'm asking.
14   A.  I would imagine that it always went out, and maybe the
15       timing had to do with some of our holidays or stuff, you
16       know.
17   Q.  Okay.
18   A.  It's assumption again.
19   Q.  The best you can estimate is, you always did it; is that
20       fair?
21   A.  To my memory and knowledge, this was a very routine
22       thing that got sent out, I thought usually at the same
23       time, but --
24   Q.  Did Patrick ever use any language with you about
25       justifying Rabbi Krakoff's potential contract in terms

Page 269

1    of whether or not there was enough work being generated
2    by JHCN patients coming to Hospice of Michigan?
3    A.  There was never a conversation to my knowledge and
4        memory.
5          And I went to him asking for him to do it as a
6        benefit to our relationship, that if I was going through
7        a transition and succession, I wanted it to be as neat
8        as possible for Hospice of Michigan; that they feel that
9        this is a continuance and -- and it's -- you know, as
10       long as it's -- it's functioning and doing the service
11       for the patients, we want to be there and presume they
12       want to be there.
13          And -- and I thought it was, you know, a -- a
14       responsible plan so that the transition did not have a
15       negative effect for the relationship, for our patients
16       and for both organizations.
17              (Discussion held off the record.)
18              (Deposition Exhibit 16 marked
19              for identification.)
20   BY MS. PRESCOTT:
21   Q.  Exhibit 16, I'm handing you right now.
22          Easy first question.
23          Is the document -- is this Jewish Hospice
24       Chaplaincy Network letterhead?
25   A.  Correct.

Rabbi E.B. 'Bunny' Freedman
March 13, 2024

Page 270

1  Q.  Okay.  And do you know -- at the bottom, it says "Other
2      hospices served during April."
3          Do you know whether this was given in April of 2021
4      or can -- do you know --
5  A.  Hold on.  Let me look at this.
6  Q.  -- when this was made?
7  A.  Let me see if I -- okay.
8          I have some indication that this was --
9  Q.  Well, it says anticipated summer of 2022 Rachel would
10     come?
11  A.  Right.
12         So -- yeah.  So, this was probably somewhere in
13     mid-2022, is my guess.
14  Q.  Okay.
15  A.  Yeah.  This is after --
16         MR. McGORISK:  Don't guess.
17  BY MS. PRESCOTT:
18  Q.  All right.  Let's ask some --
19  A.  No, I want to --
20         THE REPORTER:  I'm sorry?
21         MR. McGORISK:  -- was also 2021, apparently.
22  A.  No, here is when --
23         THE REPORTER:  I'm sorry.  Are we off?  Sorry.
24         MR. McGORISK:  All right.  Off the record for a
25     second.

Page 271

1          (Discussion held off the record.)
2  BY MS. PRESCOTT:
3  Q.  Do you know what the date is?
4  A.  Pardon?
5  Q.  Do you know what the date of the document is?
6  A.  I do not know the date.
7  Q.  Okay.  Because we can read the rabbinic intern's entries
8      and make some guess, but you don't -- you couldn't
9      testify; is that fair?
10  A.  Yeah.  That's correct.
11  Q.  Okay.  Some questions I just want to understand about --
12     okay.  "Auxiliary --" "Auxiliary Rabbis."
13  A.  Uh-huh.
14  Q.  Are those the rabbis we talked about earlier that we
15     called like pulpit rabbis in another part of the
16     deposition?
17  A.  This is a listing of a number of rabbis that like I --
18     you see here retired.
19         So, it -- it consists of a lot of public rabbis.
20     It -- it consists of some other chaplains that are
21     working in other organizations like Jewish Senior Life,
22     and these are the people that we frequently used because
23     they were very responsive and had constituents that --
24     that we served.  And -- yeah.
25  Q.  When you talk about using them, you mean they were the

Page 272

1      assigned spiritual care advisor for a patient at Hospice
2      of Michigan but not paid by Hospice of Michigan --
3  A.  Right.
4  Q.  -- or JHCN?
5  A.  Correct.
6  Q.  Okay.  Then, at the bottom, there's some information
7      about weekly census and it says:
8              "Average Hospice of Michigan patients served
9          in April:  35 to 38 weekly."
10         Is your understanding that, okay, your own internal
11     records would show we've got 35 to 38 people this month
12     that we have some spiritual care role for?
13  A.  Uh-huh.  Uh-huh.
14  Q.  Yeses and nos.
15  A.  Yes.  Yes.
16  Q.  And by "we," that could include you or Mr. Krakoff or
17     Ms. Kaluzny or Rabbi Rabin or --
18  A.  Yeah.
19  Q.  But it also could be any of the auxiliaries, too?
20  A.  Right.
21  Q.  Okay.  And is --
22  A.  It looks -- looks to me like a roster of people
23     that were commonly serving JHCN patients.
24  Q.  The next line says:
25              "Average JHCN Hospice Census:  --"

Page 273

1      So, we know there's a total census document that
2      shows some people are just being followed and some
3      people are in palliative.
4  A.  Uh-huh.
5  Q.  This number of hospice census of 90 to 95, was that
6      about -- was that pretty -- pretty steady in '21 and
7      '22?
8          MR. McGORISK:  Object to form.  Vague.
9  A.  The -- I mean, we're talking COVID, post-COVID.  It was
10     very lopsided during that period.  I mean, it soared.
11     It surged or whatever you want to say, and then it went
12     down, and it had to do with avail-- if they let us in
13     the building, they didn't, people called us, they
14     didn't.
15         That was a very complicated time.  So, to jump at
16     and say this was average, this was a snapshot.
17  BY MS. PRESCOTT:
18  Q.  Okay.
19  A.  That's all I could say.
20  Q.  Okay.
21         MR. McGORISK:  Are you doing okay?
22  A.  I'm doing great.
23         MR. McGORISK:  Okay.
24  A.  Having fun.
25         (Discussion held off the record.)

Page 274

BY MS. PRESCOTT:

2  Q.   Do you remember any discussion or meetings with anyone
3       with -- let's just narrow it to Patrick or Patrick and
4       Bob -- related to the -- the Krakoff contract or your
5       relationship as in the ghosting period; right?
6            We talked about that period, from sometime in early
7       2021 through July of 2021.
8            Do you remember any meetings during that time?
9  A.   Again, you want to know any meetings with Patrick or --
10 A.   Bob.
11 A.   -- Bob?
12 Q.   Here, like, for example, we see these -- "Quick touch
13      base with Rabbi re contract," May of 2021.
14           That's Bates 12391.
15           Do you remember any contents to any such meeting,
16      if it happened?
17 A.   So, there were a lot of calls from -- from me, texts,
18      e-mails to -- to Patrick during that period.
19           I mentioned a meeting that probably happened in
20      20- -- no.  That was probably '22.
21           Your -- your time frame you're looking for?
22 Q.   Well, I just handed you a meeting notice from May of
23      '21.
24           Do you remember whether you had a meeting and, if
25      so, whether it was discussed -- or what was discussed

Page 275

1       about "contract"?
2  A.   So, as I was mentioning, I -- I try to -- I tried to
3       reach out numerous times, and there were calls.  And I
4       explicitly -- we don't -- but I can't date them exactly.
5       But it was probably in the year 2021.
6  Q.   Were you just kind of getting put off like just vague --
7  A.   Being ghosted, yeah.
8  Q.   -- and --
9  A.   And -- you know, once in a while, we talk.  I
10      reached him.  He felt compelled to -- to get back to me,
11      and we talked, and they -- they didn't add up to very
12      much.
13 Q.   Okay.  So, there was no content that you do recall of
14      any substance?
15 A.   No.
16 Q.   Okay.  Same question -- and we have another one in
17      August of 2021, August 2nd, 2021?  7-30 of 2021.
18           I mean, basically, these meeting notices, do you
19      remember any content from any -- any --
20 A.   I mentioned to you a meeting that we had in -- in -- in
21      our offices, which I think happened during 2021,
22      where -- which was an extensive meeting.  We had a lot
23      of staff people there.  And but this -- conference room
24      in the galleria.
25           So, this has a location.

Page 276

1            Yeah.  I think -- yeah.  That's where the hospice
2       offices are.
3            That sort of makes sense that we had a meeting
4       there.
5            I mean, this is all about pressing him to -- to
6       move on this thing.
7  BY MS. PRESCOTT:
8  Q.   Any content you do remember from any meetings in June or
9       July at all with Patrick Miller -- June or July of 2021?
10 A.   Your question is that --
11 Q.   Do you have any memory of any --
12 A.   The content of the meetings?
13 Q.   Yes, in July -- June or July of 2021.
14 A.   The one that I mentioned in the office was --
15 Q.   That's the one with the invoice?
16 A.   No.
17 Q.   Oh, okay.
18 A.   That was where Patrick met with us to assuage our
19      concerns, and it didn't assuage our concerns.  And he
20      was stalling, sort of, and, you know, vague.
21 Q.   This is the arrogant, vague meeting?
22 A.   Yeah.  Yeah.  Yeah.  Right.
23 Q.   Okay.  And have you told me everything you can remember
24      of the details of that meeting?
25 A.   I don't remember specifically.

Page 277

1       MS. PRESCOTT:  Okay.  Why don't we take a break so
2  I can go through my notes, just make sure I'm done.  I
3  think I'm done or very close to done, and if you give me
4  10 minutes, I'll check back in.
5            (Short recess at 5:06 p.m.)
6                    *   *   *
7            (Record resumed at 5:24 p.m.)
8       MS. PRESCOTT:  A couple of questions here just to
9  finish up.
10 BY MS. PRESCOTT:
11 Q.   Okay.  Did you ever hear anyone at Hospice of Michigan
12      talk about separating or terminating Greg Parry?  Did
13      they ever talk about that with you?
14 A.   No.
15 Q.   Did anyone ever tell you after the fact why it could
16      happen?
17 A.   I learned only from the depositions.
18 Q.   Okay.  Did you use text messages to communicate with
19      anyone at Hospice of Michigan?
20 A.   I'm sure I did.
21 Q.   Okay.  And did you ever talk -- for example, during the
22      ghosting, when you're trying to track Patrick down and
23      get him to call you back or those kinds of things, did
24      you use your phone or texting mechanisms to talk about
25      any of the things we've talked about today?

Rabbi E.B. 'Bunny' Freedman
March 13, 2024

Page 278

1  A.   I presume so.
2  Q.   Okay.  Have you looked in your phone?
3  A.   Well, not talking -- talking -- yeah, talking about like
4       where are you, let's do a meeting, so on and so forth.
5  Q.   Fair.
6            Have you looked in your phone for documents related
7       to this case at any point --
8  A.   I haven't.
9  Q.   -- or text messages?
10 A.   No.
11 Q.   Okay.  Can you -- do you -- would you have anything
12      stored back?  Have you deleted them?
13 A.   The --
14            MR. McGORISK:  You've still got the same phone?
15 A.   No.  When did -- I got a new phone about two months ago.
16 BY MS. PRESCOTT:
17 Q.   Okay.
18 A.   And I don't know where I have --
19 Q.   Did the texts come over, though?
20            They usually throw them over.
21 A.   So, your -- answer an earlier question is, it wouldn't
22      be my habit to send over documents.
23            THE REPORTER:  "Would" or "would not"?  Sorry.
24 A.   I don't do -- with texts.
25            THE REPORTER:  "Would" or "would not be"?

Page 279

1  A.   Pardon?
2            MR. McGORISK:  "Would not be"?
3            THE REPORTER:  "Would" or "would not"?
4  A.   I'm sorry.
5  BY MS. PRESCOTT:
6  Q.   It would be your habit or it would not be your habit?
7  A.   It would not be my habit.  It would be -- I'm not sure I
8       would know how to do it, even.
9  Q.   Fair.
10           All I want to understand is if you have texts going
11      back more than two months ago.  Like if you went in your
12      phone and looked for a text from your family or your
13      friends --
14 A.   I got a new phone within the last three months or
15      something.
16 Q.   Well, don't delete any texts that may have to do with
17      anything we talk about today, if you -- if you would.
18 A.   Sure.
19 Q.   Did you ever work with Terre Herro on anything to do
20      with --
21 A.   Carrie?
22 Q.   Terre, T-e-r-r-i(sic).
23 A.   Thank you.
24           MS. SMITH-MORRIS:  T-e-r-r-e.
25           MR. McGORISK:  Yeah.

Page 280

1  A.   Okay.  However.  I got it.  Terre.
2  BY MS. PRESCOTT:
3  Q.   Herro --
4  A.   What?
5  Q.   -- last name Herro -- on anything to do with IT with
6       HOM?
7  A.   I'd probably remember that name, and I do not.
8  Q.   Okay.  How about Eric Kaplan?  Did you ever work with
9       Mr. Kaplan?
10 A.   I did not.
11 Q.   Okay.  Have you had any training on the anti-kickback
12      statute?
13 A.   Yes.
14 Q.   Okay.
15           MR. McGORISK:  Objection.  Asked and answered.
16 BY MS. PRESCOTT:
17 Q.   Where did you get that training from?
18           You said you -- did you get training after -- I
19      know Natalie told us she got training after she was
20      separated from Hospice of Michigan.  Right?
21           Did you put on a training at JHCN about the
22      anti-kickback statute in the last year or two?
23 A.   Now, same one -- only the same one that Natalie refers
24      to.  I was --
25 Q.   Okay.  But that was after she left Hospice of Michigan;

Page 281

1       right?
2  A.   After who?
3  Q.   After Natalie left Hospice of Michigan?
4            I'm just trying to put it in time.
5  A.   I presume -- yeah, I know you're trying to.  I'm trying
6       to be somewhat accurate and, you know, be as truthful as
7       I can.
8            Yeah.
9            No, give me a second.
10           I can't think as well at 5:30 as I did at 9:00.
11           We're at -- what's the timeline?
12 Q.   Can I -- I'll ask a different -- I'll withdraw it.
13 A.   I think she was -- after she was -- for sure, it was
14      after she was released.
15 Q.   Okay.
16           For -- do you know of any training that you
17      attended on the anti-kickback statute before, if we take
18      as a timeline, Natalie's release from Hospice of
19      Michigan?
20 A.   I believe that I took training at Hospice of Michigan.
21 Q.   Okay.
22 A.   Yeah.
23 Q.   So, that would have been prior to --
24 A.   I think, yeah.
25 Q.   -- just let -- it would have been prior to 2010?

Page 282

1  A.  Yeah.  Probably.
2  Q.  Can you -- do you know what the definition of what
3      counts as a referral is specific to that law?
4  A.  I'm somewhat -- I think I'm rather -- more familiar than
5      a lot of people.  I think I'm pretty clear.
6  Q.  What's your understanding?
7  A.  I understand that if there's ever an agreement for two
8      parties to provide any gifts or money or exchange in
9      kind or -- to make referrals that involve federal funds,
10     there could be very serious legal consequences to that,
11     including jail time and fines and, you know -- that's
12     the quickie.
13 Q.  Fair.
14        All I wanted to do was break out what it means to
15     make a referral as that law defines it.
16        It might be different than the man on the street or
17     the lady on the street.
18        Do you know what the statute definition is?
19 A.  The statute definition of a referral, the word
20     "referral"?
21 Q.  Well, yeah.  What you just said.
22        You know, providing a value or gift for money and
23     making an agreement to make a referral.
24        What is the "to make a referral"?  What is -- what
25     counts?

Page 283

1  A.  That means a referral for services that someone will
2      be -- the -- the organization or the person or the
3      doctor, whatever it is, will be remunerated,
4      particularly with federal funds.
5  Q.  But what is the "refer"?  What is it -- what counts?
6        Does it count to -- to suggest?  Does it count --
7  A.  Could you ask the question --
8  Q.  Yeah.
9        Like does it count if you suggest?  Does it count
10     if you recommend?  Do you have to have -- is it only a
11     referral if it comes on a certificate that's engraved?
12        Like what -- what is a referral?
13 A.  I would say, but I don't know, that this is part of the
14     statute exactly, in the various trainings that I've
15     gotten, that -- that if it -- it is something that ends
16     up leading a patient -- we'll talk about patients --
17     leading a patient to get to -- to get services that
18     there's a remuneration for, it's called a referral.
19     Anything that would lead to that.
20 Q.  Okay.  There was talk about, you know, within Hospice of
21     Michigan shortly before my client was separated that all
22     it was going to take was one person to be a
23     whistleblower.
24        Did anyone ever discuss that with you, that
25     concept, that all it's going to take for some serious

Page 284

1      problems was for there to be a whistleblower; one person
2      is all it took?
3  A.  I don't think so.  Not that stands out in my memory.
4  Q.  Did --
5        MR. McGORISK:  Can you take your hand away from
6      your -- or he's going to get --
7  A.  Yes.
8        I'm sorry.
9  BY MS. PRESCOTT:
10 Q.  Lee -- from time to time, did you meet with Lee Ann
11     Myers or have interactions and exchanges with Ms. Myers?
12 A.  Not that I -- no, I don't think so.
13        MS. PRESCOTT:  Okay.  Why don't you play the piece
14     of the conversation.  We can mark this tape.
15        I guess that would be --
16        THE REPORTER:  17.
17        MS. PRESCOTT:  17.
18        MR. McGORISK:  Well, what's the purpose for him
19     listening to it now?
20        MS. PRESCOTT:  Because he's -- he's used, and he's
21     talked about in this piece.
22        (Audio recording played.)
23        (Audio recording stopped.)
24 BY MS. PRESCOTT:
25 Q.  Okay.  So, I know -- we'll mark the document as an

Page 285

1      exhibit, but we just heard a portion of the tape that
2      was at about 33 minutes to 34 minutes, and the woman
3      speaking was Myers.  Parry is the man.  And they're
4      talking about "all it's going to take is one person."
5        Did you hear -- did you hear the "it's only going
6      to take one person"?
7  A.  I couldn't make it out.  That's fine.
8        MS. PRESCOTT:  Okay.
9        MS. SMITH-MORRIS:  Do you want me --
10       MS. PRESCOTT:  Yeah, you want to --
11 BY MS. PRESCOTT:
12 Q.  I think if you heard it again --
13 A.  Do you want me to come over to the other side?
14 Q.  If you want.
15       MR. McGORISK:  You can just assume that that -- ask
16     the question, assuming that that's what she said.  I
17     mean --
18       MR. HERSCHFUS:  I don't think he heard.
19 BY MS. PRESCOTT:
20 Q.  Okay.  So, she says something to the effect of "All it's
21     going to take is one person if we disclose.  Bunny would
22     be the wild card there."
23 A.  I thought -- I think I have seen those words in the
24     deposition somewhere.
25 Q.  "Would keep me up at night.  Bunny would be the wild

Rabbi E.B. 'Bunny' Freedman
March 13, 2024

Page 286

```
 1    card here.  He would never disclose because he has so
 2    much more to lose because he is wrapped up in this many
 3    times over."
 4  A.   That's -- who is talking?
 5  Q.   That's Lee Ann Myers, the current Chief Administrative
 6    Officer of Hospice of Michigan, then CFO.
 7         Do you know what she means or do you -- about you
 8    "are wrapped up in this many times over" and "have much
 9    more to lost than Hospice of Michigan"?
10  A.   I mean she doesn't understand anything about our
11    relationship.
12  Q.   Do you agree that if the government got a hold of the
13    facts of this case, that you have much more to lose than
14    Hospice of Michigan?
15         MR. McGORISK:  He's not going to answer that.
16  BY MS. PRESCOTT:
17  Q.   Well, don't agree or not agree.
18         MR. McGORISK:  No.  He's not going to answer.
19         Don't answer.
20  BY MS. PRESCOTT:
21  Q.   Do you have much more to lose than Hospice of Michigan?
22  A.   I'm instructed by my --
23         MS. PRESCOTT:  Well, it goes to bias.  It goes to
24    the witness's -- you know, his interest in -- in
25    testimony.
```

Page 287

```
 1         MR. McGORISK:  Well, you're asking for him to agree
 2    or disagree --
 3         MS. PRESCOTT:  So, I dropped the "agree."
 4  BY MS. PRESCOTT:
 5  Q.   Right?
 6         Do you have much more to lose by the facts of this
 7    matter coming out than Hospice of Michigan?
 8  A.   My counsel --
 9         MR. McGORISK:  Object to foundation.  Requires
10    speculation on the part of the witness, and it's
11    improper hypothetical.
12  A.   And I won't answer --
13  BY MS. PRESCOTT:
14  Q.   Well, it's --
15  A.   -- on instruction of my --
16  Q.   He's not instructing you not to answer.
17         MR. McGORISK:  Not -- not on this question.
18         I mean, I -- if -- I don't know what -- for what to
19    come out?
20         It's a vague question.
21         MS. PRESCOTT:  Self-disclosure under the
22    anti-kickback statute --
23         MR. McGORISK:  He didn't do anything wrong.  He's
24    taking the position that he hasn't done anything wrong.
25    You're taking the position that he did.  And he's told
```

Page 288

```
 1    you for seven hours here he -- everything was on the
 2    up-and-up.  So, for you to -- it's an improper
 3    hypothetical.
 4         MS. PRESCOTT:  Why are you coaching him, Brian?
 5         MR. McGORISK:  He's not going to -- he's not going
 6    to admit that he had any wrongdoing; okay?  So --
 7  A.   I certainly won't.  I'll say the opposite.
 8         Can I say the opposite?
 9  BY MS. PRESCOTT:
10  Q.   You answered for most all the day --
11         THE WITNESS:  Do you want me to?
12  BY MS. PRESCOTT:
13  Q.   -- without your lawyer.
14         Do you feel comfortable answering that you have --
15    you don't agree that you have more to lose than Hospice
16    of Michigan; is that fair?
17  A.   My counsel does not want me to answer that question.
18         MR. McGORISK:  Well, no --
19  A.   I have feelings and thoughts about that but -- which
20    are completely --
21         MR. McGORISK:  I'm objecting because of the
22    improper hypothetical, and it assumes that there was
23    wrongdoing, and implied through the question itself.
24    So, to that extent, I'm going to instruct him not to
25    answer.  Because you're presupposing through the
```

Page 289

```
 1    question that there was wrongdoing.
 2         MS. PRESCOTT:  I'm just asking --
 3         THE WITNESS:  Do you want to step outside and
 4    talk --
 5         MR. McGORISK:  No --
 6         MS. PRESCOTT:  No, no, no.  I'm not -- I didn't
 7    presuppose anything.
 8  BY MS. PRESCOTT:
 9  Q.   I want to know your state of mind, as we close out here,
10    whether you feel you have more to lose because you are
11    tied up in something wrong many times over, much more to
12    lose than Hospice of Michigan?  Do you feel --
13  A.   Do I agree with that statement that I -- that I'm tied
14    up in -- with wrongdoing?
15  Q.   That -- do you feel you have a lot to lose if the facts
16    of this case come out?
17  A.   I welcome being in a court of law with -- making a total
18    oath about all that I said here today.  It's 100 percent
19    true.  And I have nothing to lose, and I won't lose
20    because everything I did was proper.
21         I have no queasiness in my stomach that this might
22    go to court and -- and be a problem.  It's not a problem
23    for me, and I have nothing to lose, except people saying
24    the wrong things and -- and implying that some of the
25    things that I read in the depositions when people lie
```

Rabbi E.B. 'Bunny' Freedman
March 13, 2024

Page 290

1   about me.
2   Q.   Are you okay -- are you comfortable that your testimony
3        and the questions here today are -- if they -- if
4        they're all known?  You're not concerned if they're
5        publicly aired in a court of law?
6   A.   Oh, yeah, I -- I would put -- if you want me to write a
7        column of what we do and -- and how we do it --
8   Q.   Just -- I'm talking about today's questions and today's
9        testimony.
10  A.   I said earlier in our conversation that I wouldn't be
11       comfortable people knowing my salary, but, of course,
12       they could look at a 990 and -- and find it.
13            But -- but, yeah, so I'm comfortable with
14       everything I said here.  Perfectly comfortable.
15  Q.   Becoming public?
16            MR. HERSCHFUS:  Well, I'm going to object.  There's
17       a protective order --
18            MR. McGORISK:  Yeah.  It's subject to a protective
19       order.  So --
20  A.   They're all making noise, and I -- that's --
21            MR. HERSCHFUS:  He's not going to admit that he
22       wants it to become public when there's a stipulated
23       protective order.
24  BY MS. PRESCOTT:
25  Q.   I thought you do.  I thought you wanted everything to

Page 291

1        come out?
2             MR. HERSCHFUS:  It doesn't matter what he wants or
3        doesn't want.  There's an organization involved there,
4        too.  There's a protective order.  So, he doesn't
5        have --
6   BY MS. PRESCOTT:
7   Q.   Which is it?  What do you want?
8             MR. HERSCHFUS:  It's what the attorneys want.
9             MR. McGORISK:  You know what --
10            MS. PRESCOTT:  It's not --
11            MR. HERSCHFUS:  It is.
12            MS. PRESCOTT:  It isn't.
13            MR. HERSCHFUS:  That's why judges sign orders.
14            MR. McGORISK:  He's not going to answer it.
15            MS. PRESCOTT:  Why are you talking?  Why are you
16       talking?
17            MR. HERSCHFUS:  That's why judges sign -- that's
18       why judges sign orders.
19            MS. PRESCOTT:  Why are you talking --
20            MR. HERSCHFUS:  If you have an issue with it -- and
21       if you have an issue with it, you can take it up with
22       the court.
23            MS. PRESCOTT:  You don't need to talk.  You're not
24       objecting.  You don't need to coach him.
25  BY MS. PRESCOTT:

Page 292

1   Q.   I just want to know what you want.
2             Do you want the facts to all come to light?
3             MR. HERSCHFUS:  I'm objecting to your
4        characterization of what was coaching --
5             MR. McGORISK:  You're --
6             THE REPORTER:  I'm sorry, guys.  One at a time.
7             MR. HERSCHFUS:  I think your behavior is
8        inappropriate when two attorneys have already instructed
9        you, and you're trying to push the witness because
10       you're looking to get some dig in or you're looking to
11       get some information, particularly that a protective
12       order prohibits you from getting.  It's not right.  Not
13       right.
14            I mean, a lot of what -- your behavior is wrong.
15       But this in particular --
16            MS. PRESCOTT:  My behavior.  Go ahead and put it on
17       the record.
18            MR. HERSCHFUS:  -- just not -- just not -- just not
19       right.
20            MS. PRESCOTT:  Tell -- tell me my behavior.
21            MR. HERSCHFUS:  Just not right.
22            MS. PRESCOTT:  Go ahead and put it on the record.
23            MR. HERSCHFUS:  Continue on.  I think you're long
24       past the seven and a half hours, too.
25            MS. PRESCOTT:  No, we're not.  We're not even

Page 293

1        close.
2             MR. HERSCHFUS:  Well, showing up a half hour late,
3        I don't think you get the -- the extra half hour.
4             MS. PRESCOTT:  We're not even close, sir.  And
5        you're locked outside and can't get in the building, and
6        we all sit around and don't gripe at you about it.
7             MR. HERSCHFUS:  Oh, I'm sure.
8             MR. McGORISK:  Let's stop the arguments --
9             MS. PRESCOTT:  Everybody has their issues --
10            THE REPORTER:  I'm sorry?
11            MR. McGORISK:  He's not going to answer the last
12       question.
13            MS. PRESCOTT:  Stop the arguments?  I didn't start
14       the arguments.
15            You don't need to talk over, and you don't need to
16       tell him not to answer when it's not privileged.
17  BY MS. PRESCOTT:
18  Q.   I just was going off your last point.
19            You want the facts that you've testified here
20       today, other than salary -- and I get that piece --
21       other than who is getting paid by what organization -- I
22       took your point on those -- other than that, you're
23       comfortable with everything being out in public?
24            MR. McGORISK:  Don't -- don't answer.
25  BY MS. PRESCOTT:

Rabbi E.B. 'Bunny' Freedman
March 13, 2024

Page 294

1  Q.  Or you're not?
2       MR. McGORISK:  I'm instructing him not to answer.
3  You're harassing the witness.  It's not even relevant.
4  It's not proportional to the needs of the case.  There's
5  a protective order in place.
6       MS. PRESCOTT:  Okay.  I just thought the witness
7  might want to answer that one, but we can close out if
8  he doesn't.
9       MR. McGORISK:  He's not answering.  I already
10 instructed him to.  So, either -- if you have any other
11 questions --
12      MS. PRESCOTT:  Fine.
13 A.  But feel free to call me.  My number is --
14      MR. McGORISK:  Don't -- hey, stop.  Stop it.
15 A.  Okay.
16      MS. PRESCOTT:  They wouldn't let me call you at
17 first, or we wouldn't have had to come to your office, I
18 promise you.
19      I pass the witness.
20      MR. HERSCHFUS:  I have no questions.
21      MR. McGORISK:  Thank you.
22      THE REPORTER:  Okay, guys.  U.S. Legal requests we
23 ask --
24      MR. HERSCHFUS:  I don't think you should let that
25 one stand on the record because she's making a

Page 295

1  representation on the record that contravenes the letter
2  that you wrote to her about that, and it's absolutely
3  untrue.
4       MR. McGORISK:  Yeah.  You knew I was representing
5  him, through my e-mail, I told you, for purposes of the
6  deposition.  And then instead of sending me a copy of
7  the subpoena and the notice, okay, you try to serve him
8  separately.
9       MS. PRESCOTT:  Brian, you said we -- you wouldn't
10 accept service.  I begged you to do it.
11      MR. McGORISK:  I never said that.  I said -- on
12 January 9th, I said I represent --
13      MS. PRESCOTT:  You said you wouldn't, and I needed
14 to go ahead and get the deposition going.  So, you
15 wouldn't accept service, and he, who didn't meet with me
16 or talk to me or never known me, and I can't comment on
17 him because I don't know him, wasn't any part of it
18 because he wasn't in on it.
19      So, don't -- I don't know why this person over here
20 is telling us what happened didn't happen.  He wasn't
21 part of it, and I didn't say anything that was untrue.
22      MR. HERSCHFUS:  Do me a favor --
23      MS. PRESCOTT:  "Please advise if you are accepting
24 service of subpoena for Rabbi Freedman, January 4th."
25      MR. HERSCHFUS:  How -- specifically mark that, some

Page 296

1  of the last comments she just made.
2       I -- I think some of this has to go to the judge.
3  Your behavior is just -- just condemnable.
4       MS. PRESCOTT:  Okay.  Go ahead, Brian.
5       MR. HERSCHFUS:  It's just ridiculous.
6       I mean, there's got to be a level of -- of -- just
7  get professionalism.
8       MS. PRESCOTT:  Why don't you put on the record who
9  you represented yesterday before you start telling me
10 about professionalism?
11      MR. HERSCHFUS:  Well, then you take -- why don't
12 you take that to the court?  Why don't you take it to
13 the court and let's see who gets sanctioned, you or me?
14      MS. PRESCOTT:  Okay.
15      Go ahead.  I'm sure you know the way to Magistrate
16 Grant's chambers.
17      MR. HERSCHFUS:  You know, I --
18      MS. PRESCOTT:  Go ahead and make --
19      MR. HERSCHFUS:  I really wish this was my case.
20 Because I'll tell you something.  If you think your
21 behavior --
22      MS. PRESCOTT:  I'm sure you do, Brian --
23      MR. HERSCHFUS:  If you think your behavior --
24      MS. PRESCOTT:  -- so you could control it.
25      THE REPORTER:  I'm sorry?

Page 297

1       MR. HERSCHFUS:  If you think your behavior be
2  allowed -- I don't know any judge that would allow it.
3       MS. PRESCOTT:  And I don't know any judge that
4  would allow it to go by that you lied to them either.
5       MR. HERSCHFUS:  Yeah.  Yeah.  I'm sure --
6       MS. PRESCOTT:  But go ahead and prove me wrong.
7       MR. HERSCHFUS:  Take -- take it to the court.  Take
8  it to the court.
9       MS. PRESCOTT:  I did.
10      MR. HERSCHFUS:  You know how to get to the court.
11      MS. PRESCOTT:  I did, and you told the judge what
12 was convenient.
13      MR. HERSCHFUS:  You know how to get to the court.
14      Take it up.
15      MS. PRESCOTT:  We can go off, John.
16      THE REPORTER:  Okay, guys.  U.S. Legal requests we
17 ask counsel on the record if they'd like to order.
18      Sarah, would you like to order the transcript
19 today?
20      MS. PRESCOTT:  Yes.
21      THE REPORTER:  Thank you.
22      David, would you like a copy?
23      MR. DEROMEDI:  Yes.  Yes.
24      THE REPORTER:  Brian, would you like a copy?
25 Either Brian?

Rabbi E.B. 'Bunny' Freedman
March 13, 2024

Page 298

1    MR. McGORISK:  No, I don't need a copy.
2    (Discussion held off the record.)
3    THE REPORTER:  Brian, did you want to order the
4  transcript?
5    MR. HERSCHFUS:  I'll talk to --
6    THE REPORTER:  Okay.  Thanks.
7        (Deposition Exhibit 17 marked
8        for identification.)
9    (Deposition concluded at 5:42 p.m.)
10                  *   *   *
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 299

1  STATE OF MICHIGAN )
2  COUNTY OF OAKLAND )
3            CERTIFICATE OF NOTARY PUBLIC
4      I do hereby certify that the witness, whose
5  attached testimony was taken in the above matter, was
6  first duly sworn to tell the truth; the testimony
7  contained herein was reduced to writing via remote
8  attendance of the witness by means of stenography;
9  afterwards transcribed; and is a true and complete
10  transcript of the testimony given.
11      I further certify that I am not connected by blood
12  or marriage with any of the parties; their attorneys or
13  agents; and that I am not interested, directly or
14  indirectly, in the matter of controversy.
15      In witness whereof, I have hereunto set my hand
16  this day at Highland, Michigan, County of Oakland, State
17  of Michigan on Friday, March 22, 2024.
18
19
20  _____
21      John J. Slatin, RPR, CSR-5180
22      Certified Shorthand Reporter
23      Notary Public, Oakland County, Michigan
24      My commission expires:  July 25, 2029
25